**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ST. CHARLES PARISH, A POLITICAL SUBDIVISION OF THE STATE OF LOUISIANA, AND MATTHEW JEWELL, IN HIS OFFICIAL CAPACITY AS ST. CHARLES PARISH PRESIDENT, *Plaintiffs*, v. FEDERAL EMERGENCY MANAGEMENT AGENCY, *Defendant*. | Civil Action No. 2:23-cv-01369 Section P Judge Papillion Magistrate Judge North |

<u>**DECLARATION OF TAMMI HINES**</u>

I, Tammi Hines, do hereby declare and state as follows:

1.      I am the Senior Director of the Information Management Division, Office of the Chief Administrative Officer at the Federal Emergency Management Agency ("FEMA"), a component of the United States Department of Homeland Security ("DHS"). The Office of the Chief Administrative Officer manages FEMA facilities; occupational safety, health, and environmental programs; information management; accountable property; and other support services to enable FEMA's mission success. In my capacity as Senior Director of the Information Management Division, I am responsible for administering FEMA's statutory information management programs to comply with its obligations under the Federal Records Act, Paperwork Reduction Act, and Freedom of Information Act ("FOIA"). I have held this position since November 22, 2020. I have over 20 years of experience in information management within the federal government.

2.      In addition to my official role as a Senior Director, I am the acting Chief of the Disclosure Branch. I have been the acting Chief of the Disclosure Branch since April 2024.

3.       The Disclosure Branch, which is within FEMA's Information Management Division, handles all FOIA requests for FEMA, including records related to disaster response and relief and their related grants, the National Flood Insurance Program ("NFIP"), or any other FEMA responsibilities and actions. The Disclosure Branch presently consists of 17 federal employees and contractors, whom I oversee. These 17 employees and contractors are divided into teams, including Intake, Processing, as well as Appeals and Litigation.[1] The Appeals and Litigation Team is limited to one Government Information Specialist and one contractor who was hired in July 2023. They handle all litigation processing for the Disclosure Branch.

4.      Because of its responsibility for FOIA requests across FEMA, the Disclosure Branch frequently works with various FEMA components to search for and process records.

5.      Given its scope, the Disclosure Branch handles many FOIA requests. On average, the Branch receives 20–40 FOIA requests per week. In November 2022, when Plaintiffs submitted their FOIA request, the Branch received approximately 28 FOIA requests per week. From November 1, 2022, to September 30, 2023, when FEMA began monthly productions of responsive records to Plaintiffs, FEMA received 1,121 requests. From September 30, 2023, to March 31, 2024, when FEMA concluded its monthly productions, FEMA received 695 requests. Of the 1,816 requests received from November 1, 2022, to March 31, 2024, 215 requests are still open. In total, there are 729 open requests.

---

[1] Seven of these employees are paid through disaster funding and can only perform minimal work not specifically related to a disaster. As discussed below, Plaintiffs' FOIA request is not specific to a disaster.

6.      Due to my official duties as Senior Director of the Information Management Division and acting Chief of the Disclosure Branch, I am familiar with the procedures followed by the Disclosure Branch in responding to requests made pursuant to FOIA.

7.      I am familiar with the Complaint filed by Plaintiffs St. Charles Parish and parish president Matthew Jewell, seeking disclosure of records sought through FOIA.

8.      The statements contained in this declaration are based upon my personal knowledge; upon information provided to me in my official capacity, including information provided by members of the Disclosure Branch, other FEMA components involved in searching for and processing records in this case in coordination with the Branch, and third-party vendors that submitted information subject to the FOIA request at issue; and upon conclusions I reached based on that knowledge or information.

## FEMA's Search for Responsive Records

9.      The NFIP is a federal flood insurance program, administered by FEMA, that services nearly five million policies across the United States.

10.     Risk Rating 2.0 is FEMA's actuarial update to the NFIP's pricing approach. FEMA formally announced Risk Rating 2.0 on its website in April 2021 and began applying it to NFIP policies on October 1, 2021.

11.     FEMA contracted with three vendors to license their flood catastrophe models—CoreLogic, Inc. (an information services company focused on the property industry), Verisk Analytics, Inc. (a data, analytics, and technology provider that works with the insurance industry and government organizations, and that helped pioneer the field of probabilistic catastrophe modeling used by insurers), and KatRisk LLC (a catastrophe modeling company). CoreLogic was also contracted by FEMA to acquire replacement cost values to complete catastrophe modeling

work. FEMA also contracted with Milliman, Inc., an industry-leading actuarial firm, to take the catastrophe modeling output from the other vendors and use that output to assist FEMA in developing Risk Rating 2.0.

12.     The use of catastrophe models has been standard insurance industry practice for over 20 years. The National Association of Insurance Commissioners ("NAIC") describes a catastrophe model as "a computerized process that simulates potential catastrophic events based on historical events. The simulated events generate scenarios of frequency, severity, and location. Catastrophe models incorporate data, technology, scientific research, engineering methods, and statistical analysis to model complex scenarios and events."[2]

13.     The CoreLogic, KatRisk, and Verisk catastrophe models were run by FEMA and the output was provided to Milliman to create the rating plan; as a result, all of the relevant Risk Rating 2.0 modeling data was under Milliman's possession. The output of the catastrophe models contains estimated losses by each model vendor, reflecting their underlying assumptions and proprietary data. NFIP policyholder insurance data, containing geospatial location information about a structure and the selected coverage of insurance applied to that structure, is imported into each vendor's catastrophe model. Those vendor models determine the flood hazards exposed to a given property based on its location as well as the vulnerability of the location based on its structural characteristics. Each model's view of hazard and vulnerability is unique to that model's assumptions and the data sourced by that model and vendor to inform the riskiness of the properties being analyzed. Together those components allow a model to estimate losses in a given year that

---

[2] NAIC Center for Insurance Policy and Research, *Catastrophe Models (Property)* (last updated Mar. 20, 2024), https://content.naic.org/cipr-topics/catastrophe-models-property.

the structure could experience. These loss estimates are derived directly from each catastrophe model vendor and thus reflect each vendor's proprietary data underlying those loss estimates.

14.    On November 3, 2022, Plaintiffs submitted a FOIA request to FEMA requesting "all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana, in Risk Rating 2.0." The Disclosure Branch acknowledged Plaintiffs' request by email on November 7, 2022, and it assigned it the tracking number 2022-FEFO-00111.

15.    On November 23, 2023, the Disclosure Branch asked Plaintiffs to clarify the specific data being sought, so as to assist the Branch in finding records responsive to Plaintiffs' broad request for Risk Rating 2.0 data. Plaintiffs responded that same day stating that "[t]he NFIP uses risk modeling to determine how much premium to charge participants who participate in the flood insurance program. I am requesting the risk model used to assign premiums to St. Charles Parish residents. I believe Milliman was the company that did the modeling for FEMA?"

16.    FEMA conducted two searches in response to Plaintiffs' FOIA request—the first beginning on November 25, 2022, and ending on January 6, 2023, and the second, prompted by Plaintiffs' administrative appeal, beginning on March 8, 2023, and ending on April 3, 2023.

**A.    FEMA's Initial Search**

17.    On November 25, 2023, the Disclosure Branch commenced its search by referring

Plaintiffs' FOIA request to a FOIA liaison[3] in FEMA Region 6,[4] where Plaintiffs are located.

18.     The Disclosure Branch referred Plaintiffs' FOIA request by emailing a FOIA "tasker" to the Region 6 FOIA liaison. A tasker is a FOIA search information form that initiates a search and ultimately documents how the search was performed. It includes a summary of the FOIA request, the name of the office tasked to search, the name of the employee who performed the search, where the search was performed, what search terms were used, and what was located. The employee who completes the search normally provides the search details in the tasker. The tasker here included the following summary of the FOIA request: "[p]lease provide all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St Charles Parish, Louisiana, in Risk Rating 2.0."

19.     On December 2, 2022, the Region 6 FOIA liaison responded to the referral by informing the Disclosure Branch that it had conducted a search and determined that the region did not have access to the records requested because NFIP risk modeling data utilized to determine premiums belongs to the actuaries within the Federal Insurance Directorate ("FID"), an organization within FEMA that manages the NFIP.[5] As part of its responsibility in administering

---

[3] FOIA liaisons serve as points of contact that assist the Disclosure Branch in searching for records related to particular FEMA regions and programs. The Disclosure Branch tasks these liaisons with searches for their respective regions and programs. The liaisons coordinate with regional and program officials to gather responsive records, and they work with the Disclosure Branch to ensure that searches are performed correctly and that responsive records are submitted to the Disclosure Branch for processing.

[4] FEMA Region 6 consists of the states of Arkansas, Louisiana, New Mexico, Oklahoma, and Texas. FEMA Region 6's office is located at Federal Regional Center, 800 North Loop 288, Denton, TX 76209.

[5] Specifically, Region 6 management analyst Stephen Murphy consulted with the region's flood management insurance branch and determined that the region did not have any risk modeling data, as such data was the responsibility of FID.

the NFIP, FID is responsible for estimating and charging premiums for NFIP policies under Risk

Rating 2.0. The Region 6 liaison recommended that the Disclosure Branch refer Plaintiffs' FOIA

request to FID, which it did that day.

     20.     On January 6, 2023, FID determined that it could not satisfy Plaintiffs' request

because the request sought trade secrets protected under FOIA Exemption 4. FID interpreted

Plaintiffs' request for "all data … used to calculate" NFIP premiums in St. Charles Parish as an

indirect way of seeking the trade-secret geospatial information that feeds into the rating engine for

Risk Rating 2.0, which FEMA referred to collectively as "the engine" in its response.[6] FID

construed Plaintiffs' request in this manner because the rating engine generates premiums, and

because the premiums for St. Charles Parish would be informed by trade-secret geospatial data

FEMA uses for that area. Between August 2019 and December 2023, FID received 28 FOIA

requests for information pertaining to Risk Rating 2.0. These Risk Rating 2.0 requests were each

reviewed on an individual basis for responsive records maintained by FID.[7] Of the 28 FOIA

requests for information about Risk Rating 2.0, Exemption 4 was invoked only in three cases. Each

of these cases sought geospatial information in the Risk Rating 2.0 ratings engine. In the case of

Plaintiffs' request, FID determined that geospatial layers specific to St. Charles Parish, as well as

the remaining geospatial layers for the country that informed the NFIP's rating approach for the

---

[6] The rating engine is the software system that FEMA uses to combine all aspects of the rating data and methodology to generate premiums for a quote or policy.

[7] Trends in FOIA casework about Risk Rating 2.0 led FID to publish several exhibits online on FEMA's website that describe the cost of flood insurance for single-family homes under the NFIP's pricing approach. These exhibits used insights from the FOIA process for FID to identify highly sought-after documents that could be released publicly to increase the program's transparency. FEMA has continued to maintain these public-facing datasets, which have been available for several years, by updating them with more current data on the price for single-family policies under the NFIP.

area, were a trade secret. Because FID interpreted Plaintiffs' request to include geospatial data for the rating engine, which it had consistently determined to be exempt under Exemption 4, it did not conduct a search for Plaintiffs' request.[8]

21.     FID had developed a standardized response to ratings engine FOIA requests, which explained that the ratings engine algorithm is a protected "trade secret" under Exemption 4. FEMA's January 27, 2023, final response letter to Plaintiffs used that standardized response, stating in relevant part:

> The development, implementation, or operation of the National Flood Insurance Program's rating methodology known as Risk Rating 2.0 can be withheld from release under FOIA Exemption 4. The Risk Rating Engine was designed using privately held data that the US government purchased through contracting. Forcing the government through FOIA to reveal the proprietary data of the third party would breach exemption 4 of the Freedom of Information Act which protects trade secrets and commercial financial information. The modeling information is very valuable and the company that produced it would be at a significant loss if it were to be made public.
>
> …
>
> We recommend you use OpenFEMA. OpenFEMA is the public's resource for FEMA program data which promotes a culture of Open Government and increasing transparency, participation, and collaboration among the Whole Community in support of FEMA's mission to help people before, during, and after disasters. The website for OpenFEMA is OpenFEMA | FEMA.gov.

22.     FID referred Plaintiffs to OpenFEMA because, apart from the trade secret information that Plaintiffs sought, it believed that the publicly available information on the website would satisfy their request for the data used to calculate NFIP premiums under Risk Rating 2.0.

---

[8] FID employee Heath Mitchell made the determination regarding Plaintiffs' FOIA request. Mr. Mitchell coordinates the assignment of FOIAs across FID in collaboration with FEMA's Disclosure Branch and Office of Chief Counsel. He took responsibility for assessing Plaintiffs' FOIA request because FID primarily handles FOIA requests pertaining to Risk Rating 2.0. He consulted John Heaton, Deputy Chief Counsel in FEMA Chief Counsel's Information Law Branch, and Adam Muffett, Attorney Advisor in FEMA Chief Counsel's Federal Insurance and Mitigation Division, in making the Exemption 4 determination.

**B.**      **FEMA's Second Search**

23.      On February 27, 2023, Plaintiffs administratively appealed FEMA's final response. Plaintiffs argued that FEMA improperly failed to state in its final response whether or not it possesses the requested information, and that "it is highly improbable that FEMA was unable to recover a single responsive and non-confidential document." Plaintiffs stated that "it seems the agency misunderstood the[ir] request." They clarified that, contrary to FEMA's interpretation of their FOIA request, the request "did not seek third party proprietary data" in FEMA's risk rating engine "or any type of algorithm that FEMA used to calculate the NFIP premiums in Risk Rating 2.0," but instead "seeks the data that is crucial to the residents of St. Charles Parish and will assist in understanding the risk rating in order to intelligently protect and advance the interest of its citizens."

24.      Plaintiffs also argued in their administrative appeal that FEMA's response was improper because it was vague and failed to state whether FEMA reviewed any documents, whether the agency determined if any documents were responsive, or how it determined whether the documents constituted trade secrets. And Plaintiffs argued that FEMA failed to rely on the appropriate standard for what constitutes "confidential" information under Exemption 4.

25.      FEMA assigned Plaintiffs' appeal the tracking number 2023-FEAP-0003. In response to Plaintiffs' appeal, FEMA initiated a second search for responsive documents on March 8, 2023, once again referring Plaintiffs' request to FID and also providing the parties' various correspondences.

26.      Based on its review of these materials, FID teams associated with actuarial sciences, data analytics, and insurance systems believed that Plaintiffs' appeal was vague as to the specific data Plaintiffs had requested. However, FID noted that Plaintiffs referenced the Milliman

data that was used to create the Risk Rating 2.0 rating methodology and determined that data to be the potential focus of Plaintiffs' request.[9]

27.     On March 16, 2023, FID contacted Plaintiffs asking for "specific examples of records that fall under 'all data' described in the request."

28.     Plaintiffs responded on March 23, 2023. Plaintiffs did not provide any examples, stating it was "impossible" to do so "because FEMA has refused to disclose any information that it used to determine premiums charged by the NFIP for flood insurance coverage."

29.     In the following two weeks, from March 23, 2023, to April 3, 2023, FID and the Disclosure Branch collectively concluded that FEMA had misinterpreted Plaintiffs' FOIA request and had documents potentially responsive to the request.[10] Based on the offices' reconsideration of the FOIA request in light of Plaintiffs' appeal, FID and the Disclosure Branch determined that the request did not seek trade-secret ratings-engine data and could not be satisfied simply with publicly available data regarding rate calculations, but instead sought non-publicly-available data: the Milliman data (and subsumed data from the other catastrophe modeling vendors) underlying Risk Rating 2.0. And FID and the Disclosure Branch determined that records that FEMA had previously collected but had not yet released for a prior FOIA request from a separate requester contained all the Milliman data potentially responsive to Plaintiffs' request.

30.     The prior FOIA request, an August 17, 2022, FOIA request with tracking number 2022-FEFO-00776, had sought "[a]ll actuarial communications, reports, spreadsheets, data files, and other records provided to FEMA by Milliman, Inc. in connection with Milliman's work under

---

[9] FID reached this determination primarily through the analysis of Heath Mitchell and Kevin Long, FID's Insurance Systems Branch Chief.

[10] This determination included the acting Actuarial and Catastrophic Modeling Branch Chief Rebecca Dunn and actuary Emily Slater as well as FID's Reinsurance Branch Chief, John Kulik.

Risk Rating 2.0." As the prior request had noted, FEMA's January 18, 2022, public report titled *Risk Rating 2.0 Methodology and Data Sources*[11] had stated that Milliman had worked for FEMA to develop Risk Rating 2.0 and that "Milliman's work under Risk Rating 2.0 has been fully documented in over 40 separate actuarial communications to FEMA provided over the course of the engagement, including both actuarial reports and other formats such as spreadsheets and electronic data files."

31.    In November 2022, FID conducted a search for the 2022-FEFO-00776 request by locating a shared electronic database repository containing all actuarial communications, reports, spreadsheets, data files, and other records provided to FEMA by Milliman in connection with Milliman's work for Risk Rating 2.0. FID had used the repository to organize and store all final deliverables that Milliman had produced for FEMA as part of its contract and had provided to FEMA electronically. Under the supervision of FID's Branch Chiefs for the Actuarial and Catastrophic Modeling Branch and the Reinsurance Branch,[12] FID reviewed the repository to ensure that all final deliverables had been included and reviewed their emails from Milliman to ensure no files were missing. FID transferred all the data files to the Disclosure Branch via a shared electronic folder. At the time that FEMA was considering Plaintiffs' FOIA request and appeal, it had not processed or produced the repository materials for the 2022-FEFO-00776 request.

32.    Between March 24, 2023 and April 3, 2023, the Disclosure Branch and FID reviewed the 2022-FEFO-00776 request materials and the shared folder containing the Milliman data for this prior request, and they concluded from their review that the database had all the

---

[11] https://www.fema.gov/sites/default/files/documents/FEMA_Risk-Rating-2.0_Methodology-and-Data-Appendix__01-22.pdf.

[12] Andy Neal and John Kulik respectively. Andy Neal is no longer at FEMA. Naomi Ondrich has assumed his role.

records potentially responsive to Plaintiffs' request. The Disclosure Branch and FID reached this conclusion based on four considerations. First, FID had previously confirmed the shared folder contained all Milliman data. Second, Plaintiffs specifically identified Milliman data in their FOIA request. Third, in response to FEMA's attempt to clarify their request, Plaintiffs further specified they were requesting the Risk Rating 2.0 "risk model used to assign premiums," which they identified "Milliman" as the source for. And fourth, the data sought—the "risk model used to assign premiums to St. Charles Parish"—does not exist at the parish level. The risk data outputs of the catastrophe models are produced at the location level and aggregated to the state and line-of-business level in the "Target Rate Level" exhibit produced to Plaintiffs, discussed below. Target rate levels, *i.e.*, target NFIP premiums, are set at the state and occupancy level, rather than at the parish level. FEMA does not aggregate to parish or county levels when developing its rating algorithm.

33.     Nonetheless, the records in the repository of Milliman documents (all of which FEMA has produced), accompanied by publicly-available exhibits on FEMA's website, provide all that is necessary to calculate a Risk Rating 2.0 premium for a specific building in St. Charles Parish or any other location. The set of documents comprising the "Target Rate Level" exhibit[13] summarizes the final target premiums without fees assigned to each of FEMA's lines of business.[14] "Appendix F.1 NT" contained therein summarizes final target premiums by line of business. These final target premiums are used to create the base rates for the respective lines of business, which

---

[13] Those documents are noted in the accompanying *Vaughn* index documenting withholdings FEMA made in its sixth and final production of records to Plaintiff.

[14] "Lines of business" is defined as segments of FEMA's policyholders, separated by occupancy (single-family home vs. non-single family home), levee status (leveed vs. non-leveed structures), peril (for example, inland flood, storm surge, and other sub-perils), and type of coverage (coverage A for building coverage, coverage C for contents coverage).

are the foundational rates for policyholders' flood insurance premiums. Those base rates are found online via the "Appendix D – Rating Factors" document that FEMA has published online for several years.[15] The base rates are then adjusted based on the geographic, building, and coverage characteristics (*i.e.*, policyholder input variables), which are also contained online on Appendix D. The set of documents comprising the "Concentration Factor" exhibit[16] supports the creation of the concentration risk factor, which is also included in Appendix D online and reflects FEMA's efforts to account for differences in risk due to differences in policy concentration (*i.e.*, the greater flood risk in areas with a higher concentration of policies). Together, these documents provide the necessary data to understand how flood insurance premiums are calculated under Risk Rating 2.0, including in St. Charles Parish. FEMA's methodology in calculating rates is fully explained in its January 2022 online report titled *Risk Rating 2.0 Methodology and Data Sources*, as described above.

34.    As the report makes clear, catastrophe modeling is foundational to Risk Rating 2.0 premium development. The NFIP runs catastrophe models, licensed by third-party vendors, over various market baskets (which are representative samples of policies in a given area) to establish average annualized losses (*i.e.*, the total expected losses for all policyholder) at a state and location level. This data is then used as inputs for determining rating factors, *i.e.*, the individualized geographic and property characteristics to adjust base rates. Catastrophe models are also run on NFIP-policyholder data to determine the necessary target rate levels described above. The resulting base rates and rating factors make up the rating plan. The NFIP rating engine was developed based

---

[15] https://www.fema.gov/sites/default/files/documents/fema_appendix-d-rating-factor-tables_02242023.xlsx.

[16] Those documents are noted in the accompanying *Vaughn* index documenting withholdings FEMA made in its sixth and final production of records to Plaintiff.

on this rating plan; geospatial layers (distance to coast, elevation, etc.) were created in order to assign geographic and structural characteristics to a policyholder's property upon obtaining a quote for a policy. Those characteristics are then assigned their respective rating factors to determine applicable premium.

35.     FEMA completed its work on the search for Plaintiffs' request on April 3, 2023. Its tasker documenting the search, dated April 3, 2023, noted that the "shared files" were searched and that, accordingly, no search terms were used. The form noted that "all requested documents" were located.

36.     The tasker also provided the following explanation regarding the records located, to include in FEMA's response to the FOIA request:

> The Target Rate Level Exhibit shows the catastrophe model results, the derivation of the selected Average Annualized Losses (AALs) by state from the modeled results, how those AALs were rescaled by Occupancy type and Location, and the allocation of AALs by Coverage type (A/C) and Peril. Exhibits 10 and 11[17] show the derivation of each territory factor by Peril.

> Also, we would like to provide additional information that will be useful in gaining a better understanding of Risk Rating 2.0. FEMA has released full-risk rates data at the National, State, County, and Zip Code Levels for the public. The attached exhibits show the risk-based cost of flood insurance or the full actuarial rate for single-family homes under Risk Rating 2.0, using data from single-family policies renewed before Sept. 30, 2022. These exhibits will be updated and revised once data is available for all policyholders who have renewed their policies under Risk Rating 2.0.

> We will advise that the requester visit the Online resources for more information concerning full-risk rates under Risk Rating 2.0. The full-risk rates data can be found at: https://www.fema.gov/flood-insurance/work-with-nfip/riskrating/single-family-home.

_____

[17] Exhibits 10 and 11 are documents that FEMA produced to Plaintiffs in its second and third monthly productions to Plaintiffs.

37.     FEMA's explanation noted that the "Target Rate Level Exhibit" and Exhibits 10 and 11 together show the catastrophe model results," the derivation of AALs by state from model results, how AALs were rescaled, the allocation of AALs by coverage type and peril, and the derivation of territory factors by peril in order to specifically direct Plaintiffs to the local level information they are seeking. As described above, target rate levels are determined at the state and occupancy level, rather than the parish or county level. The respective target premiums for St. Charles Parish stakeholders can be found within the Louisiana state target premiums in "Appendix F.1 NT" of the "Target Rate Level" exhibit based on which occupancy they fall into (single-family home or non-single family home), and which peril and coverage they are seeking. That target premium informs the St. Charles Parish base rates that would fall under the Louisiana base rates for the respective line of business. There are no individual base rates at the parish or county-level. The base rates are found online in the Appendix D document discussed above. St. Charles Parish stakeholders seeking their respective territory factors referenced in the tasker explanation above would reference the Appendix D territory factor exhibits based on their respective Hydrologic Unit Code ("HUC," here HUC12)[18] and levee ID if applicable. These factors are applied to individuals within these boundaries. These factors can be found in Appendix D, and a description of these factors (and other technical terms used here and elsewhere) can be found in the *Risk Rating 2.0 Methodology and Data Sources* report on FEMA's website.[19] Any other factors relating to the

---

[18] HUC's are a positioning system utilized to establish various regions; the number afterwards identifies how zoomed in the map is, as each additional digit moves the map in even more. For example, HUC08 is the lower Mississippi region encompassing parts of multiple states; when one moves down to the HUC12 level the map becomes much more localized.

[19] https://www.fema.gov/sites/default/files/documents/FEMA_Risk-Rating-2.0_Methodology-and-Data-Appendix__01-22.pdf.

derivation of flood insurance premiums are applied at the structure level (for example, First Floor Height, Ground Elevation, or Distance to Coast).

38.     FEMA anticipated issuing a response to Plaintiffs and beginning to provide responsive material soon after April 19, once it had publicly released the full-risk-rate data on its website and could also direct the requester to these public materials.

39.     Plaintiffs brought suit against FEMA regarding their FOIA request on April 25, 2023.

40.     FEMA ultimately issued its first interim response to Plaintiffs on September 29, 2023. As it indicated in the response letter, and its subsequent response letters for its rolling monthly productions of records between then and February 6, 2024, FEMA's search resulted in 12,904 pages of responsive records. FEMA ultimately produced 13,065 pages.[20] As FEMA explained in its final interim response letter accompanying its final production on March 12, 2024, FEMA processed additional pages because, in the course of its processing of records from its search of the shared repository of documents, its procurement office identified a handful of additional responsive contracts in September 2023.[21] Attached hereto is FEMA's final FOIA response letter to Plaintiffs.

---

[20] FEMA processed the thousands of pages for production at a considerably faster rate than its standard processing rate of 500 pages per month. FEMA's accelerated processing allowed it to produce all responsive records to Plaintiffs more than a year before it had initially anticipated completing the productions at its standard rate.  (In the parties' November 2023 correspondence regarding processing rates, FEMA had conveyed that it anticipated completing productions in November 2025 at its standard processing rate, and September 2024 if it doubled its standard processing rate.)

[21] Specifically, Matrice Dickens-Gaddy and Michael Sutton in FEMA's Office of the Chief Procurement Officer identified performance work statements for Milliman, CoreLogic, and KatRisk in FPDS.gov and FEMA's contract writing system, using the search term "Milliman." These documents were not in FEMA's central electronic repository of Milliman documents because they pertained to contracts with the third-party vendors for their data and services, not the

41.     Based on the foregoing discussion, I aver that FEMA searched all files likely to contain materials responsive to Plaintiffs' FOIA request.

**Justifications For Application of FOIA Exemptions to Withhold Information**

42.     FEMA withheld records under Exemptions 4 and 5 to withhold certain information in the records that it produced to Plaintiffs.

43.     Attached hereto is FEMA's *Vaughn* index. The *Vaughn* index entries have been tailored to each specific withholding to explain the basis for that withholding. Nonetheless, many of the entries in the *Vaughn* index contain similar language because many of the releases to Plaintiffs include records that are similar in style, presentation, and content.

**A.     Exemption 4**

44.     Exemption 4 protects "trade secrets and commercial or financial information obtained from a person which is privileged or confidential." 5 U.S.C. § 552(b)(4).

45.     Under Exemption 4, a trade secret "is a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983).

46.     FEMA initially invoked Exemption 4 to protect from disclosure trade-secret geospatial data underlying the risk rating engine for Risk Rating 2.0.

---

actual data underlying Risk Rating 2.0 itself. Moreover, the Disclosure Branch acknowledges that its initial 12,904-page count may have been slightly inaccurate due to administrative error caused by the FEMA's FOIAXpress processing platform; the system's review log feature, listing the number of pages contained, at times slightly miscounted pages. FEMA no longer uses the processing platform.

47.     After Plaintiffs' appeal caused FEMA to reevaluate their FOIA request and determine that Plaintiffs did not seek trade-secret rating-engine data and instead sought non-publicly-available modeling data undergirding Risk Rating 2.0, FEMA applied Exemption 4 to protect from disclosure portions of the data that are not trade secrets.

48.     To apply Exemption 4 when withheld records do not contain trade secrets, an agency must establish that the records are (1) commercial or financial; (2) obtained from a person; and (3) privileged or confidential. *See Pub. Citizen*, 704 F.2d at 1290. Additionally, an agency must demonstrate foreseeable harm from disclosure. *See* 5 U.S.C. § 552(a)(8)(A)(i).

49.     Information is commercial under Exemption 4 if, in and of itself, it serves a commercial function or is of a commercial nature. *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002). Among other situations, information satisfies this test if the provider of the information has a commercial interest in the information submitted to the agency, including because the information is intrinsically valuable business information, pertains to the exchange of goods or services or the making of a profit, and, if disclosed, could inflict commercial harm. *See, e.g.*, *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d at 1290; *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319–20 (D.C. Cir. 2006); *Citizens for Resp. & Ethics in Washington v. United States Dep't of Just.*, 58 F.4th 1255, 1263 (D.C. Cir. 2023).

50.     A "person" under Exemption 4 includes both individuals and companies. *See, e.g.*, *Gulf & W. Indus., Inc. v. United States*, 615 F.2d 527, 529 & n.5 (D.C. Cir. 1979).

51.     Commercial or financial information is "confidential" for purposes of Exemption 4 if it is private or secret. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 434 (2019). The information must be customarily kept private, or at least closely held, by the person imparting it. *Id.* An additional consideration that bolsters the confidentiality of the information, but is not

required, is if the person imparting the information did so with assurances from the government that the government would keep the information private. *Id.* at 434–35.

52.     An agency can demonstrate foreseeable harm under Exemption 4 by showing how disclosing, in whole or in part, the withheld information would harm an interest protected by the exemption, such as harm to the information submitter's economic or business interests. *See, e.g.*, *WP Co. LLC v. U.S. Small Bus. Admin.*, 575 F. Supp. 3d 114, 119 (D.D.C. 2021).

53.     As reflected in the accompanying *Vaughn* index, the agency invoked Exemption 4 to protect confidential commercial "contract" information and "modeling" information. The Exemption 4 withholdings described as commercial contract information—showing, *e.g.*, "Quantity," "Unit Price," "Amount," "Funded," and "labor hour billing" "figures"—all refer to each catastrophe modelers' Federal Acquisition Regulation-based contracts with FEMA, and in particular line-item pricing and other contract information associated with licensing each modelers' software. The "modeling" information withholdings refer to catastrophe model outputs. As explained below and in further detail in the modeling vendors' declarations, these outputs are plainly considered by the vendors, and the catastrophe modeling industry at large, to be proprietary and private product information that must be and is closely guarded. The model outputs are commercially valuable information produced directly from, and are directly reflective of, the vendors' proprietary and closely guarded catastrophe models, which they have developed at great expense, license in commercial offerings, and depend on to generate revenue. And as explained below and in further detail in the vendors' declarations, the line-item contract information also is considered valuable and private business information by the modelers and accordingly is closely guarded by them.

1.      ***Catastrophe Modeling Data***

54.      The Exemption 4 withholdings described as "confidential commercial modeling factor(s)" in the accompanying *Vaughn* index all refer to various redacted elements of the "Target Rate Level" exhibit documents and "Concentration Factor" exhibit documents—produced as part of FEMA's sixth and final production of records—in which catastrophe modeling output is contained.

55.      Catastrophe modeling output in this case is modeled Average Annual Losses ("AALs") and scale factors applied to those AALs at the state and line-of-business level. An AAL is defined as an estimated loss that could occur in a given year from the modeled flooding peril sources (such as storm surge, inland flood, etc.). FEMA obtained estimated AALs from CoreLogic, KatRisk, and Verisk from the catastrophe models that it licensed from these vendors, and it then applied scale factors to the AALs generated by the vendors from their models. A scale factor is simply an adjustment to the modeled AALs when FEMA compared those vendor-generated loss estimates to historical NFIP experience; if a model had an upward or downward bias in its modeled loss estimates relative to what the NFIP has reasonably experienced in historical events, then the modeled losses for each vendor were adjusted to bring the modeled losses (without overfitting the modeled data to the historical experience). The resulting output are scaled AALs, which is simply the modeled AALs straight out of each of the model vendors' proprietary models, multiplied by the applicable scale factors. The scaled AALs then become the basis for deriving the target level premium in the "Target Rate Level" exhibit. Scaled AALs were not withheld, so as to provide Plaintiffs with a sense of the variation between the catastrophe modeled loss estimates. FEMA only withheld the modeled AALs generated by CoreLogic, KatRisk, and Verisk through use of their catastrophe models.

56.     In other words, the withheld information relating to "confidential commercial modeling factor(s)" was provided to FEMA by third-party vendors; their third-party catastrophe model software generated estimated modeled losses that FEMA redacted.

57.     The withheld AALs are considered confidential commercial information by each third-party catastrophe model vendor because these model outputs provide valuable insight into the core model assumptions each vendor uses to calculate estimated flood losses. The vendors license their catastrophe modeling software and data to clients such as FEMA as proprietary products; their catastrophe models are developed at great expense and represent their main method of generating revenue. Thus, the vendors naturally treat the core assumptions undergirding their proprietary models as proprietary as well. Were these assumptions to become public, it would cause large financial damage to the vendors, which is why they closely safeguard their catastrophe modeling information.[22] As part of FEMA's ordinary process for handling FOIA requests that implicate Exemption 4, the vendors have each explained to FEMA these considerations and has made clear the vital importance of protecting their catastrophe modeling information.

58.     In accordance with DHS FOIA regulatory guidance, 6 C.F.R. § 5.7(c), FEMA reached out to each vendor to (a) provide them written notice that their Risk Rating 2.0 modeling and algorithm data was the subject of a FOIA request and may contain confidential commercial information protected from disclosure under Exemption 4, and (b) solicit their perspective on the necessity to protect this information and on whether they customarily kept the data at issue private

---

[22] As part of its withholdings, FEMA also withheld the scale factors used to go from modeled AALs to scaled AALs. As discussed, FEMA did not withhold the scaled AALs themselves. (Those are available in Appendix G.5 of the "Target Rate Level" exhibit.) Because the scaled AALs are simply a multiplication of the modeled AALs by the scale factors, knowing the scale factors would allow Plaintiffs and others to divide the scaled AALs by the scale factor to back into the modeled AALs for each third-party vendor. Again, the release of modeled AALs would also cause financial damage to the catastrophe modelers.

and provided it to FEMA with assurance of confidentiality. These written notices are known as "submitter's notices."

59.    On June 21, 2023, FEMA sent an email to Milliman attaching a submitter's notice concerning the company's Risk Rating 2.0 data. On July 5, 2023, Milliman responded with no objections to the release of their Risk Rating 2.0 modeling and algorithm data except with respect to business information containing confidential and commercial data submitted by KatRisk, Verisk, and CoreLogic. Milliman also forwarded a letter, dated June 27, 2023, from Verisk, indicating that the company objected to the release of its models, model output, and algorithm data.

60.    On August 11, 2023, FEMA sent an email to KatRisk and CoreLogic attaching a submitter's notice concerning their Risk Rating 2.0 data. On August 17, 2023, KatRisk responded via email with a letter dated August 17, 2023. KatRisk stated that its modeling information contains trade secrets and should not be made publicly available. On September 8, 2023, CoreLogic responded via email with a letter dated September 8, 2023. CoreLogic objected to the release of its data, algorithms, calculations, pricing, valuations, outputs, deliverable, or other related data, claiming the information is protected under Exemption 4.

61.    On September 12, 2023, FEMA sent a follow-up email to KatRisk, CoreLogic, and Verisk requesting confirmation that their aggregated Risk Rating 2.0 data could be released. On September 12, 2023, KatRisk and Verisk both confirmed their aggregated data could be released. On September 15, 2023, CoreLogic confirmed that its aggregated data could be released.[23]

---

[23] Although KatRisk, CoreLogic, and Verisk all consented to release of aggregated data, they have consistently objected to the release of their location-level and event-level proprietary information.

62.     All release recommendations from KatRisk, CoreLogic, and Verisk regarding modeling data were applied accordingly.

63.     The following is information that I have determined based on review of FEMA's correspondences with the modeling vendors and subsequent consultation with them. Each vendor has confirmed the necessity of the specific Exemption 4 withholdings of vendor modeling information reflected in the accompanying *Vaughn* index.

64.     The withheld modeling information is the vendors' commercial information because it reflects and reveals proprietary assumptions at the heart of the proprietary catastrophe models that they develop at great expense and license for profit, in a highly technical and competitive industry, to various clients seeking to price insurance products. The catastrophe models are the vendors' commercial products, and as such their model outputs, reflecting sensitive intellectual property undergirding their products, is highly commercially valuable. The model outputs are a fundamental aspect of the vendors' catastrophe modeling commercial offerings; their clients, including FEMA, specifically license the vendors' catastrophe models in order to  have those models generate the vendors' loss estimates.

65.     As explained above, the redacted outputs of the catastrophe models contain estimated losses by each model vendor, reflecting their underlying assumptions and proprietary data. Although NFIP policyholder insurance data (containing geospatial location information about a structure and the selected coverage of insurance applied to that structure) is imported into each vendor's model, the models determine the flood hazards exposed to a given policyholder's property based on its location as well as the vulnerability of the location based on its structural characteristics. Each model's view of hazard and vulnerability is unique to that model's assumptions and the data sourced by that model and vendor to inform the riskiness of the properties

being analyzed. Together those components allow a model to estimate losses in a given year that the structure could experience. These loss estimates are derived directly from each catastrophe model vendor and thus reflect each vendor's proprietary data underlying those loss estimates.

66.     The withheld modeling information is confidential because the vendors customarily keep their catastrophe modeling product information private and do not publicly release such information or permit public release of such information. That includes modeling outputs generated by their catastrophe models, which their clients can generate only through limited software licenses. The vendors generally protect their catastrophe models and modeling factors and outputs from disclosure across their contracts and business activities by, among other things, using specific contract language restricting or limiting access to the data internally and externally; marking modeling information as confidential; implementing policies to guide employees and external parties in reporting modeling data breaches; establishing password protections governing access to their software platforms; housing the model data in secure network databases and requiring others to do so as well; and prohibiting data release by third parties unless approved in the license for specific data for specific purposes or with prior written consent.

67.     The vendors take these steps to closely guard their modeling information, including the modeling output information at issue here, so as to protect their commercial interests and protect themselves from competitive and financial harm. Investors and others involved in insurance markets license various catastrophe models and use them to price their products and purchases within the insurance market. If the vendors' modeling information were to be released, others in the insurance market or new entrants then could reverse-engineer the vendors' existing catastrophe models. That, in turn, would seriously impact the vendors' financial prospects, as their catastrophe models and model outputs represent their entire business. Put simply, why would

anyone in the insurance industry pay to license the vendors' models if they have been released freely?

68.    As CoreLogic put in its September 8, 2023 submitter notice response letter, disclosure "would cause significant competitive and financial harm to CoreLogic by enabling CoreLogic's competitors to gain access to information, which could subsequently be used by that competitor to predict CoreLogic's pricing and methodologies, and to potentially reverse engineer its products / services / models." KatRisk echoed this sentiment in its August 17, 2023 submitter notice response letter, explaining that the "data and software provided to FEMA are the result of extensive internal development work over many years. Making our data, software and location level results available to the public could have substantial financial impacts on our company and cause us to lose the intellectual property associated with our products. If our data or software is made publicly available at no cost, the ability for KatRisk to license our products and remain financially viable would be greatly diminished." And as Verisk explained in its June 27, 2023, letter, "[w]e develop, update and enhance our proprietary loss models at great expense. We derive economic value (in fact nearly all our revenue) from them. We are careful to label them and the user documentation prominently as confidential." Each of the vendors' own declarations further reinforces and explains the commercial and confidential interests at stake in the withholdings at issue.

69.    The vendors also each provided the withheld modeling information to FEMA on the expectation that their modeling information would be kept private, and they each received assurances from FEMA as part of their work on Risk Rating 2.0 that the information would be protected from disclosure. Each vendor provided FEMA with only a limited license for use of catastrophe modeling software, premised on the agreement that FEMA did not have ownership of

the vendors' proprietary data and could not publicly release such data. As Verisk noted to FEMA in its June 27, 2023 letter, the parties' 2017 contract explicitly had confidentiality as a contract term (which stated that "Disclosure of output and the user manuals and guides outside of FEMA is prohibited"). The KatRisk and CoreLogic contracts implicitly contain such a confidentiality guarantee, as they both provide FEMA with only a limited license to run catastrophe modeling and do not give FEMA any right over the vendors' proprietary data in the models.

70.    The vendors have all indicated that if FEMA is not able to protect their catastrophe modeling information from public disclosure, they will likely be unwilling to license their catastrophe modeling products and services to the government in the future in a similar fashion, thus harming the ability of FEMA and other agencies to improve risk assessment through modern technology.

## 2.    *Contract Information*

71.    The Exemption 4 withholdings described as "contract information" in the accompanying *Vaughn* index all refer to various line-item elements of the vendors' procurement contracts with FEMA for use of their catastrophe models. In particular, the withholdings pertain to contract terms in FEMA's contracts with CoreLogic, KatRisk, and Milliman. The vendors had submitted the contracts to FEMA as part of the Federal Acquisition Regulation procurement process, and they had included within these documents various contract terms ranging from line-item "unit" pricing to hourly billing rates.

72.    As FEMA had done with respect to the vendors' catastrophe modeling data, the agency reached out to these vendors through submitter notices under 6 C.F.R. § 5.7(c) regarding disclosure of their contract information.

73.     On February 19, 2024, FEMA sent written notice to Milliman concerning the contract the vendor had submitted. On February 22, 2024, Milliman responded via email with no objections to FEMA releasing the contract with redactions to withhold line-item unit price, quantity, amount, and billing rate figures contained therein.

74.     On February 19, 2024, FEMA sent written notice to KatRisk concerning the contract the vendor had submitted. On February 22, 2024, KatRisk responded via email with no objections to FEMA releasing the contract with redactions to withhold the quantity, unit price, and amount figures contained therein. KatRisk also requested that FEMA withhold the total contract award amount. On February 23, 2024, FEMA responded and explained that total award amounts are typically releasable and can be found in the public domain on websites such as the Federal Procurement Data System and Government Spending Open Data. On February 23, 2024, KatRisk responded agreeing with the disclosure of the total award amount.

75.     On February 19, 2024, FEMA sent written notice to CoreLogic concerning the contract the vendor had submitted. On March 2, 2024, CoreLogic responded via email with no objections to FEMA releasing the contract with redactions to withhold the contract amount and funded figures contained therein.

76.     FEMA applied redactions to the Milliman, KatRisk, and CoreLogic contract terms in the manner described above but otherwise produced the contracts to Plaintiffs.

77.     The following is information that I have determined based on review of FEMA's correspondences with the modeling vendors and subsequent consultation with them. Each vendor has confirmed the necessity of the specific Exemption 4 withholdings of contract information reflected in the accompanying *Vaughn* index.

78.    The withheld contract information is the vendors' commercial information because each withholding reflects line-item pricing and other product-related contract terms that the vendors submitted to FEMA and FEMA agreed to in order to license the vendors' catastrophe models. The vendors generated the contract terms, including the unit pricing, based in part on their costs to develop, manage, and maintain the models that they licensed to FEMA and based in part on the nature of the products and services they contracted with FEMA to provide.

79.    The withheld contract information is confidential because the contractors do not publicly disclose any of the information. The contractors developed these contract terms as part of the process of submitting bids to FEMA to provide catastrophe modeling to the agency. The information is commercially sensitive, and thus never publicly disclosed by the vendors, because it can be utilized by their competitors, including to undercut their pricing or underbid them in future contracting opportunities with the government or private clients.

### B.    Exemption 5

80.    Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption protects internal agency documents that are subject to the deliberative process privilege. *See, e.g.*, *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 512 (D.C. Cir. 2011). Exemption 5 also has been construed to exempt all documents that are normally privileged in the civil discovery context. *See, e.g.*, *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799–800 (1984). As a result, the exemption protects "trade secret or other confidential … commercial information." Fed. R. Civ. P. 26(c)(7); *see, e.g.*, *Fed. Open Mkt.*

*Comm. v. Merrill*, 443 U.S. 340, 360 (1979). Additionally, for any Exemption 5 withholding, an agency must demonstrate foreseeable harm from disclosure. *See* 5 U.S.C. § 552(a)(8)(A)(i).

### 1.    *Deliberative Process Information*

81.    An agency may withhold information subject to the deliberative process privilege under Exemption 5 if it demonstrates that the information is pre-decisional and deliberative.

82.    As reflected in the accompanying *Vaughn* index, FEMA invoked Exemption 5 to protect portions of one draft FEMA document containing pre-decisional and deliberative information that was neither approved nor used in the final development of Risk Rating 2.0 to generate premiums (or for any purpose). This draft document refers to a prior iteration of the "Target Rate Level" exhibit that was included in the responsive documents but is superseded by the final "Target Rate Level" exhibit, also provided to Plaintiffs. The draft exhibit is therefore pre-decisional and not final.

83.    Release of this pre-decisional and deliberative risk rating data would cause confusion to the public because this information is not incorporated in the final risk rating calculations, and because part of the information is incorrect. As explained above, much of the information involved in rate setting is made publicly available, as FEMA attempts to be as transparent as possible. However, releasing pre-decisional and inaccurate target rate levels could lead to members of the public looking to those target rate levels in determining how their flood insurance is priced. This would create an inaccurate conclusion, as the target rate level would be incorrect. FEMA's openness and transparency would then be undercut by the release of this inaccurate information, as it would prevent the public from engaging with, and understanding, rate making by confusing some of them with inaccurate information. These types of foreseeable harms

fall within the ambit of Exemption 5's core concerns. *See, e.g.*, *Reps. Comm. for Freedom of the Press v. United States Customs & Border Prot.*, 567 F. Supp. 3d 97, 122 (D.D.C. 2021).

### 2.    *FEMA Confidential Commercial Information*

84.    An agency may withhold inter-agency or intra-agency information as confidential commercial information under Exemption 5 if it demonstrates that the information is government-generated information that is commercial in nature (e.g., because it relates to the buying and selling of goods and is implicated in business transactions) and is sensitive and otherwise unavailable because, if disclosed, it would put the government at a competitive disadvantage in contracting or other business transactions or otherwise harm its commercial interests. *See, e.g.*, *Merrill*, 443 U.S. at 360–63 ; *Gov't Land Bank v. Gen. Servs. Admin.*, 671 F.2d 663, 665–66 (1st Cir. 1982); *Hoover v. U.S. Dep't of the Interior*, 611 F.2d 1132, 1140–42 (5th Cir. 1980); *Morrison-Knudsen Co. v. Dep't of the Army of U.S.*, 595 F. Supp. 352, 355 (D.D.C. 1984), *aff'd sub nom. Morrison-Knudsen Co. v. Dep't of Army*, 762 F.2d 138 (D.C. Cir. 1985).

85.    EMA manages flood risks in the NFIP and the program's future exposure in part by "secur[ing] reinsurance coverage . . . from private reinsurance and capital markets." 42  U.S.C. § 4081(e).  FEMA contracts with private insurers to transfer some NFIP flood risks to them; FEMA pays them premiums, and in return these reinsurers agree to provide annual coverage for losses above an agreed-upon amount (as with an ordinary insurance arrangement).  Each year sine 2017, FEMA has negotiated with and contracted with several private reinsurance companies to secure, in some years, more than $1 billion in coverage for certain NFIP losses. And FEMA also secures reinsurance coverage through the issuance of bonds to the capital markets; as part of this coverage, FEMA also pays premiums in exchange for reinsurance coverage for a set term.

86.     In obtaining reinsurance coverage, FEMA, as any insurance purchaser, attempts to target certain rates and coverage amounts based on its understanding of the probability that it will incur financial losses.

87.     In negotiations with reinsurers, reinsurance buyers recognize and accept that reinsurers require certain data to assess the risks that reinsurers would assume if they entered into reinsurance agreements with buyers. Thus, in negotiations with reinsurers, FEMA provides reinsurers with detailed but summarized catastrophe model input data and key statistics with a summary of key adjustments made to the model input data, as well as the summarized output data directly from each vendor model using the same input data provided.

88.     Reinsurance buyers including FEMA typically withhold from reinsurers any adjustments they make to the model output data based on their internal analysis of that model and its output; and reinsurers similarly withhold the same type of information from buyers based on the reinsurers' own internal analysis. Since the buyer's objective is to minimize the price paid for reinsurance coverage and maximize the amount of coverage offered, the buyer withholds components of the model output where the buyer may have increased the loss output to a level higher than the reinsurer estimated, as this could lead reinsurers to use the buyer's estimate for components with a higher buyer estimate and their own estimate for components with a lower buyer estimate, thus increasing their quoted rate and/or reducing their offered amount of reinsurance coverage for the proposed transaction. Since the reinsurer's objective is to maximize the price received for the coverage, the reinsurer withholds the same type of information from the buyer, as the buyer strategy applied in reverse could lead to a lower offered price for the proposed transaction.

89.     As reflected in the accompanying *Vaughn* index, the agency invoked Exemption 5 to protect confidential commercial FEMA information: contract in-force dates.

90.     The contracts in-force date is, simply put, the date for which all NFIP insurance policies in effect on that date are included in the data used for input into the catastrophe models for the analysis in question. Since the overwhelming majority of NFIP policies provide coverage for one year, the data used for model input generally includes NFIP policies that previously became effective after the date one year prior to the contracts in-force date and remain effective on the contracts in-force date. Thus, the model input data excludes NFIP policies that have expired on or before the contracts in-force date, and it excludes NFIP policies for which coverage may have been bound on or before the contracts in-force date but became effective after the contracts in-force date.

91.     The withheld contract in-force date information is commercial because it is contract information that is fundamental to the contracts and would provide access to internal proprietary model output with the precise valuation date. If disclosed, it would reveal to reinsurers that FEMA negotiates with the exact or approximate adjustment factors applied internally by FEMA for model vendor output that has already been provided to reinsurers with a contracts in-force date exactly on or relatively close to that date. The adjustment factors for applicable output components could be calculated or approximated by the reinsurers by simply comparing the adjusted model vendor output in the Target Rate Level exhibit with the direct unadjusted model vendor output (where it differs) that FEMA provides to reinsurers for the applicable reinsurance transaction. As explained above, that would result in higher quoted rates and/or lowered offered coverage amounts in negotiations with reinsurers. Paying higher prices would reduce FEMA's funding to pay for losses to NFIP policyholders and expenses to operate the NFIP. FEMA having to pay higher reinsurance

rates would also likely be reflected in higher NFIP rates to policyholders. And less reinsurance coverage would reduce NFIP reinsurance recoveries if a triggering event were to occur. These consequences logically explain why FEMA would treat the in-force date as private if it identified the underlying data already provided to reinsurers that would reveal the exact or approximate adjustment factors applied for internal FEMA use (as it would do here).

92.     The contract in-force date is confidential because it contains sensitive information that is not otherwise available, as its disclosure would compromise price negotiations with NFIP reinsurers. At its core, a reinsurance transaction represents one party transferring some of their insurance risk to another party for a negotiated price. The NFIP does this through the issuance of bonds to the capital markets, and through contracts with major reinsurers which operate somewhat like an insurance plan for an insurance plan. Should the contract in-force information in these records be released and reinsurers accessed it, the release would provide them with a substantial advantage in negotiations for reinsurance rates. Here, disclosure of the in-force dates would identify the underlying data already provided to reinsurers that would reveal the exact or approximate adjustment factors applied for internal FEMA use, thus compromising reinsurance negotiations. To safeguard its bargaining position in these negotiations, FEMA never publicly discloses the approximate adjustment factors it applies for internal FEMA use; nor does it publicly disclose any information that could readily reveal such adjustment factors.

✶✶

93.     FEMA conducted a line-by-line review of all the withheld information to ensure that it contained no segregable, nonexempt information. With respect to each piece of information withheld, no further information could be reasonably segregated from the exempt information and released, for the reasons stated above.

33

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 14th day of June 2024.

_____

TAMMI HINES