## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ST. CHARLES PARISH, A POLITICAL SUBDIVISION OF THE STATE OF LOUISIANA, AND MATTHEW JEWELL, IN HIS OFFICIAL CAPACITY AS ST. CHARLES PARISH PRESIDENT, | |
| *Plaintiffs*, | Civil Action No. 2:23-cv-01369 |
| v. | Section P |
| FEDERAL EMERGENCY MANAGEMENT AGENCY, | Judge Papillion |
| *Defendant*. | Magistrate Judge North |

### <u>DECLARATION OF ROGER GRENIER, PhD</u>

I, Roger Grenier, do hereby declare and state as follows:

1.      I am Senior Vice President and lead the Global Resilience Practice of Verisk Extreme Event Solutions ("VEES"), formerly known as AIR Worldwide, a subsidiary of Verisk Analytics, Inc. ("Verisk"). VEES and Verisk are Delaware corporations. VEES is headquartered in Boston. Verisk is headquartered in Jersey City. VEES has subsidiaries or branch offices in the UK, Germany, India, Singapore, China, and Japan. Among my responsibilities in leading the Global Resilience Practice is overseeing our engagement with government entities, including FEMA.

2.      Verisk is a leading data, analytics, and technology provider serving the insurance industry, corporations, governments, and non-governmental organizations. Verisk develops

advanced technologies, builds unique data assets, and leverages deep insurance industry knowledge to build valuable solutions for our clients.

3.      VEES pioneered the field of probabilistic catastrophe modeling used by insurers, reinsurers, intermediaries, financial institutions, governments, and others to manage their risk from extreme events. Our models, which form the basis of our solutions, enable companies to identify, quantify, and plan for the financial consequences of catastrophes.

4.      VEES has developed models for more than 120 countries, including models for floods, hurricanes, earthquakes, winter storms, tornadoes, hailstorms, wildfires, terrorism, and pandemics. We also help our clients to plan for and manage climate and weather-related risk, and serve our customers by providing advanced research, development, and analysis delivered through software platforms available through a subscription license.

5.      FEMA licenses VEES software and models for United States Tropical Cyclone, Inland Flood and Tsunami (collectively, the "VEES flood model") which produce a combined estimate of flood risk from precipitation, storm surge, and earthquake-induced waves.

6.      I am familiar with the Freedom of Information Act ("FOIA") request and the Complaint filed by Plaintiffs St. Charles Parish and parish president Matthew Jewell seeking disclosure of records sought through FOIA.

7.      The statements contained in this declaration are based upon my personal knowledge, information provided to me in my official capacity, and conclusions I reached based on that knowledge or information.

**Verisk's Data in FEMA's Records**

8.      Risk Rating 2.0 is FEMA's actuarial update to the National Flood Insurance Program's pricing methodology.

9.      I am familiar with Plaintiffs' FOIA request seeking "all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana, in Risk Rating 2.0". Plaintiff is requesting the risk model used to assign flood insurance premiums to St. Charles Parish residents.

10.       It is my understanding that FEMA used its own flood insurance policyholder data as input for the VEES flood model ("input data"), selected the model analysis options, ran the model, and generated flood loss estimates. I also understand that FEMA and its actuarial consultant, Milliman, Inc. ("Milliman"), utilized the results of the VEES flood model, along with other model results and data, in developing Risk Rating 2.0. VEES had no role in preparing the input data, running the models, or extracting, analyzing, and utilizing the VEES flood model results.

**Withholding of Confidential Commercial Information**

11.      I understand that at our request FEMA withheld VEES confidential commercial information related to modeling factors under FOIA Exemptions 4. By "modeling factors," I mean Verisk model results, which include estimated losses from thousands of simulated floods.

12.      The Verisk simulated floods are incorporated within our licensed software platform and include both probabilistic and historical events. The probabilistic events are realistic simulations of events that could occur in any year. The historical events are recreated simulations of actual historical events.

13.     For each flood in the catalog, our flood model simulates the "footprint" of water depth across the affected area, calculates the depth of water at individual building locations, determines the degree of damage for each building type, and applies insurance policy terms to estimate the loss.

14.     When licensees like FEMA input their flood insurance policyholder data and run our flood model, the software produces estimates of the annual expected losses. These loss estimates are derived directly from our model and represent our proprietary data. They are a core part of our catastrophe modeling commercial offering; our licensees are paying for the ability to have our model generate these loss estimates. And the loss estimates reflect the core underlying assumptions and proprietary aspects of our model; they hinge on our model's unique view of flood hazard and vulnerability.

15.     We were notified via email from Nancy Watkins of Milliman on June 26, 2023, that FEMA received a FOIA request from Adams and Reese, LLP, on behalf of the president of St. Charles Parish regarding Milliman's work on Risk Rating 2.0.

16.     Milliman provided us with a copy of a letter from FEMA to Milliman dated June 21, 2023, which cited the FOIA request and noted that the requestor was seeking records on the Risk Rating 2.0 methodology including modeling and algorithm data. The FEMA letter to Milliman noted that the requested data might contain confidential commercial information protected from disclosure under Exemption 4. The letter inquired about Milliman's perspective on the necessity to protect this information and in particular on whether Milliman customarily kept the data at issue private and provided it to FEMA with assurance of confidentiality.

17.     In their follow-on June 26, 2023, letter to VEES, Milliman noted they were preparing a list of data included in the work products that Milliman had provided to FEMA that

Milliman believed to be confidential, which included our modeling results. Milliman invited us to comment on the list.

18.     We responded via email and letter to Milliman on June 27, 2023, outlining our position. We objected to the release of modeling factors or algorithms derived from our model results, noting that our models are confidential and constitute our closely held trade secrets, are not in the public domain, and are not generally known. We noted that we license models to clients, like FEMA, only under license agreements with strict confidentiality requirements and with limitations on disclosure of the model output.

19.     Our response to Milliman also noted that we develop, update, and enhance our proprietary loss models at great expense and that we derive substantial economic value from them. We noted that we are careful to label them and the user documentation prominently as confidential.

20.     Our response to Milliman included an excerpt of FEMA's model contract with Verisk, which notes that "Disclosure of output and the user manuals and guides outside of FEMA is prohibited." We also noted that we asked FEMA to confirm the confidentiality and nondisclosure aspects of our license and that FEMA's contracting officer did so by email on September 28, 2017. We followed up with another email to Milliman on July 6, 2023, to inquire whether Milliman required any additional information from us. Nancy Watkins from Milliman replied later that day and stated that our response was included in the information provided to FEMA.

21.     We are aware that FEMA specifically withheld modeling factors developed from our model results in their response to the FOIA request.

22.     We develop, update, and enhance our proprietary loss models at great expense. Our company was built on and continues to have at its foundation the revenue we derive from licensing

subscription-based software, which includes our models, to our clients. A significant portion of our annual revenue is derived from these licenses.

23.     We keep our modeling factors, the models themselves, and our user documentation private. We do not publicly release the information. We protect the information from disclosure across our contracts and business activities by specific contract language restricting or limiting access to the data internally and externally; marking the information as confidential; using confidentiality agreements or NDAs where appropriate; implementing policies to guide employees and external parties in reporting data breaches; establishing password protections governing access to our software platforms; housing the model data in secure network databases; prohibiting data release by third parties unless approved in the license for specific data for specific purposes or with our prior written consent; and generally requiring confidentiality in order to protect our trade secrets and the investment we've made in our models.

24.     I believe that the methods through which we protect our intellectual property and data are standard across the modeling industry including but not limited to our competitors and business partners, and are aligned to the strict protections our clients use for their own proprietary and private customer data.

25.     We take these steps to keep our proprietary information confidential because we invest considerable financial and human capital resources to develop, maintain and improve our innovative models. Our investments contribute significantly to the understanding of risk, to the benefit of many stakeholders. These investments only make business sense if we have protections to ensure that our intellectual property will not be exposed to unauthorized parties and/or impermissibly exploited by other organizations, around the country, and around the world.

26.     Examples of ways in which our models could be exploited include enabling competitors to develop or substantially improve their own models using Verisk's intellectual property and enabling insurers to develop insurance rating plans without licensing the models, effectively creating a situation where insurers who are paying for lawful access are subsidizing their competitors. The loss estimates from our model, coupled alongside the FEMA input policyholder data, is a specific example of how our confidential modeling information could be exploited.

27.     Guarding against public disclosure also serves the public interest by enabling innovation and availability of robust models to support a healthy insurance market, leading to stable commercial and homeowner markets generally. Sophisticated models are an improvement over historical methods for determining risk, and models continue to improve, fostered by competition. If model developers cannot protect their investment, future models may be less granular and predictive of risk, potentially limiting the availability of sophisticated tools that can help encourage a healthy insurance market and maintain availability of insurance coverage.

28.     We provided our flood model to FEMA on the expectation that it and the associated modeling factors would be kept private, and we received assurances from FEMA as part of its work on Risk Rating 2.0 that the information would be protected from disclosure. In particular, as cited previously, FEMA's model contract with VEES notes that "Disclosure of output and the user manuals and guides outside of FEMA is prohibited." FEMA specifically agreed to the confidentiality and nondisclosure aspects of the contact in an email from FEMA's contracting officer on September 28, 2017.

29.     If FEMA is unable to maintain the confidentiality of our catastrophe modeling information, we will likely be unwilling to license our catastrophe modeling products to the

government in the future in a similar fashion. As discussed, public disclosure of our proprietary

catastrophe modeling information poses great financial risk to us.

      I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct to the best of my knowledge.

Executed on this 13th day of June 2024.

_____
Roger Grenier
Senior VP, Verisk Extreme Event Solutions