UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ST. CHARLES PARISH, A POLITICAL SUBDIVISION OF THE STATE OF LOUISIANA, AND MATTHEW JEWELL, IN HIS OFFICIAL CAPACITY AS ST. CHARLES PARISH PRESIDENT,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY,<br><br>*Defendant*. | Civil Action No. 2:23-cv-01369<br><br>Section P<br><br>Judge Papillion<br><br>Magistrate Judge North |

### DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil 56.1, Defendant Federal Emergency Management Agency ("FEMA") hereby submits this concise statement of material facts as to which there is no genuine dispute.

1. Risk Rating 2.0 is FEMA's actuarial update to premiums for the National Flood Insurance Program ("NFIP"), which is the flood insurance program that FEMA administers. *See, e.g.*, Decl. of Tammi Hines ("Hines Decl.") ¶ 10.

2. Risk Rating 2.0 relies on catastrophe modeling, which is a computerized process that simulates potential disaster events (based on historical event data, scientific research, engineering methods, and statistical analysis) and then generates scenarios of disaster frequency, severity, and location. *Id.* ¶ 12

3. FEMA hired Milliman, Inc., to assist with the development of Risk Rating 2.0 premiums, and the agency hired three other vendors, CoreLogic, Inc., KatRisk LLC, and Verisk Analytics Inc., for the Risk Rating 2.0 catastrophe modeling. *Id.* ¶¶ 11, 13, 55. Milliman relied on

modeling data and models from the three other vendors, and all of its actuarial output thus incorporated the data and analysis from the other three catastrophe modeling vendors. *Id.*

4.    Plaintiffs, St. Charles Parish and parish president Matthew Jewell, submitted a FOIA request to FEMA on November 3, 2022, seeking "all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana, in Risk Rating 2.0." *Id.* ¶ 14 (quotation marks omitted).

5.    On November 23, 2023, Plaintiffs clarified their FOIA request, stating:"[t]he NFIP uses risk modeling to determine how much premium to charge participants who participate in the flood insurance program. I am requesting the risk model used to assign premiums to St. Charles Parish residents. I believe Milliman was the company that did the modeling for FEMA[.]" *Id.* ¶ 15 (quotation marks omitted).

6.    FEMA initially misinterpreted Plaintiffs' FOIA request as seeking trade-secret information in the agency's ratings engine for generating premiums, and accordingly the agency applied Exemption 4 to categorically withheld Risk Rating 2.0 records on January 27, 2023. *Id.* ¶¶ 20–22.

7.    On February 27, 2023, Plaintiffs administratively appealed FEMA's determination. *Id.* ¶ 23.

8.    In response to Plaintiffs' appeal, FEMA reexamined Plaintiffs' FOIA request, determined that it had misinterpreted the request as seeking trade-secret ratings-engine information, and concluded that Plaintiffs' request for risk modeling data used to calculate NFIP premiums in St. Charles Parish sought the Milliman data undergirding Risk Rating 2.0. *Id.* ¶¶ 25–29.

9.    Between March 23, 2023, and April 3, 2023, FEMA determined that records the agency had FEMA had previously collected but had not yet released for a prior FOIA request from a

separate requester contained all the Milliman data (and subsumed modeling data from the other catastrophe modeling vendors) potentially responsive to Plaintiffs' request. *Id.* ¶ 29.

10. The prior FOIA request, an August 17, 2022, FOIA request, had sought "[a]ll actuarial communications, reports, spreadsheets, data files, and other records provided to FEMA by Milliman, Inc. in connection with Milliman's work under Risk Rating 2.0." *Id.* ¶ 30 (quotation marks omitted). As the prior request had noted, FEMA's January 18, 2022, public report titled *Risk Rating 2.0 Methodology and Data Sources* had stated that Milliman had worked for FEMA to develop Risk Rating 2.0 and that "Milliman's work under Risk Rating 2.0 has been fully documented in over 40 separate actuarial communications to FEMA provided over the course of the engagement, including both actuarial reports and other formats such as spreadsheets and electronic data files." *Id.* (quotation marks omitted).

11. In November 2022, FEMA conducted a search for this prior FOIA request by (a) locating a shared electronic database repository containing all actuarial communications, reports, spreadsheets, data files, and other records provided to FEMA by Milliman in connection with Milliman's work for Risk Rating 2.0, and then (b) confirming the comprehensiveness of the repository. *Id.* ¶ 31.

12. For Plaintiffs' FOIA request in this case, FEMA reviewed the previously collected Milliman documents and confirmed that they had all risk modeling records potentially responsive to the request. *Id.* ¶¶ 32–33, 36–37.

13. FEMA produced all the previously collected actuarial records, as well as three separate risk modeling contracts, to Plaintiffs, in monthly rolling productions totaling 13,065 pages. *Id.* ¶ 40.

14. The produced records and publicly available information that FEMA has directed Plaintiffs to contain all the information that Plaintiffs need to understand the risk modeling used to

generate premiums in St. Charles Parish, and to understand how those premiums are calculated for a given building in the parish. *Id.* ¶¶ 32–34, 36–37.

15. FEMA applied FOIA Exemptions 4 and 5 to redact certain information in the records that it produced to Plaintiffs. *Id.* ¶¶ 42–43.

16. FEMA applied Exemption 4 to withhold certain line-item contract terms—showing, *e.g.*, the "Quantity," "Unit Price," "Amount," "Funded," and "labor hour billing" figures"—in the Federal Acquisition Regulation-based contracts that CoreLogic, KatRisk, and Milliman submitted to contract with FEMA. *Id.* ¶ 71; *id.*, *Vaughn* Index. The withheld contract terms are obtained from a person because they are the vendors own; are commercial because they constitute basic information; and are confidential because they are customarily kept private by the vendors. *See id.* ¶¶ 78–79.

17. FEMA also applied Exemption 4 to withhold modeling output information generated by CoreLogic, KatRisk, and Verisk from their catastrophe models. *Id.* ¶ 55; *id.*, *Vaughn* Index. The withheld information was obtained from a person because it was generated directly by the vendors' catastrophe models; is commercial because FEMA obtained it by licensing the vendors' catastrophe models in a commercial transaction and because the output information reflects the models' proprietary assumptions and data, which is intrinsically valuable and can be exploited by the vendors' competitors; and is confidential because the vendors closely guard their model data in a variety of ways, including using specific contract and license agreement language restricting access and dissemination, as they did here with FEMA. *Id.* ¶¶ 55–69.

18. FEMA applied Exemption 5 to withhold, under the deliberative-process privilege, portions of a draft internal rate-setting record (the "Target Rate Level" exhibit documents) with premium and model data. *Id.* ¶ 82; *id.*, *Vaughn* Index. The draft FEMA document, generated in coordination with the agency's contracted vendor, Milliman, *id.* ¶¶ 11, 13, 29–33, contains pre-decisional and deliberative risk-rating data that is not incorporated in Risk Rating 2.0 premiums—it

4

was superseded by the final risk-rating data in the final Target Rate Level exhibit that FEMA produced to Plaintiffs and applied Exemption 4 redactions to—and contains incorrect rating information that could confuse the public, *id.* ¶¶ 82–83.

19. FEMA also applied Exemption 5 to withhold contract in-force dates—the cutoff dates for the NFIP flood insurance policies that it includes as inputs for catastrophe modeling—in its internal rate-setting records also generated in coordination with its contracted vendor, Milliman. *Id.* ¶¶ 11, 13, 29–33, 89–90; *id.*, *Vaughn* Index. That information is commercial and confidential because it relates directly to FEMA's NFIP rate-setting analysis, and because the private insurers that FEMA negotiates and contracts with to purchase reinsurance coverage for excess NFIP losses could (a) utilize this information to derive the private, closely-guarded adjustment factors that FEMA applies internally to catastrophe model outputs to internally assess flood risks and losses, and (b) utilize this private information to gain leverage in reinsurance negotiations and force FEMA to accept higher reinsurance premiums and/or less reinsurance coverage. *Id.* ¶¶ 89–92.

Dated: June 14, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Yoseph T. Desta*
YOSEPH T. DESTA (CA Bar No. 332179)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Phone: 202-305-3080
Email: Yoseph.T.Desta@usdoj.gov

*Counsel for Defendant*