**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ST. CHARLES PARISH, A POLITICAL SUBDIVISION OF THE STATE OF LOUISIANA, AND MATTHEW JEWELL, IN HIS OFFICIAL CAPACITY AS ST. CHARLES PARISH PRESIDENT,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY,<br><br>*Defendant*. | Civil Action No. 2:23-cv-01369<br><br>Section P<br><br>Judge Papillion<br><br>Magistrate Judge North |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

    A.    Factual Background ....................................................................................................2

    B.    Procedural Background ..............................................................................................8

        1.    Plaintiffs' FOIA Request ..............................................................................8

        2.    FEMA's Initial Search and Response .............................................................9

        3.    Plaintiffs' Administrative Appeal ................................................................10

        4.    FEMA's Identification of Potentially Responsive Records .....................................10

        5.    Litigation ...................................................................................................13

LEGAL STANDARDS .............................................................................................................16

ARGUMENT .............................................................................................................................18

I.    FEMA Conducted an Adequate Search for Responsive Records .......................................18

II.    FEMA Properly Invoked Exemption 4 to Withheld Confidential Commercial Information Obtained from Contractors ....................................................................................27

    A.    Exemption 4 Covers the Withheld Contractor Modeling Information ...........................28

    B.    Exemption 4 Covers the Withheld Contractor Contract Information............................33

III.    FEMA Properly Invoked Exemption 5 to Withhold its Own Confidential Commercial Information and Information Protected by the Deliberative-Process Privilege .....................34

CONCLUSION..........................................................................................................................39

**INTRODUCTION**

In this Freedom of Information Act ("FOIA") litigation, Plaintiffs St. Charles Parish and parish President Matthew Jewell seek information from the Federal Emergency Management Agency ("FEMA") regarding the "data" used to calculate flood insurance premiums in the parish under Risk Rating 2.0, FEMA's actuarial update to the National Flood Insurance Program ("NFIP").  FEMA conducted a thorough search of responsive records, locating and carefully reviewing a central electronic repository its actuaries maintained to store all the final actuarial communications and other data submitted by Milliman, Inc., the primary vendor that FEMA hired to assist with its actuarial update and that Plaintiffs specifically highlighted as of interest to them in their pursuit of Risk Rating 2.0 data.  After processing the thousands of pages of responsive records it had located, FEMA determined that the vast majority of such records could be fully disclosed and produced them to Plaintiffs with no withholdings.  FEMA determined, however, that portions of some records were exempt from disclosure under FOIA Exemptions 4 and 5, and it accordingly redacted the exempt information in these records when it provided them to Plaintiffs.

Plaintiffs now challenge those withholdings, along with the adequacy of FEMA's search, but those challenges lack merit.  FEMA's search was reasonably calculated to locate all responsive records because the agency ultimately identified and reviewed a comprehensive database of final Risk Rating 2.0 actuarial data provided by the very vendor that Plaintiffs themselves focus on through their request.  The agency's declarations accompanying this motion, which describes in detail the agency's entire search process and decisionmaking, are entitled to a presumption of good faith.

Moreover, the agency's declarations and *Vaughn* index, and the accompanying declarations of each of the Risk Rating 2.0 vendors whose data is implicated in the records at issue, readily demonstrate that FEMA appropriately applied Exemptions 4 and 5.  At bottom, Plaintiffs' challenge to FEMA's Exemption 4 withholdings fails because Plaintiffs seek to compel the agency to produce

proprietary risk modeling data from CoreLogic, Inc., KatRisk LLC, and Verisk Analytics, Inc., other outside vendors involved in Risk Rating 2.0 alongside Milliman and whose data is incorporated into Milliman's and FEMA's work.  The withheld modeling data forms the very core of the risk modeling software and data that these vendors licensed to FEMA and license to other clients as their central product offerings, and they thus guard closely and never publicly release the data.  Plaintiffs also err in challenging FEMA's Exemption 4 withholding of certain line-item contract terms that the vendors included in the procurement forms they submitted in order to contract with FEMA for Risk Rating 2.0 work, as these terms are sensitive business information that the vendors keep private.

Plaintiffs' challenge to FEMA's Exemption 5 withholdings likewise fails because Plaintiffs seek to compel the agency to disclose (a) data that would reveal the agency's sensitive internal analysis of how it views particular NFIP risk issues, which would clearly harm its bargaining position in its price negotiations with private reinsurers for supplemental NFIP insurance coverage and thus represents the agency's own protected confidential commercial information, and (b) a draft risk modeling document that has incorrect data that FEMA never incorporated into Risk Rating 2.0, and that is thus subject to the deliberative-process privilege.

Accordingly, and for the reasons described more fully below, there is no genuine issue of material fact in this case, and FEMA is entitled to summary judgment.

## BACKGROUND

### A.     Factual Background

The NFIP is a federal flood insurance program that services nearly five million policies across the United States.  *See, e.g.*, Diane P. Horn & Baird Webel, Introduction to the National Flood Insurance Program (NFIP), at 1, Cong. Rsch. Serv., R44593 (Apr. 2, 2024), https://crsreports. congress.gov/product/pdf/R/R44593.  It is the primary source of flood insurance coverage for residential properties in the country, providing roughly $1.3 trillion in coverage.  *Id.* at 1–2.

Congress tasked FEMA with administering the NFIP. 42 U.S.C. §§ 4011(a), 4019. Accordingly, FEMA has the authority to estimate and set NFIP premium rates. *Id.* §§ 4014(a), 4015(a). Except for certain congressionally-authorized subsidies, by statute FEMA must estimate the premiums required to make flood insurance available on an actuarial basis. *Id.* § 4014(a)(1)(A)(i), (iv). This means that FEMA must calculate NFIP rates to reflect the true flood risks to each property (*i.e.,* the expected value of all future costs due to flooding for each property). *See, e.g.,* Casualty Actuarial Society, Statement of Principles Regarding Property and Casualty Ratemaking, at 2 (May 2021), https://perma.cc/65ZZ-8SVQ; *Drewett v. Aetna Cas. & Sur. Co.,* 539 F.2d 496, 497–98 (5th Cir. 1976).

Between the NFIP's inception in the late 1960s and 2021, FEMA calculated premiums using a methodology that did not consider an individual property's cost or other factors that fully reflected an individual property's flood risk or costs. Instead, in line with general insurance practices at the time of the NFIP's creation, FEMA established premiums using basic and static geographic and structural characteristics to classify properties. That included the location and elevation of the property in a Flood Insurance Rate Map ("FIRM"), which is a map that is based on flood studies of river and coastal flooding and displays a limited set of flood risk zones. *See, e.g.,* FEMA, Flood Insurance Manual, *3. How to Write* at Section 3.I (Apr. 2021), https://perma.cc/D4WN-F85Q; *Diane P. Horn, National Flood Insurance Program: The Current Rating Structure and Risk Rating 2.0,* at 1–3 (Apr. 4, 2022), https://perma.cc/2GAT-HN5Z.

Over the years, the NFIP achieved its goal of making flood insurance "available on a nationwide basis." 42 U.S.C. § 4001(d). But several reports in the 2000s and 2010s raised serious concerns about how FEMA's rate-setting methods and data were outdated, simplistic, and inaccurate—resulting in premiums that did not fully reflect the actual risk of flood damage and inequitably distributed premiums—and recommended that FEMA modernize its rate-setting approach, including by leveraging existing technology and probabilistic damage analysis utilized in the

3

private insurance market. *See, e.g.*, U.S. Gov't Accountability Admin., GAO-09-12, *Flood Insurance: FEMA's Rate-Setting Process Warrants Attention* 3–5 (Oct. 2008), https://perma.cc/3UVK-H349; Nat'l Rsch. Council, *Levees and the National Flood Insurance Program: Improving Policies and Practices*, at 80 (2013), https://doi.org/10.17226/18309; Tech. Mapping Advisory Council, *Annual Report* §§ 3.1–3.4 (Dec. 2016), https://perma.cc/NN2S-6JNG.

In April 2021, FEMA announced Risk Rating 2.0 on its website. FEMA, *Risk Rating 2.0 is Equity in Action* (Apr. 2021), https://perma.cc/TW62-NXXP. As the agency explained, Risk Rating 2.0 would allow FEMA to calculate expected flood losses more accurately—using current technology and better data than were used for legacy rates and thereby more equitably distributing NFIP premiums across all policyholders based on the value of their home and the unique flood risk of their property. *Id.* at 1, 5. Risk Rating 2.0 premium rates have been in effect for all new policies, as well as existing policies whose policyholders opted to utilize the new rates, since October 1, 2021. FEMA, *NFIP's Pricing Approach*, https://www.fema.gov/flood-insurance/risk-rating (last updated Nov. 28, 2023). Risk Rating 2.0 began to take effect for all other policies on April 1, 2022—applying on their renewal—and was fully implemented as of April 1, 2023. *Id.*

Risk Rating 2.0 updates the NFIP pricing methodology in three ways relevant to the instant suit: It incorporates a more comprehensive set of risk factors, relies on catastrophe modeling, and implements a centralized rating engine.

First, Risk Rating 2.0 does not base premiums solely on a property's location and elevation in a FIRM flood zone, like the legacy rating approach did. Risk Rating 2.0 instead also considers a wide range of (a) more specific geographic variables and data, including the distance to water and the type of water (e.g., river, lake, or coast), the drainage area of the river, levee data, and the elevation of the structure relative to the flooding source; and (b) more specific structural variables, including the structure's foundation height and the structure's replacement cost value. *See, e.g.*, FEMA, *Rate*

4

*Explanation Guide* (Mar. 2022), https://perma.cc/TSP3-98C9; FEMA, *National Flood Insurance Program: Risk Rating 2.0 Methodology and Data Sources* 8–14 (Jan. 18, 2022), https://www.fema.gov/sites/default/files/documents/FEMA_Risk-Rating-2.0_Methodology-and-Data-Appendix__01-22.pdf ("*RR 2.0 Methodology and Data*"); FEMA, Flood Insurance Manual, *3. How to Write* at Section 3.II.B–C (Oct. 2022), https://perma.cc/9FQL-P2Z4.

Second, Risk Rating 2.0 utilizes catastrophe models that draw on the expanded range of flood risk data to better estimate future potential loss due to flood events. *RR 2.0 Methodology and Data* at 4–7. A catastrophe model is a computerized process that simulates potential disaster events based on historical event data, scientific research, engineering methods, and statistical analysis; the simulated events generate scenarios of disaster frequency, severity, and location. *See, e.g.*, NAIC Center for Insurance Policy and Research, *Catastrophe Models (Property)*, https://content.naic.org/cipr-topics/catastrophe-models-property (last updated Mar. 20, 2024). Such a model is necessary because catastrophic risk, such as for floods, tornadoes, and earthquakes, cannot be estimated well from historical data; single, unpredictable and infrequent events such as Hurricane Katrina can significantly increase NFIP flood losses in the aggregate and materially alter the distribution of these losses among states. *See, e.g.*, American Academy of Actuaries, *Use of Catastrophe Model Output*, at 3, 31–33 (July 2018), https://perma.cc/X2V3-GMRS. So, Risk Rating 2.0 relies on catastrophe modeling to build off the historical data and other input data to statistically predict probabilities of future flood events pose. The use of catastrophe models in this manner has become standard practice for insurance companies. *Id.* at 5.

FEMA hired Milliman, Inc., an industry-leading actuarial firm for many insurance companies, for the risk modeling undergirding Risk Rating 2.0. *See, e.g.*, *RR 2.0 Methodology and Data* at 1, 4; Decl.

of Tammi Hines ("Hines Decl.") ¶¶ 11, 13[1]; Decl. of Matthew Chamberlain ("Milliman Decl.") ¶ 2. Milliman in turn relied on modeling data and models from three other FEMA-contracted vendors, CoreLogic, Inc., KatRisk LLC, and Verisk Analytics Inc., to assist with development of Risk Rating 2.0's catastrophe modeling.  *See, e.g.*, *RR 2.0 Methodology and Data* at 4; Decl. of Mikhail Palatnik ("CoreLogic Decl.") ¶¶  2, 4–5, 7 ; Decl. of KatRisk LLC ("KatRisk Decl.") ¶¶ 2, 5; Decl. of Roger Grenier, PhD ("Verisk Decl.") ¶¶ 5, 10; Hines Decl. ¶¶ 11, 13, 55; Milliman Decl. ¶¶ 7–8.

Third, Risk Rating 2.0 implements a centralized rating engine to generate rates.  *See* U.S. Dep't of Homeland Security*, Privacy Impact Assessment for the National Flood Insurance Program (NFIP) PIVOT System*, DHS/FEMA/PIA-050, at 35-38, at https://www.dhs.gov/sites/default/files/2022-09/privacy-pia-fema-050-nfippivot-sep2022.pdf.  The rating engine is the software system that FEMA uses to combine all aspects of the rating data and methodology to generate premiums for a quote or policy.  *Id.*  The ratings engine streamlines the process for insurance agents to sell NFIP policies and customers to buy them.

For the vast majority of NFIP policyholders, Risk Rating 2.0's changes have resulted in premium decreases or only slight premium increases.  Risk Rating 2.0 has resulted in 23% of policyholders seeing, on average, an immediate decrease in monthly premiums, and in 66% of policyholders seeing, on average, an increase of $10 or less per month.  FEMA, *NFIP's Pricing Approach*, https://www.fema.gov/flood-insurance/risk-rating (last updated Nov. 28, 2023).

FEMA has made publicly available Risk Rating 2.0 premium changes and other premium and policy data by state and county, as well as documents comprehensively detailing the justifications,

---

[1] In addition to the Hines declaration, FEMA has provided a similar though more abbreviated declaration from Naomi Ondrich ("Ondrich Decl."). FEMA has provided both declarations because both its FOIA and actuarial teams were involved in and worked together to search for and process records for Plaintiffs' FOIA request.

methodology, and data sources supporting Risk Rating 2.0. *Id.*[2] For example, in April 2021 and January 2022 FEMA released a 64-page NFIP technical document titled *Risk Rating 2.0 Methodology and Data Sources*. This report described Milliman's work to assist FEMA with developing Risk Rating 2.0 and provided detailed descriptions "of the methodology and data sources used," including "GIS data, Market Basket data, NFIP in-force exposure, NFIP loss and exposure data, and catastrophe model output." *RR 2.0 Methodology and Data* at 1. The report also included algorithms, rates, rating factors, and illustrative examples of rate calculation and actuarial soundness under Risk Rating 2.0. *Id.*[3]

Apart from Risk Rating 2.0, FEMA has also worked to better manage flood risks in the NFIP and the program's future exposure by "secur[ing] reinsurance coverage . . . from private reinsurance and capital markets." 42 U.S.C. § 4081(e). FEMA contracts with private insurers to transfer some NFIP flood risks to them; FEMA pays them premiums, and in return these reinsurers agree to provide coverage for losses above an agreed-upon amount (as with an ordinary insurance arrangement). FEMA, *National Flood Insurance Program's Reinsurance Program*, https://www.fema.gov/flood-

---

[2] For example, Exhibit 4 on a subpage of FEMA's *NFIP's Pricing Approach* webpage provides the following data on St. Charles Parish in particular: As of September 30, 2022, the parish has 7,416 NFIP policies in force; the average full-risk rate under Risk Rating 2.0 for a single-family home in the parish is $2,766, and the current average rate is $815. FEMA, *Cost of Flood Insurance for Single-Family Homes under NFIP's Pricing Approach*, https://www.fema.gov/flood-insurance/work-with-nfip/risk-rating/single-family-home. Another subpage provides an exhibit, titled "Louisiana — Risk Rating 2.0 — County Breakdown," showing the following first-year premium changes for St. Charles Parish policyholders under Risk Rating 2.0: 7% paying less in monthly premiums; 78% seeing only up to a $10 increase in monthly premiums; 10% seeing between a $10-$20 increase in monthly premiums, and the remainder seeing larger increases. FEMA, *NFIP's Pricing Approach State Profiles*, https://www.fema.gov/flood-insurance/risk-rating/profiles.

[3] Also released in April 2021 were "Risk Rating 2.0 Methodology and Data Sources - Premium Calculation Worksheet Examples" and "Risk Rating 2.0 Methodology and Data Sources - Appendix D Rating Factors." FEMA, *NFIP's Pricing Approach*. "Worksheet Examples" provides four sample worksheets explaining various inputs that led to premium rates using Risk Rating 2.0. "Appendix D Rating Factors" provides numerical rating values for various rating factors, to help the public better understand how premiums are calculated under Risk Rating 2.0.

insurance/work-with-nfip/reinsurance (last updated Mar. 26, 2024).  Each year since 2017, FEMA has entered into annual contracts with 18–32 reinsurance companies; it has paid these companies between $90 million and $235 million in total annual premiums to secure between $500 million and $1.5 billion in total coverage—providing the agency with an additional method to fund payment of NFIP flood claims after catastrophic flood events.  *Id.*  FEMA also secures reinsurance coverage through the issuance of bonds to the capital markets; as part of this coverage, FEMA also pays tens of millions in premiums in exchange for reinsurance coverage for a set term.  *Id.* [4]

**B.   Procedural Background**

**1.   Plaintiffs' FOIA Request**

On November 3, 2022, Plaintiffs submitted a FOIA request to FEMA requesting "all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana, in Risk Rating 2.0."  Compl. ¶ 20, ECF No. 1.  FEMA's central FOIA office, known as its Disclosure Branch, acknowledged Plaintiffs' request by email on November 7.  *See* Hines Decl. ¶¶ 3, 14.  On November 23, the branch asked Plaintiffs for "clarity" regarding the "specific data" being sought, so as to assist "the search tasker in finding records."  Compl. ¶ 21 (quotation marks omitted); *see* Hines Decl. ¶ 15.  Plaintiffs responded that same day, stating that "[t]he NFIP uses risk modeling to determine how much premium to charge participants who participate in the flood insurance program. I am requesting the risk model used to assign premiums to St. Charles Parish residents. I believe Milliman was the company that did the modeling for FEMA."  Compl. ¶ 22 (quotation marks omitted); *see* Hines Decl. ¶ 15.

---

[4] The additional coverage covers portions of NFIP losses up to a certain amount for a single qualifying flood event.  For example, FEMA's 2024 reinsurance placements with private companies provide coverage for 8% of losses between $7 billion and $9 billion and 22% of losses between $9 billion and $11 billion.  FEMA, *FEMA Announces Reinsurance Program to Manage Future Flood Risk in 2024*, https://www.fema.gov/press-release/20240103/fema-announces-reinsurance-program-manage-future-flood-risk-2024.

2.       **FEMA's Initial Search and Response**

The Disclosure Branch commenced its search for responsive records on November 25, 2022. *See* Hines Decl. ¶¶ 16–17.  That day, it referred Plaintiffs' FOIA request to a FOIA liaison in FEMA Region 6, where Plaintiffs are located.  Specifically, the branch tasked Region 6 to complete the search and it summarized the FOIA request.  *Id.* ¶¶ 17–18.  On December 2, 2022, the Region 6 FOIA liaison responded to the referral by stating that the region had conducted a search and determined that it did not have access to the records requested because NFIP risk modeling data utilized to determine premiums belongs to the actuaries within the Federal Insurance Directorate ("FID"), the organization within FEMA that manages the NFIP and a range of programs designed to mitigate against future losses from floods, earthquakes, tornadoes, and other natural disasters.  *Id.* ¶ 19.  The Region 6 liaison recommended that the Disclosure Branch refer Plaintiffs' FOIA request to FID, which the branch did that day.  *Id.*

In January 2023, FID determined that it could not satisfy Plaintiffs' request because the request sought proprietary information protected under FOIA Exemption 4.  *Id.* ¶ 20.  FID construed Plaintiffs' request for "all data . . . used to calculate" NFIP premiums in St. Charles Parish as an indirect way of seeking trade-secret geospatial information in the rating engine for Risk Rating 2.0. *Id.* (quotation marks omitted).  FID construed Plaintiffs' request in this manner because the rating engine generates premiums, and because the premiums for St. Charles Parish would be informed by trade-secret geospatial data for that area.  *Id.*  FID had received other FOIA requests for such trade-secret data and interpreted Plaintiffs' request in the same manner.  *Id.*  FID developed a standardized response to these requests that explained the algorithm is a protected "trade secret" under Exemption 4.  *Id.* ¶ 21.  FEMA's January 27, 2023, final response letter to Plaintiffs used that standardized response, stating in relevant part that (1) the rating engine "was designed using privately held" and "proprietary data" "that the US government purchased through contracting," and (2) Plaintiffs should

use FEMA's Open FEMA public resource for FEMA program data. *Id.*; *see also* Compl. ¶¶ 24–25. FID referred Plaintiffs to OpenFEMA because, apart from the trade-secret information that Plaintiffs sought, it believed that the publicly available information on the website would satisfy their request for the data used to calculate NFIP premiums. *See* Hines Decl. ¶ 22.

### 3.    Plaintiffs' Administrative Appeal

On February 27, 2023, Plaintiffs administratively appealed FEMA's final response. Compl. ¶ 26. Plaintiffs argued that "it is highly improbable that FEMA was unable to recover a single responsive and non-confidential document." Hines Decl. ¶ 23 (quotation marks omitted). Plaintiffs stated that "it seems the agency misunderstood the[ir] request." *Id.* (quotation marks omitted). They clarified that, contrary to FEMA's interpretation, their FOIA request "did not seek third party proprietary data" in FEMA's risk rating engine "or any type of algorithm that FEMA used to calculate the NFIP premiums in Risk Rating 2.0," but instead "seeks the data that is crucial to the residents of St. Charles Parish and will assist in understanding the risk rating in order to intelligently protect and advance the interest of its citizens." *Id.* (quotation marks omitted). Plaintiffs also argued that FEMA's response was improper because it failed to state whether FEMA reviewed any documents, determined if any documents were responsive, or how it determined whether the documents constituted trade secrets, and because it failed to rely on the appropriate standard for applying Exemption 4. *Id.* ¶ 24.

### 4.    FEMA's Identification of Potentially Responsive Records

In response to Plaintiffs' appeal, FEMA initiated a second search for responsive documents on March 8, 2023, once again referring Plaintiffs' request to FID and also providing the parties' various correspondences. *Id.* ¶ 25. FID believed that Plaintiffs' appeal was vague as to the data Plaintiffs had requested, but it concluded that Plaintiffs could be seeking the Milliman data that was used to create the Risk Rating 2.0 rating methodology. *Id.* ¶ 26. On March 16, 2023, FID contacted Plaintiffs asking for "specific examples of records that fall under 'all data' described in the request."

Plaintiffs responded on March 23, 2023. *Id.* ¶ 27 (quotation marks omitted). Plaintiffs did not provide any examples, stating it was "impossible" to do so. *Id.* ¶ 28 (quotation marks omitted); *see also* Compl. ¶ 29.

In the following two weeks, FID and the Disclosure Branch coordinated through emails and meetings, and they collectively concluded that FEMA had misinterpreted Plaintiffs' FOIA request and had documents potentially responsive to the request. *See* Hines Decl. ¶ 29. More specifically, FID and the Disclosure Branch determined—consistent with Plaintiffs' explanation in their appeal— that Plaintiffs' FOIA request did not seek the Risk Rating 2.0 rating engine algorithm or associated rating-engine data and could not be satisfied simply with publicly available data regarding rate calculations, but instead sought non-publicly-available data: the Milliman data underlying Risk Rating 2.0. *Id.* And FID and the Disclosure Branch determined that records that FEMA had previously collected but had not yet released for a prior FOIA request from a separate requester contained all the Milliman data potentially responsive to Plaintiffs' request. *Id.*

The prior FOIA request, assigned case number 2022-FEFO-00776, had sought "[a]ll actuarial communications, reports, spreadsheets, data files, and other records provided to FEMA by Milliman, Inc. in connection with Milliman's work under Risk Rating 2.0." *Id.* ¶ 30 (quotation marks omitted). As the prior request had noted, FEMA's January 2022 public report titled *Risk Rating 2.0 Methodology and Data Sources* had stated that Milliman had worked for FEMA to develop Risk Rating 2.0 and that "Milliman's work under Risk Rating 2.0 has been fully documented in over 40 separate actuarial communications to FEMA provided over the course of the engagement, including both actuarial reports and other formats such as spreadsheets and electronic data files." *Id.* (quotation marks omitted). In November 2022, FID conducted a search for this request by locating a shared electronic database repository containing all actuarial communications, reports, spreadsheets, data files, and other records provided to FEMA by Milliman in connection with Milliman's work for Risk Rating

2.0.  *Id.* ¶ 31.  FID had used the repository to organize and store all final deliverables that Milliman had produced for FEMA as part of its contract and had provided to FEMA electronically.  *Id.*  FID reviewed the repository to ensure that all final deliverables had been included.  *Id.*  FID transferred all the data files to the Disclosure Branch via a shared electronic folder.  *Id.*

Between March 24, 2023, and April 3, 2023, the Disclosure Branch and FID reviewed the 2022-FEFO-00776 request materials and the shared folder containing the Milliman data for this prior request, and they concluded from their review that the database had all the records potentially responsive to Plaintiffs' request.  *Id.* ¶ 32.  The Disclosure Branch and FID reached this conclusion based on five considerations: (1) FID had previously confirmed the shared folder contained all Milliman data; (2) Plaintiffs had specifically identified Milliman data in their FOIA request; (3) in response to FEMA's attempt to clarify their request, Plaintiffs further specified they were requesting the Risk Rating 2.0 "risk model used to assign premiums," which they identified "Milliman" as the source for; (4) no "risk model" data neatly exists at the parish level, as Plaintiffs' request contemplated, since FEMA generates risk data outputs from catastrophe models at the location level and aggregates them beyond the parish or county level; and (5) despite the lack of ready-made parish-level data, specific documents in the Milliman shared folder and publicly available exhibits on FEMA's website together provide all that is necessary to calculate a Risk Rating 2.0 premium for a specific building in St. Charles Parish (or any other locale).  *Id.* ¶¶ 32–33.

FEMA completed its work on the search for Plaintiffs' request on April 3, 2023.  *Id.* ¶ 35.  Its form documenting the search noted that the located records included a "Target Rate Level Exhibit," which "shows the catastrophe model results, the derivation of the selected Average Annualized Losses (AALs) by state from the modeled results, how those AALs were rescaled by Occupancy type and Location, and the allocation of AALs by Coverage type (A/C) and Peril."  *Id.* ¶ 36 (quotation marks omitted).  The search form also noted that "Exhibits 10 and 11 show the derivation of each territory

factor by Peril." *Id.* (quotation marks omitted).  In other words, as FEMA identified, the located records included data showing how FEMA, through Risk Rating 2.0, translated countrywide and statewide modeling results for premium calculations down to local-level premium results.  *Id.* ¶ 37.

On April 14, 2023, FEMA informed Plaintiffs regarding the completion of its second search and of its impending processing of records.  *See* Compl. ¶ 30.  FEMA anticipated issuing a response to Plaintiffs and beginning to process responsive material soon after April 19, 2023, once it had publicly released full-risk rates on its website and could also direct Plaintiffs to these public materials. *See* Hines Decl. ¶ 38.

### 5.    Litigation

Plaintiffs sued FEMA on April 25, 2023.  *See* Compl.  They alleged that FEMA's failure to timely respond to their request and appeal violated FOIA, and they requested that the Court order FEMA to process their request, perform a full and adequate search for the requested records, and identify what documents or information it was withholding under Exemption 4.  *Id.* at 7.  FEMA timely filed its Answer on June 26, 2023.  *See* Answer, ECF No. 9.[5]

On August 11, 2023, Plaintiffs served discovery on FEMA.  *See* Mem. in Supp. of Mot. for a Protective Order Precluding Discovery 1 ("Protective Order Mem."), ECF No. 12-1.  Plaintiffs served 16 interrogatories, seeking information on FEMA's search in response to their FOIA request as well on a range of other topics, including how FEMA maintained records and documents pertaining to Risk Rating 2.0 and what percentage of FEMA's FOIA responses involved Exemption 4.  *Id.*, Ex. B. Plaintiffs also served four requests for production, including to obtain FEMA's *Vaughn* index, non-privileged documents that FEMA utilizes regarding the application of Exemption 4, and guidance

---

[5] St. Charles Parish also was one of the plaintiffs in the Administrative Procedure Act litigation challenging Risk Rating 2.0, which is also pending before the Court.  The Court dismissed the parish from that suit.  *Louisiana v. DHS*, Case No. 2:23-CV-01839, ECF No. 100.

that contractors handling Risk Rating 2.0 provided to FEMA regarding the confidentiality of Risk Rating 2.0. *Id.*  FEMA moved for a protective order under Federal Rule of Civil Procedure 26(c), arguing that discovery was unwarranted because of the case law generally barring discovery in FOIA cases and limiting such discovery to the adequacy of the agency's search, which Plaintiffs' discovery requests went beyond. *See id.* at 2–6.  As part of its briefing in support of its motion, FEMA also explained that it had identified 12,904 pages of potentially responsive records through its search; was processing those records to review and ensure protection of potentially proprietary data exempt from disclosure; anticipated based on its in-progress review that certain records were exempt; and anticipated making an initial production of non-exempt records to Plaintiffs by the beginning of October, with monthly productions thereafter. *See* Reply Mem. in Supp. of Mot. For a Protective Order Precluding Discovery 7–8 ("Protective Order Reply"), ECF No. 18-2.

Magistrate Judge Michael B. North granted FEMA's protective order motion as to the majority of Plaintiffs' discovery requests.  Order on Mot., ECF No. 21.  But he denied FEMA's motion in part, determining that "limited discovery" was "appropriate." *Id.* at 2.  He justified the limited discovery based on (1) FEMA's delays, namely its two-month delay in issuing its January 27, 2023, response to Plaintiffs' FOIA request, and failure to issue a final decision at that point on Plaintiffs' administrative appeal; and (2) FEMA's "blanket invocation of confidentiality" to withhold all records in its January 27 response, including some that appear to be publicly available, and its subsequent representations that it was in the midst of processing records and expected certain records to be exempt from disclosure. *Id.* at 1–2.[6]  FEMA timely produced the ordered discovery.

---

[6] The Court directed FEMA to respond to Plaintiffs' interrogatories that pertained to FEMA's search for and identification of responsive records and FEMA's application of Exemption 4; and it directed FEMA to respond to Plaintiffs' requests for production concerning guidance that contractors provided to FEMA regarding Risk Rating 2.0 data and non-privileged documents that FEMA relies on regarding the application of Exemption 4. *Id.* at 2; *see* Protective Order Mem., Ex. B.

On September 29, 2023, FEMA issued its first interim response to Plaintiffs on their FOIA appeal.  *See* Hines Decl. ¶ 40.  FEMA indicated in its response that it had located 12,904 pages of records.  *Id.*  Between then and February 2024, FEMA continued to make monthly rolling productions of records in full, disclosing an additional 11,426 pages of records with no withholdings.  *Id.* (Mar. 12, 2024, Resp. Letter Ex.).  Finally, on March 12, 2024, FEMA issued is last interim response, wherein it released 1,115 pages with portions of these records withheld under Exemptions 4 and 5.  *Id.*[7]

As FEMA explained, it applied Exemption 4 to withhold proprietary information: namely certain confidential commercial modeling data that third-party vendors assisting FEMA in developing Risk Rating 2.0—*i.e.*, CoreLogic, KatRisk, and Verisk—had submitted to FEMA as part of their work.  *Id.*  Consistent with DHS regulatory guidance, 6 C.F.R. § 5.7(c), FEMA reached out to each vendor to (a) provide them written notice that their modeling information was the subject of a FOIA request and may contain confidential commercial information under Exemption 4, and (b) solicit their perspective on the necessity to protect this information, and in particular on whether they customarily keep the data at issue private and provided it to FEMA under assurances of confidentiality, *see* Hines Decl. ¶¶ 58, 72.  Each vendor explained that their withheld pieces of data are proprietary elements of their commercial products, and that they closely guard in various ways and provided to FEMA only under assurances of confidentiality.  *Id.* ¶¶ 59–61, 64–69; *see also* Verisk Decl. ¶¶ 15–20, 23; CoreLogic Decl. ¶¶ 14, 17–18, 26; KatRisk Decl. ¶¶ 13–14, 16, 20–21; Milliman Decl. ¶ 14.[8]

---

[7] FEMA processed 161 additional pages beyond the 12,904 pages it initially identified because (a) while it processed records from its search of the shared repository of documents, its procurement office identified a handful of additional responsive contracts, and (b) its initial page-count may have been slightly off due to an administrative error in its processing platform.  *Id.* ¶ 40 & nn.20, 21.

[8] FEMA's response letter did not specifically note the Exemption 4 withholdings that the agency applied to certain line-item CoreLogic, KatRisk, and Milliman contract terms.  But, as reflected in the redacted documents it produced to Plaintiffs and in the *Vaughn* index attached hereto, FEMA did apply the Exemption 4 to this contract information.  As it did for the withheld modeling data, the

FEMA explained that it applied Exemption 5 to (1) withhold contract in-force dates, as these dates could provide access to internal proprietary data and compromise price negotiations with NFIP reinsurers; and (2) partially withhold a draft document containing data that was not approved or used in risk rating plans and that was partially incorrect.  *See* Hines Decl. ¶ 40 (Mar. 12, 2024, Resp. Letter Ex.).

Following FEMA's productions, Plaintiffs' counsel informed FEMA's undersigned counsel by email that Plaintiffs intended to challenge the agency's search and its withholdings.

## LEGAL STANDARDS

The Freedom of Information Act, 5 U.S.C. § 552, represents a balance struck by Congress "between the right of the public to know and the need of the Government to keep information in confidence."  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. 89-1497, 89th Cong., 2d Sess. 6 (1966)).  Although the statute reflects a general philosophy of disclosure by agencies in response to properly submitted requests, *see id.*, the statute also recognizes "that public disclosure is not always in the public interest and thus provided that agency records may be withheld from disclosure under any of the nine exemptions defined in 5 U.S.C. § 552(b)," *CIA v. Sims*, 471 U.S. 159, 166–67 (1985); *see also Martin v. U.S. Dep't of Just.*, 488 F.3d 446, 453 (D.C. Cir. 2007).[9]  The exemptions from FOIA's disclosure requirements are designed "to balance the public's interest in governmental transparency against the legitimate governmental and private interests [that] could be harmed by the release of certain types of information." *United Techs Corp. v. U.S. Dep't of Defense*, 601

---

agency consulted with the vendors about the need to withhold their contract information.  *See* Hines Decl. ¶¶ 72–76.

[9] Courts in this Circuit and in other Circuits frequently rely on FOIA decisions from the D.C. Circuit because it is "the federal appellate court with the most experience in this field."  *Cooper Cameron Corp. v. U.S. Dep't of Lab., Occupational Safety & Health Admin.*, 280 F.3d 539, 543 (5th Cir. 2002); *see also, e.g., Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1257 n.23 (11th Cir. 2008); *Whitaker v. Dep't of Com.*, 970 F.3d 200, 206 & n.25 (2d Cir. 2020).

F.3d 557, 559 (D.C. Cir. 2010) (quotation marks omitted).  Accordingly, courts have emphasized that the exemptions "are intended to have meaningful reach and application" and should not be "construed in a nonfunctional way."  *John Doe Agency*, 493 U.S. at 152, 157.

FOIA cases are typically resolved on motions for summary judgment.  *See, e.g.*, *Flightsafety Servs. Corp. v. U.S. Dep't of Labor*, 326 F.3d 607, 610 (5th Cir. 2003); *Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Courts review agency responses to FOIA requests *de novo*.  *See* 5 U.S.C. § 552(a)(4)(B).  Courts consider two issues to determine whether summary judgment for the agency is appropriate.  First, the court determines whether the agency has made "reasonable efforts to search for the records" requested by the plaintiff.  *Id.* § 552(a)(3)(C); *see generally Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015).  Second, if an agency's search locates responsive records, the court determines whether the government has properly withheld records or information under any of FOIA's exemptions.  5 U.S.C. § 552(a)(4)(B); *see generally Shapiro v. U.S. Dep't of Just.*, 893 F.3d 796, 799 (D.C. Cir. 2018); *Rahim v. FBI*, 947 F. Supp. 2d 631, 639 (E.D. La. 2013).  Agencies can satisfy their burden of proof through the submission of "affidavits that explain in reasonable detail the scope and method of the search," *Meeropol v. Meese*, 790 F.2d 942, 952 (D.C. Cir. 1986) (quotation marks omitted), and how the "material withheld is logically within the domain of the exemption claimed," *PHE, Inc. v. Dep't of Just.*, 983 F.2d 248, 250 (D.C. Cir. 1993) (quotation marks omitted).  Such agency declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks omitted); *see also, e.g.*, *Jud. Watch, Inc. v. CIA*, 310 F. Supp. 3d 34, 41 (D.D.C. 2018).

**ARGUMENT**

**I.      FEMA Conducted an Adequate Search for Responsive Records**

The adequacy of any FOIA search is "dependent upon the circumstances of the case." *Schrecker v. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003).   An agency must demonstrate, under the circumstances before it, that it conducted a reasonable search:  that it "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Mobley*, 806 F.3d at 580; *see also, e.g.*, *Batton v. Evers*, 598 F.3d 169, 176 (5th Cir. 2010) ("An agency may demonstrate that it conducted an adequate search by showing that it used methods which can be reasonably expected to produce the information requested." (quotation marks omitted)).   Accordingly, "[t]here is no requirement that an agency search every record system." *Batton*, 598 F.3d at 176; *see also, e.g.*, *Watkins L. & Advoc., PLLC v. U.S. Dep't of Just.*, 78 F.4th 436, 442 (D.C. Cir. 2023).   Nor does the adequacy inquiry turn on "the fruits of the search," *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003), or whether the agency can "demonstrate that all responsive documents were found and that no other relevant documents could possibly exist," *Watkins L. & Advoc.*, 78 F.4th at 442 (quotation marks omitted); *see also, e.g.*, *Batton*, 598 F.3d at 176; *SafeCard Servs.*, 926 F.2d at 1201.   Rather, summary judgment for the agency is appropriate where it employed methods reasonably expected to produce the requested information and its declaration describing these search methods is "reasonably detailed" and "aver[s] that all files likely to contain responsive materials . . . were searched." *Porup v. CIA*, 997 F.3d 1224, 1237 (D.C. Cir. 2021) (quotation marks omitted).   Such is the case here.

FEMA is entitled to summary judgment on the adequacy of its search because it has submitted detailed declarations describing the rational steps the agency took to locate the requested Risk Rating 2.0 data and averring that these steps enabled it to search all files likely to contain responsive data. The Hines declaration comprehensively lays out the who-what-where-when-and-why of FEMA's

entire search process. *See* Hines Decl. ¶¶ 14–41. The Ondrich declaration provides a similar, more abbreviated overview. *See* Ondrich Dec. ¶¶ 12–19. Most importantly, the declarations describe how senior members of FEMA's Disclosure Branch and actuarial team worked together in March-April 2023 and (1) determined, based on Plaintiffs' FOIA appeal and the parties' correspondences, that Plaintiffs' FOIA request sought the risk-modeling data, *i.e.*, Milliman data, undergirding Risk Rating 2.0 premiums; (2) identified an existing FEMA electronic repository of all final Milliman actuarial communications, reports, spreadsheets, data files, and other records provided as part of Milliman's work on Risk Rating 2.0, which had already been reviewed by FEMA's actuaries as part of FEMA's work on a prior FOIA request similarly seeking Risk Rating 2.0 data; (3) reexamined the repository, containing thousands of pages, to ensure that it contained all applicable risk model data used to assign premiums, as Plaintiffs had requested; and (4) specifically analyzed how Plaintiffs could use particular exhibits in the technical records collected for production to understand the premiums generated in localities such as St. Charles Parish. *See* Hines Decl. ¶¶ 25–37; *see also* Ondrich Decl. ¶¶ 13–19.

This fulsome declaration discussion, and the declarations' explanation of FEMA's entire search process beginning in November 2022, is certainly more than "reasonably detailed." Accordingly, the Hines and Ondrich declarations are entitled to a presumption of good faith and easily demonstrate FEMA's compliance with its obligation to conduct a legally adequate search. Particularly because FOIA requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," the D.C. Circuit counsels that it "is hardly an area in which the courts should attempt to micro manage the executive branch" in its good-faith efforts to locate responsive records. *Schrecker*, 349 F.3d at 662 (quoting *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002)). That counsel applies with special force here, where technical modeling, concerning the agency's multi-year effort to update the pricing methodology for a program providing coverage to millions of Americans, is what is at issue.

Plaintiffs cannot rebut the presumption of good faith that attaches to FEMA's declarations. Neither of the examples of alleged bad faith that Plaintiffs have previously relied upon—(1) FEMA's delays in responding to and adjudicating their FOIA request and appeal and producing documents, and (2) its initial blanket invocation of Exemption 4, before determining that this blanket invocation was erroneous and identifying and processing documents—suffice to rebut the good-faith presumption, as overwhelming case law establishes.

Courts consistently conclude that agencies' various FOIA delays are, as a general matter, not indicative of bad faith and thus do not rebut the presumption of good faith. *See, e.g.*, *Iturralde*, 315 F.3d at 315 ("[I]nitial delays in responding to a FOIA request are rarely, if ever, grounds for discrediting later affidavits by the agency."); *Goland v. CIA*, 607 F.2d 339, 355 (D.C. Cir. 1978) ("[I]n view of the well-publicized problems created by the . . . time limits for processing FOIA requests and appeals, the [agency's] delay alone cannot be said to indicate an absence of good faith." (footnote omitted)); *Skurow v. U.S. Dep't of Homeland Sec.*, 892 F. Supp. 2d 319, 326 (D.D.C. 2012) ("Courts routinely find that delays in responding to FOIA requests are not, in and of themselves, indicative of agency bad faith."); *Navigators Ins. Co. v. Dep't of Just.*, 155 F. Supp. 3d 157, 169 (D. Conn. 2016) ("The touchstone of the reasonableness inquiry appears to be simply the thoroughness of the search, notwithstanding the tardiness of the results." (quotation marks omitted)).[10] Indeed, courts "routinely find" that quite lengthy delays, of *several years*, "do not suggest agency bad faith." *Amiri v. Nat'l Sci. Found.*, 664 F. Supp. 3d 1, 23 (D.D.C. 2021) (collecting cases, including *Competitive Enter. Inst. v. Nat'l Aeronautics & Space Admin.*, 989 F. Supp. 2d 74, 88–89 (D.D.C. 2013) (two-year delay), and *Thomas v. Dep't of Justice*, 531 F. Supp. 2d 102, 109 (D.D.C. 2008) (three-year delay)); *see also, e.g.*, *Holt v. U.S. Dep't*

---

[10] Countless other cases reinforce this principle, across circumstances. *See, e.g.*, *Fischer v. Dep't of Justice*, 723 F. Supp. 2d 104, 108 (D.D.C. 2010) (rejecting argument that agency's failure to produce documents until after litigation commenced evidenced agency's bad faith); *Am. Fed'n of Gov't Emp. v. Broad. Bd. of Governors*, 711 F. Supp. 2d 139, 148 (D.D.C. 2010) (same).

*of Just.*, 734 F. Supp. 2d 28, 37 (D.D.C. 2010) (almost seven-year delay before providing substantive response did not show bad faith); *Wheeler v. U.S. Dep't of Just.*, 462 F. Supp. 2d 48, 54 (D.D.C. 2006) (over a year-long delay just in beginning to conduct FOIA search did not show bad faith); *Smith v. U.S. Marshals Serv.*, No. 19-CV-3572-LTS, 2021 WL 1177692, at *5 (S.D.N.Y. Mar. 29, 2021) (three-year delay in responding to FOIA request did not show bad faith). *A fortiorari*, then, FEMA's much more modest delays—a matter of months, not years—in initially responding to Plaintiffs' FOIA request and appeal and in searching, processing, and making rolling monthly productions of responsive records cannot show bad faith. *Amiri*, 664 F. Supp. 3d at 23 (similar analysis).

Moreover, FEMA's modest "delay" is not just nonprobative as a general matter; it is also plainly justified by the circumstances that the agency faced. As reflected in the Hines declaration, several factors explain the time FEMA took: (1) the agency's significant FOIA workload and backlog and limited staff to work on FOIA requests and cases; (2) the influx of FOIA requests specifically related to Risk Rating 2.0 in the past two years, creating complexity and the need for intra-agency coordination; (3) the potential breadth and vagueness of Plaintiffs' FOIA request (regarding "all" the data undergirding a complex, many-years-in-the-making update to a national agency program) and FEMA's initial misunderstanding of what exactly Plaintiffs sought and numerous efforts to clarify the request; (4) the agency's efforts to correct its misunderstanding and coordinate internally to search for and locate responsive records; (5) the need for the agency, in processing responsive records, to perform the legally required consultation with the third-party vendors who submitted the data contained therein, 6 C.F.R. § 5.7(c), so as to ensure protection of their confidential commercial information; and (6) the need for the agency to process and produce thousands of pages. *See* Hines Decl. ¶¶ 3, 5, 15, 20, 23, 26–29, 32, 40, 58–61, 72–75. Any of these circumstances in isolation, and certainly their combination, amply demonstrate that FEMA has acted in good faith in the time it took to search for and begin producing the records responsive to Plaintiffs' request. *Cf., e.g., Amiri*, 664 F.

21

Supp. 3d at 23 (no bad faith where "backlog" and "an administrative error" explained delay); *Edelman v. Sec. & Exch. Comm'n*, 172 F. Supp. 3d 133, 157–58 (D.D.C. 2016) (no bad faith where broad request explained delay); *Competitive Enter. Inst.*, 989 F. Supp. 2d at 88–89 (no bad faith where staffing issues caused delay); *Budik v. Dep't of the Army*, 742 F. Supp. 2d 20, 33 (D.D.C. 2010) (no bad faith where "administrative error" caused delay); *S. Appalachian Biodiversity Project v. U.S. Forest Serv.*, 500 F. Supp. 2d 764, 769 (E.D. Tenn. 2007) (no bad faith where delay was simply "tardiness" caused by backlog).

FEMA's initial blanket invocation of Exemption 4 after its first search, before it then correctly "change[d] course," also is not probative of bad faith. *Am. Oversight v. U.S. Dep't of Just.*, 401 F. Supp. 3d 16, 26 (D.D.C. 2019). That course of events does not "displace the good-faith presumption" since, as a general matter, an agency's "[m]istakes alone do not imply bad faith," and "error-free performance is not required." *Id.* at 26–27(quotation marks omitted); *see also, e.g., Fischer*, 723 F. Supp. 2d at 109 (similar). "[W]hat is expected of a law-abiding agency is that it admit and correct error when error is revealed." *Meeropol*, 790 F.2d at 953; *see also, e.g., id.* at 952–53 (initial agency noncompliance does not "count against" agency and reflect bad faith where later compliance, including through a *de novo* search, cures the past deficiency); *Am. Oversight*, 401 F. Supp. 3d at 26–27 (explaining in detail how "case after case" embodies this principle). FEMA clearly has admitted and cured its initial mistakes. And as reflected in the Hines declaration, FEMA has done so by taking steps that courts routinely conclude do not reflect bad faith and in fact can "bolster[] the good-faith presumption." *Am. Oversight*, 401 F. Supp. 3d at 26. Consider how, in response to Plaintiffs' administrative appeal, FEMA:

- Reexamined Plaintiffs' request, attempted to clarify it, and determined that the agency had misconstrued it and had thus cast too narrow of a net in the initial search, Hines Decl. ¶¶ 26–29[11];

---

[11] *See, e.g., Alford v. Dep't of Veterans Affs.*, 277 F. Supp. 3d 91, 98–99 (D.D.C. 2017) (no bad faith where agency, after failing to timely respond to FOIA request and displaying "blind spot" for the time bounds of Plaintiffs' request, "nevertheless revisited the matter" and thus demonstrated "good faith"); *Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*, 404 F. Supp. 2d 325, 333 (D.D.C. 2005) (no bad faith where,

- Conducted an additional, robust search and notified Plaintiffs within weeks, prior to their suit, *id.* ¶¶ 29–35; Compl. ¶ 30,[12] and

- Subsequently disclosed the responsive, non-exempt documents it failed to produce in its first FOIA search and response that mistakenly came up empty, Hines Decl. ¶ 40.[13]

Such error-correction steps are *desirable*, not evidence of bad faith. Accepting Plaintiffs' suggestion

otherwise would, as the D.C. Circuit has long warned, "work mischief . . . by creating a disincentive

---

"rightly or wrongly, the defendant narrowly construed the plaintiff's initial FOIA request" but then revisited the matter "after the parties engaged in discussions and this suit was commenced"), *aff'd*, 512 F.3d 677 (D.C. Cir. 2008); *Garcia v. U.S. Dep't of Just., Off. of Info. & Priv.*, 181 F. Supp. 2d 356, 367 (S.D.N.Y. 2002) (no bad faith where government determined that its "initial failure to locate responsive documents was the result of . . . administrative error").

[12] *See, e.g., Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 200 (D.C. Cir. 2014) (no bad faith where agency undertook "a second search prompted by [plaintiff]'s administrative appeal" and "quickly notified [plaintiff] that it had located [responsive] records"); *Meeropol*, 790 F.2d at 952 ("[T]he institution of a *de novo* search significantly undercuts [the] argument that earlier noncooperation by the [agency] raises a substantial question of current bad faith . . . ." (quotation marks omitted)); *Parker v. U.S. Immigr. & Customs Enf't*, 238 F. Supp. 3d 89, 104 (D.D.C. 2017) (describing how "the performance of additional searches following an agency's initial response to a FOIA request . . . actually indicates good faith and suggest[s] a stronger . . . basis for accepting the integrity of the search" (quotation marks omitted)); *Nat'l Inst. of Mil. Just.*, 404 F. Supp. 2d at 333 (no bad faith where, as a result of revisiting FOIA request, agency "expanded its search for responsive documents, searched in locations not previously searched and utilized different search terms which expanded the scope of the search"); *Wolf v. CIA*, 569 F. Supp. 2d 1, 19 (D.D.C. 2008) (finding that agency's further search efforts, after plaintiff made additional "reasoned requests" following unfruitful initial search (because agency had initially asserted a *Glomar* response without searching for potentially responsive documents), "belie[] any finding of bad faith"); *Rein v. U.S. Pat. & Trademark Off.*, 553 F.3d 353, 364 (4th Cir. 2009) (no bad faith where agency rectified initial failure to appropriately search by performing thorough search); *Highland Cap. Mgmt., LP v. Internal Revenue Serv.*, 408 F. Supp. 3d 789, 805 (N.D. Tex. 2019) ("The fact that the IRS conducted multiple searches and reviews indicates that the IRS was complying with FOIA obligations in good faith.").

[13] *See, e.g., Pub. Citizen v. Dep't of State*, 276 F.3d 634, 645 (D.C. Cir. 2002) (discussing how "subsequent disclosure" of documents initially withheld does not qualify "as evidence of bad faith"); *Abramyan v. U.S. Dep't of Homeland Sec.*, 6 F. Supp. 3d 57, 64–65 (D.D.C. 2013) (same); *Nat'l Inst. of Mil. Just.*, 404 F. Supp. 2d at 333 (same); *People for the Ethical Treatment of Animals, Inc. v. Bureau of Indian Affs.*, 800 F. Supp. 2d 173, 179 (D.D.C. 2011) (*PETA*) (same, and explaining that it is "well settled . . . that the subsequent production of responsive documents can remedy inadequate searches"); *Lechliter v. Dep't of Def.*, 371 F. Supp. 2d 589, 595 (D. Del. 2005) ("Here, Defendant corrected any 'error' by enlarging the scope of the search and providing additional documents after Plaintiff had expressed dissatisfaction with the initial search."), *aff'd sub nom.* 182 F. App'x 113 (3d Cir. 2006).

for an agency to reappraise its position, and when appropriate, release documents previously withheld. It would be unwise for us to punish flexibility, lest we provide the motivation for intransigence." *Mil. Audit Project v. Casey*, 656 F.2d 724, 754 (D.C. Cir. 1981); *see also, e.g.*, *Meeropol*, 790 F.2d at 953; *PETA*, 800 F. Supp. 2d at 179 (explaining that error-correction that results in subsequent productions cannot evidence bad-faith, as such a rule would perversely "punish those agencies that attempted to correct past inadequate searches").

Plaintiffs also may not overcome FEMA's good-faith showing at summary judgment by relying on Magistrate Judge North's pre-summary judgment perspective that the agency's delays and change in position "call[ed] into question the adequacy of [its] search" and its good faith. Order on Mot. 2. Judge North reached this assessment in granting in part and denying in part FEMA's protective order motion, wherein FEMA opposed Plaintiffs' August 2023 discovery requests based (a) chiefly on case law establishing that discovery is generally unavailable in FOIA cases and is especially unavailable before agencies move for summary judgment at the end of FOIA request processing and justify their searches and withholdings with accompanying declarations, *see* Protective Order Mem. 2–6; Protective Order Reply 2–6, as well as (b) on its ongoing efforts at the time to process voluminous responsive records for production, *see* Protective Order Reply 7–8. In other words, FEMA did not seek to prematurely litigate, and Judge North thus had no occasion to resolve, the adequacy of FEMA's search and its good faith—merits issues reserved for summary judgment. Judge North instead simply raised early "question[s]" on these issues based on FEMA's delays and change in position, in advance of the agency's opportunity and obligation at summary judgment to provide a reasonably detailed explanation for its actions. Order on Mot. 2. The Hines and Ondrich declarations, appropriately included by FEMA as part of its summary judgment submission, *see supra* at p. 17, provide such an explanation and thereby resolve Judge North's questions in FEMA's favor. As detailed above, the declarations fulsomely describe how FEMA initially invoked Exemption 4 over

all requested records because it misunderstood Plaintiffs' request, but then revisited this determination in response to Plaintiffs' appeal and performed an additional robust search that resulted in thousands of pages of non-public responsive records for processing.[14]  Although, as Judge North noted, FEMA's initial mistaken efforts may not have been up to snuff, the agency's sincere and reasonable error-correction actions cured any defect and thus demonstrate that the agency remains entitled to the presumption of good faith.

Finally, Plaintiffs have informed FEMA that they question the agency's good-faith search efforts because they believe FEMA's production are incomplete, but this argument has no basis either in fact or law.  The Hines declaration "aver[s] that all files likely to contain responsive materials . . . were searched."  *Porup*, 997 F.3d at 1237 (quotation marks omitted); *see* Hines Decl. ¶ 41.  And it substantiates this conclusion by explaining how, relying on past work on a similar FOIA request, FEMA identified a central electronic repository of Milliman modeling data—the precise data Plaintiffs identified when clarifying the scope of their request—and confirmed through its FOIA and actuarial staff that this repository comprehensively contained all final actuarial communications, reports, spreadsheets, and other records undergirding Risk Rating 2.0.  *See* Hines Decl. ¶¶ 29–32.  That explanation is all that the law requires.  *See, e.g., Batton*, 598 F.3d at 176 (adequate search where declaration "lists the particular databases that were searched and explains that these databases contain the type of information requested"); *Gahagan v. U.S. Citizenship & Immigr. Servs.*, 147 F. Supp. 3d 613, 624 (E.D. La. 2015) (similar).

In contending that FEMA's productions are incomplete, Plaintiffs appear to presume that some (unspecified) records are missing.  Yet "[t]he issue is *not* whether other documents may exist, but rather whether the search for undisclosed documents was adequate."  *Batton*, 598 F.3d at 176

---

[14] FEMA also provided this explanation in response to the interrogatories for which Judge North denied FEMA's protective order.  Nonetheless, Plaintiffs still challenge FEMA's search.

(quotation marks omitted); *see also, e.g.*, *Shapiro v. U.S. Dep't of Just.*, 40 F.4th 609, 613 (D.C. Cir. 2022) (same), *cert. denied sub nom.* 143 S. Ct. 526 (2022); *Baird v. Dep't of the Interior*, No. CV 14-1879, 2015 WL 9315746, at *2 (E.D. La. Dec. 23, 2015) (same).  Here, FEMA's search for modeling records plainly was adequate, and Plaintiffs only speculate in contending otherwise.  *Iturralde*, 315 F.3d at 316 ("[M]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." (quotation marks omitted)).  In any event, their speculation is unfounded.  There simply does not exist some other, hidden risk model "data" outputs used to assign Risk Rating 2.0 premiums in St. Charles Parish or other parish or county level.  *See* Ondrich Decl. ¶¶ 15, 19 (explaining that FEMA does not generate such data at the parish level).  All relevant risk model data here was (a) documented in the aptly titled and comprehensive *Risk Rating 2.0 Methodology and Data Sources* report authored by Milliman and issued by FEMA in January 2022, and (b) stored in the central electronic repository that FEMA searched here and produced all records from.  Those records give Plaintiffs everything that they need to understand Risk Rating 2.0 premiums in St. Charles Parish or elsewhere, *see id.* ¶¶ 15–19 (providing explanation, using basic actuarial principles and with reference to particular records, how to get down to local-level premiums), *see* Hines Decl. ¶¶ 32–37 (same), in addition to the significant amounts of data and information that FEMA has already publicly released on its website since 2021 to explain premiums, including at the local level, *see supra* at pp. 4–7.[15]

---

[15] Plaintiffs' incorrect belief that some records are "missing" may be driven by an erroneous comparison of Risk Rating 2.0 with the legacy rating approach.  Under the latter, individuals could determine rates for their particular residence using paper and pencil, since it relied on a 1970s-era methodology based on FIRMs and a handful of basic and static geographic and structural characteristics that did not take into account individualized flood risks.  Risk Rating 2.0, of course, modernizes the NFIP rate-setting approach through use of a wider range of flood risk variables and catastrophe modeling, so a paper and pencil do not suffice for an individual to determine their premium.  But all the publicly available information, and the specific records FEMA has produced here to show how to go from catastrophe model results all the way down to local-level premiums, more than suffice.

For all these reasons, FEMA is entitled to summary judgment on the adequacy of its search.[16]

## II. FEMA Properly Invoked Exemption 4 to Withheld Confidential Commercial Information Obtained from Contractors

As reflected in the Hines declaration and accompanying *Vaughn* index, FEMA invoked Exemption 4 to withhold catastrophe modeling "factor(s)" obtained from the third-party catastrophe modeling vendors for Risk Rating 2.0.  Hines Decl. ¶ 54 (quotation marks omitted).  More specifically, these pieces of data are proprietary modeling outputs—various estimated annual flood losses for, *e.g.*, different categories of occupancies and structures—of the models that the vendors license, including to FEMA for Risk Rating 2.0.  *Id.*  ¶¶ 11, 13, 33 & n.14, 55, 57, 64–65.  FEMA also invoked Exemption 4 to withhold certain line-item contract terms that the vendors submitted to FEMA as part of the contracting process.  *See id.* ¶¶ 62, 69.  Such information falls well within the ambit of Exemption 4.

Exemption 4 protects "trade secrets and commercial or financial information obtained from a person which is privileged or confidential."  5 U.S.C. § 552(b)(4).  To apply Exemption 4 when withheld records do not contain trade secrets, an agency must establish that the records are (1) commercial or financial; (2) obtained from a person; and (3) privileged or confidential.  *See, e.g.*, *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).  Additionally, an agency must demonstrate foreseeable harm from disclosure.  *See* 5 U.S.C. § 552(a)(8)(A)(i); *WP Co. LLC v. U.S. Small Bus. Admin.*, 575 F. Supp. 3d 114, 119 (D.D.C. 2021).   FEMA's own declaration and

---

[16] If the Court disagrees, FEMA respectfully requests the opportunity to supplement its supporting declarations, as courts across Circuits regularly request.  *See, e.g.*, *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 185 F. Supp. 2d 54, 65 (D.D.C. 2002) ("[W]hen an agency's affidavits or declarations are deficient regarding the adequacy of its search . . . the courts generally will request that the agency supplement its supporting declarations." (citing *Nation Mag., Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C. Cir. 1995), and *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990))); *Serv. Women's Action Network v. Dep't of Def.*, 888 F. Supp. 2d 231, 245–46 (D. Conn. 2012) (same).  FEMA likewise requests the opportunity to supplement its declarations and *Vaughn* index should the Court find that they are insufficient to sustain the agency's Exemption 4 and 5 withholdings, discussed *infra*. *See, e.g.*, *100Reporters LLC v. U.S. Dep't of Justice*, 248 F. Supp. 3d 115, 165 (D.D.C. 2017); *Gahagan*, 147 F. Supp. 3d at 630; *Johnson v. FBI*, 118 F. Supp. 3d 784, 796 (E.D. Pa. 2015).

accompanying *Vaughn* index, together with the declarations of the four modeling vendors for Risk Rating 2.0, demonstrate that FEMA has satisfied all these conditions for invoking Exemption 4.  *See, e.g.*, *Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*, 71 F.4th 1051, 1056–57 (D.C. Cir. 2023) (relying on agency declaration to substantiate Exemption 4 assertion); *WP Co.*, 575 F. Supp. 3d at 118–19 (relying on agency declaration and information submitter declaration); *Pub. Citizen v. United States Dep't of Health & Hum. Servs.*, 66 F. Supp. 3d 196, 207–09 (D.D.C. 2014) (relying on submitter declaration).

### A.     Exemption 4 Covers the Withheld Contractor Modeling Information

The withheld modeling information was "obtained  from a person" and is "commercial" and "confidential" under Exemption 4.

The withheld modeling information was "obtained from a person" because FEMA obtained this flood loss data from Core Logic, Katrisk, and Verisk—private companies outside the government. *See, e.g.*, *Flightsafety Servs.*, 326 F.3d at 611; *Gulf & W. Indus., Inc. v. United States*, 615 F.2d 527, 529 & n.5 (D.C. Cir. 1979).  As the declarations explain, FEMA obtained the information as part of licenses with the vendors for their catastrophe modeling.  *See, e.g.*, KatRisk Decl. ¶¶ 2, 5, 13, 19; CoreLogic Decl. ¶¶  2, 5, 7, 31; Verisk Decl. ¶¶ 5, 14; Milliman Decl. ¶ 7; Hines Decl. ¶¶ 11, 13, 55–57, 64; Ondrich Decl. ¶¶ 9, 11, 29–31, 35.  The mere fact that this information was then incorporated into FEMA's own Risk Rating 2.0 work and records does not change the inescapable reality that it originated "outside the government," constitutes the vendors' direct model outputs and in turn reveals their proprietary catastrophe modeling data and underlying methodologies (*see* Ondrich Decl. ¶¶ 11, 29, 31, 35–36), and thus was "obtained" from a person.  *Gulf & W. Indus.,* 615 F.2d at 529–30 (concerning data in agency report that "contained information supplied by [a private company] or from which information supplied by [the company] could be extrapolated," *e.g.*, the company's "scrap rates" and "break-even point calculations" (quotation marks omitted)); *see also, e.g.*, *Flyers Rts. Educ. Fund*, 71 F.4th at 1056–57 (similar); *OSHA Data/C.I.H., Inc. v. U.S. Dep't of Labor*, 220 F.3d 153, 162

n.23 (3d Cir. 2000) (similar, concerning ratio calculated by agency, but based upon "individual components" supplied by private-sector employers); *Elec. Priv. Info. Ctr. v. DHS*, 117 F. Supp. 3d 46, 63 (D.D.C. 2015) (similar); *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 401 (S.D.N.Y. 2014) (similar); *Judicial Watch, Inc. v. Export–Import Bank*, 108 F. Supp. 2d 19, 28 (D.D.C. 2000) (holding that documents that contain "summaries or reformulations of information supplied by a source outside of the government" are protected under Exemption 4). Nor, for the same reasons, does the fact that the CoreLogic, Katrisk, and Verisk model output data was incorporated into Milliman's analysis for FEMA change these dispositive circumstances showing that FEMA obtained the withheld data from the three modeling vendors. *See also* Milliman Decl. ¶¶ 8, 16 (explaining that the model output data belongs to the other vendors).

The withheld modeling data is commercial because "it serves a commercial function or is of a commercial nature." *Citizens for Resp. & Ethics in Washington v. United States Dep't of Just.*, 58 F.4th 1255, 1263 (D.C. Cir. 2023) (quotation marks omitted). Information meets this broad and "ordinary meaning" if it "pertains to the exchange of goods or services or the making of a profit." *Id.* at 1263, 1265; *see COMPTEL v. FCC*, 910 F. Supp. 2d 100, 115 (D.D.C. 2012) ("The terms 'commercial' or 'financial' in Exemption 4 . . . are construed broadly."). That includes profit, cost, product, and manufacturing data and the like that "reveal basic commercial operations or relate to the income-producing aspects of a business," and it extends more broadly and "applies . . . when the provider of the information has a commercial interest in the information" because, among other considerations, the information is "intrinsically valuable." *Citizens for Resp. & Ethics in Washington*, 58 F.4th at 1263, 1265 (relying on, *inter alia*, *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006), and *Pub. Citizen*, 704 F.2d at 1290).

The withheld modeling data checks all these boxes, and thus is commercial information in several ways. As the declarations explain:

- The withheld modeling data outputs are integral components of the commercial catastrophe models that the vendors license as their main product offerings to insurers and other clients.[17] Licensees commercially transact with the vendors specifically to obtain the different flood loss outputs generated by the vendors' models.[18]

- What is more, the withheld model outputs reflect each model's and modeler's underlying unique and proprietary assumptions and data on flood hazards and vulnerability.[19] The information thus reveals the "secret sauce," developed at great expense, behind the vendors' basic business operations and revenue-generating activity.[20]

- And the proprietary information is intrinsically valuable, and the vendors have a "commercial interest" in it, because it is sensitive intellectual property that facilitates greater understandings of flood risks for insurers and a range of other entities, and because its unauthorized use outside the confines of the vendors' paid licenses, including by competitors, threatens the vendors' ability to make money and remain financially viable.[21]

It is precisely because of the withheld modeling data's intrinsic value and vital role in the vendors' commercial products that the vendors closely guard the data, thus making the data "confidential" under Exemption 4. To qualify as "confidential," information must be "customarily and actually treated as private by its owner." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019); *see also, e.g., id.* at 434; *Greenspan v. Bd. of Governors of Fed. Rsrv. Sys.*, 643 F. Supp. 3d 176, 189 (D.D.C. 2022).

---

[17] *See* Verisk Decl. ¶¶ 14, 22; CoreLogic Decl. ¶¶ 7, 16, 31; KatRisk Decl. ¶¶ 18–19; *see also, e.g., Bloomberg L.P. v. U.S. Postal Serv.*, No. 22-CV-6112 (DLC), 2023 WL 3976010, at *4 (S.D.N.Y. June 13, 2023) (Exemption 4 covers licensed data "[e]xchang[ed] for money"); *Brown v. Perez*, 835 F.3d 1223, 1231 (10th Cir. 2016) (similar).

[18] *See, e.g.*, Verisk Decl. ¶ 14; KatRisk Decl. ¶ 19; CoreLogic Decl. ¶¶ 7, 31; Ondrich Decl. ¶¶ 11, 29, 35.

[19] *See* Verisk Decl. ¶ 14; CoreLogic Decl. ¶ 30; KatRisk Decl. ¶¶ 18–19, 22; Ondrich Decl. ¶¶ 11, 31, 35–36.

[20] *See* KatRisk Decl. ¶¶ 19, 21; Verisk Decl. ¶¶ 14, 19, 22, 25; CoreLogic Decl. ¶¶ 16, 31; Milliman Decl. ¶¶ 13, 15; *see also, e.g., Public Citizen v. U.S. Dep't of Health & Human Servs.*, 66 F. Supp. 3d 196, 207 (D.D.C. 2014) ("A company has a clear commercial interest in its basic business operations and techniques").

[21] *See* Verisk Decl. ¶¶ 3–4, 25–27; KatRisk Decl. ¶¶ 20–21; CoreLogic Decl. ¶¶ 26, 30–31; Milliman Decl. ¶ 15; Ondrich Decl. ¶¶ 11, 38–39; Hines Decl. ¶ 67.

The vendors' declarations amply show that the vendors customarily and actually treat the withheld data as private. Each of the declarations describes how the withheld catastrophe modeling data is core intellectual property that they do not release publicly. *See* Verisk Decl. ¶¶ 18, 23–24; CoreLogic Decl. ¶¶ 14, 17–18, 30–31; KatRisk Decl. ¶¶ 16–17, 20–21; Milliman Decl. ¶ 14; *see also* Hines Decl. ¶¶ 66–68. And each specifically explains the range of steps the vendors take to protect all their catastrophe modeling data, including the withheld data. That includes specific contract and license agreement language restricting access and dissemination; confidentiality markings; housing the data in secure network databases; and using nondisclosure agreements. *See* KatRisk Decl. ¶ 20; CoreLogic Decl. ¶¶ 15, 18; Verisk Decl. ¶¶ 18, 23; Milliman Decl. ¶ 14; *see also* Hines Decl. ¶ 66. These detailed representations are exactly the type of showing that courts accept as sufficient to demonstrate that withheld information is private and thus confidential. *See, e.g.*, *Argus Leader*, 588 U.S. at 434 (relying on declaration assertion that retailers customarily do not disclose store-level data or make it publicly available and limit employee access to it); *Greenspan v. Bd. of Governors of Fed. Rsrv. Sys.*, 643 F. Supp. 3d 176, 188 (D.D.C. 2022) (relying on representation that firm maintained information in confidence, not for public disclosure, and that dissemination was prohibited); *WP Co.*, 575 F. Supp. 3d at 119 (similar); *Seife v. FDA*, 492 F. Supp. 3d 269, 276 (S.D.N.Y. 2020) (similar, and laying out particular steps of company's confidentiality protocol, including binding third parties via nondisclosure agreements), *aff'd sub nom.* 43 F.4th 231 (2d Cir. 2022); *Am. Small Bus. League v. U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 831 (N.D. Cal 2019) (similar). And the declarations go even further than the law requires. They each explain how the vendors provided the proprietary modeling data to FEMA under assurances of privacy, including because their contracts with FEMA specifically restricted public disclosure. *See* Verisk Decl. ¶¶ 18, 28; CoreLogic Decl. ¶¶ 14–15; KatRisk Decl. ¶ 23; *see also* Ondrich Decl. ¶ 40. That context makes "doubly sure that the withheld information is confidential." *Greenspan*, 643 F. Supp. 3d at 188; *see also, e.g.*, *Renewable Fuels Ass'n v. EPA*, 519 F. Supp.

3d 1, 10, 12 (D.D.C. 2021) (explaining that *Argus Leader* indicates that assurances of privacy can be considered but are not required).

The proprietary and confidential nature of the withheld modeling data readily demonstrates that, if it were disclosed, there would be "foreseeable harm" to the interests that Exemption 4 protects. *See, e.g.*, *WP Co.*, 575 F. Supp. 3d at 118–19 ("[T]he same documents that establish that the withheld information is 'privileged or confidential' provide the requisite explanation of foreseeable harm."). Exemption 4 protects the submitters' interests in preventing disclosure and, in turn, the government's interest in receiving information from submitters. *See, e.g.*, *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 767–70 (D.C. Cir. 1974) (concluding that the legislative history of FOIA "firmly supports an inference that [Exemption 4] is intended for the benefit of persons who supply information as well as the agencies which gather it"), *abrogated on other grounds by Argus Leader*, 139 S. Ct. 2356; *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 878 (D.C. Cir. 1992). In particular, the foreseeable-harm inquiry boils down to whether disclosure of "the specific information withheld . . . would . . . caus[e] genuine harm to the submitter's economic or business interests and thereby dissuad[e] others from submitting similar information to the government." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 113 (D.D.C. 2019) (quotation marks omitted); *see also, e.g.*, *Greenspan*, 643 F. Supp. 3d at 189.

The vendors' declarations make clear that disclosure here would have grave economic or business consequences. As discussed (*see supra* at p. 30), disclosure of the withheld information would reveal the core proprietary ingredients of the vendors' products and services, which would in turn greatly diminish their ability to license and generate revenue from their commercial offerings; enable competitors to reverse-engineer or, at the very least, predict their methodologies; and, ultimately, threaten their ability to remain financially viable. *See, e.g.*, *Naumes v. Dep't of the Army*, 588 F. Supp. 3d 23, 42–43 (D.D.C. 2022) (similar); *Greenspan*, 643 F. Supp. 3d at 189 (similar); *WP Co.*, 575 F. Supp. 3d

at 119 (similar).  (It is for these very reasons that the companies assiduously keep all modeling data private.)  And, as the declarations make clear, disclosure of the modeling data would chill the willingness of these types of technology vendors to provide similar proprietary data in the future, thus impairing FEMA's (and the government's ability more broadly) to obtain valuable information necessary to improve public programs with private-sector know-how.  *See* KatRisk Decl. ¶ 25; Verisk Decl. ¶ 29; CoreLogic Decl. ¶ 32; Ondrich Decl. ¶ 41.  These foreseeable harms from the disclosure of submitter's confidential commercial information are precisely what Exemption 4 is meant to guard against.  *See, e.g.*, *Allnet Comm'n Servs., Inc. v. FCC*, 800 F. Supp. 984, 990 (D.D.C. 1992) (applying Exemption 4 to proprietary third-party modeling information that was critical to effectiveness of government program, and that third-parties would not provide in future if it were subject to release).

Because FEMA's "justification for invoking [Exemption 4]" to protect vendors' confidential and commercial modeling data is "logical" and "plausible," the agency is entitled to summary judgment on these withholdings.  *Rahim*, 947 F. Supp. 2d at 638 (quoting *Wolf*, 473 F.3d at 374–75).

**B.     Exemption 4 Covers the Withheld Contractor Contract Information**

As reflected in the Hines declaration and accompanying *Vaughn* index, FEMA also applied Exemption 4 to withhold certain line-item contract terms—showing the "Quantity," "Unit Price" "Amount," and "Funded" figures as well as hourly billing rates—in the Federal Acquisition Regulation procurement forms that CoreLogic, Milliman, and KatRisk submitted to contract with FEMA for Risk Rating 2.0.  *See* Hines Decl. ¶ 71.  This contracting information, pertaining directly to the business goods and services that the vendors contracted with FEMA to provide for Risk Rating 2.0, plainly satisfies the requirements of Exemption 4.  The contract terms are "obtained from a person" because they are the vendors' own terms, appearing in their own submissions to FEMA.  *See id.* ¶ 78; KatRisk Decl. ¶ 24; Milliman Decl. ¶ 10; CoreLogic Decl. ¶¶ 23, 29.  They are "commercial" because line-item contracting terms reflecting price and other financial and product-related information plainly

constitute basic business information.  *See, e.g., Jud. Watch, Inc. v. U.S. Dep't of Com.*, 337 F. Supp. 2d

146, 170 (D.D.C. 2004) (explaining that "terms within contracts certainly can be exempt" under

Exemption 4); *Jordan v. U.S. Dep't of Lab.*, 273 F. Supp. 3d 214, 230 (D.D.C. 2017) (information

regarding a business contact "easily" is commercial); *cf. Merit Energy Co. v. U.S. Dep't of Interior*, 180 F.

Supp. 2d 1184, 1188 (D. Colo. 2001) ("Information regarding oil and gas leases, prices, quantities and

reserves is obviously commercial in character.").  And the declarations substantiate that the vendors

customarily keep this sensitive contract information private, including to prevent competitors from

exploiting this information to predict the vendors' business strategy or outbid them in future

contracting opportunities with the government and other clients.  *See* KatRisk Decl. ¶ 24; CoreLogic

Decl. ¶¶ 17, 29; Milliman Decl. ¶¶ 10–11; Hines Decl. ¶¶ 73–75, 79.

## III.    FEMA Properly Invoked Exemption 5 to Withhold its Own Confidential Commercial Information and Information Protected by the Deliberative-Process Privilege

Exemption 5 covers "inter-agency or intra-agency memorandums or letters which would not

be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

As a threshold matter, this language requires that the agency created the records at issue or solicited

them from an outside expert, consultant, or similar source.  *See, e.g., Nat'l Inst. of Mil. Just. v. U.S. Dep't*

*of Def.*, 512 F.3d 677, 680–84 (D.C. Cir. 2008); *Hoover v. U.S. Dep't of the Interior*, 611 F.2d 1132, 1138

(5th Cir. 1980).  This threshold is easily met in this case, as all the records at issue are FEMA records

generated in coordination with Milliman, FEMA's hired contractor for Risk Rating 2.0.  *See* Hines

Decl. ¶¶ 11, 13, 29–33, 82, 90–91; *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*,

514 F. Supp. 2d 36, 44 (D.D.C. 2007) (similar).  And as discussed below, the Exemption 5-withheld

information in these records all represents FEMA's data—FEMA's own NFIP contract-related data

for catastrophe modeling analysis and its preliminary and unadopted target-premium data.

Exemption 5 applies broadly to ensure that members of the public cannot obtain through

FOIA government information that would be "normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *see also, e.g.*, *Martin v. Office of Special Counsel, Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1184-87 (D.C. Cir. 1987).  Accordingly, Exemption 5 protects agency documents that are subject to the deliberative-process privilege, *see, e.g.*, *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1047–48 (D.C. Cir. 1982), and it also extends to cover the government's "trade secret or other confidential . . . commercial information," Fed. R. Civ. P. 26(c)(7); *see, e.g.*, *Fed. Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 360 (1979); *Gov't Land Bank v. Gen. Servs. Admin.*, 671 F.2d 663, 665–66 (1st Cir. 1982); *Hoover*, 611 F.2d at 1138–40, 1142; *Morrison-Knudsen Co. v. Dep't of the Army of U.S.*, 595 F. Supp. 352, 354 (D.D.C. 1984), *aff'd sub nom.* 762 F.2d 138 (D.C. Cir. 1985).  For Exemption 5 withholdings under any theory, an agency must demonstrate foreseeable harm from disclosure.  *See* 5 U.S.C. § 552(a)(8)(A)(i).

FEMA properly invoked Exemption 5 to withhold the contract in-force dates in the Target Rate Level documents produced (showing target NFIP premiums by different NFIP segments), because these dates are the agency's confidential commercial information in its internal rate-setting records and analysis.  *See* Hines Decl. ¶¶ 33 & n.14, 84–92; Ondrich Decl. ¶¶ 16 & n.4, 47–55. Contract in-force dates are the dates that FEMA sets to determine the cutoffs for what NFIP policies it includes or excludes as its inputs into the catastrophe modeling analysis; the in-force dates exclude those policies that either expired before the set in-force dates or did not take effect until after the dates.  *See* Ondrich Decl. ¶ 53.  This date information is commercial because it is contract-related information—reflecting and identifying which NFIP contracts are in effect at the time of the analysis, and which are not—that directly informs the catastrophe modeling that FEMA utilizes to understand flood risks and generate rates for the flood insurance policies it sells.  *See id.* ¶¶ 11, 17, 53; Verisk Decl.

¶ 10; *cf. supra* at pp. 29–30.[22]   And the in-force dates are also confidential commercial information because the agency has a clear financial interest in closely guarding this information in the records it provided to Plaintiffs.  If disclosed in these records, the information would "reveal internal proprietary model output": the adjustment factors that FEMA applies internally to catastrophe model outputs when taking those vendor outputs to analyze NFIP flood risks.  *See* Ondrich Decl. ¶ 54.   Public disclosure of such adjustment factors—which are commercial and sensitive information in their own right because they relate to FEMA's actuarial analysis for its NFIP contractual offerings—would compromise the agency's price negotiations with private insurers each year for NFIP reinsurance coverage.  *Id.* ¶¶ 51, 54.

       As discussed, since 2017, FEMA has annually negotiated and contracted with several private insurers to secure upwards of a billion dollars in reinsurance coverage to fund payment of NFIP flood claims.  *Supra* at pp. 7–8.   As part of these negotiations, FEMA provides reinsurers with certain summarized catastrophe model input and output data and a summary of the key adjustments made to model data.  *See* Ondrich Decl. ¶ 50.   But FEMA *never* provides the specific adjustment factors it applies to vendor model data, as doing so would enable the reinsurers to understand FEMA's internal analysis of flood risks and leverage that understanding to demand in negotiations that FEMA pay more in reinsurance premiums and/or accept less reinsurance coverage.  *Id.* ¶¶ 51, 54.  Yet, requiring FEMA to provide the contract in-force dates in the withheld records would result in those precise consequences.  The contract in-force dates at issue here would enable reinsurers to easily calculate

---

[22] For a given policy and policyholder, the specific FEMA in-force date of their particular contract is also a basic and fundamental commercial fact.  *See Jud. Watch, Inc. v. U.S. Dep't of Com.*, 337 F. Supp. 2d 146, 170 (D.D.C. 2004) (explaining that "terms within contracts certainly can be exempt" under Exemption 4); *Jordan v. U.S. Dep't of Lab.*, 273 F. Supp. 3d 214, 230 (D.D.C. 2017) (information regarding a business contact "easily" is commercial).  Few things are more material to a commercial contract than a contract term indicating when it has legal effect.  *Cf., e.g., Citizens for Resp. & Ethics in Washington v. U.S Dep't of Just.*, No. 19-CV-3626, 2024 WL 1406550, at *4 (D.D.C. Mar. 31, 2024) ("[F]ew things are more material to a contract than the parties which it binds.").

FEMA's adjustment factors (by using model data that FEMA has already had to disclose and will have to disclose to the reinsurers as part of the ordinary negotiations process) and in turn leverage that internal FEMA analysis and the information asymmetry to significantly improve their bargaining position against the agency. *Id.* ¶¶ 50–51, 54. FEMA in turn will have to pay higher reinsurance rates each year and potentially do so for less coverage, *id.* ¶¶ 51, 54, thus harming its ability to secure reinsurance "on terms" that are "reasonable and appropriate," 42 U.S.C. § 4081(e). And higher reinsurance rates and less reinsurance coverage in turn mean that FEMA will likely have less funds to pay for losses and operate the NFIP, and will lively have to increase rates it charges to its policyholders. *See* Ondrich Decl. ¶ 54. These commercial consequences logically explain why FEMA customarily treats the adjustment factors and information revealing them (as the in-force dates would do here) as private commercial information, and thus as confidential. *See* Ondrich Decl. ¶¶ 51, 54–55; *see, e.g.*, *Hack v. U.S. Dep't of Energy*, 538 F. Supp. 1098, 1103-04 (D.D.C. 1982) (upholding Exemption 5 protection where "there can be no doubt that were cost estimates made public the agency would not be on equal footing . . . at the bargaining table" and finding that "[r]equiring the agency to tip its hand by compelling the disclosure of its cost estimates could destroy all incentive a firm would have to propose a lower price."); *Hoover*, 611 F.2d at 1135, 1140 (similarly applying Exemption 5 where disclosure of government appraisal report of value of landowners' cave and surrounding lands would harm agency's negotiations with landowner).

The interests at the core of Exemption 5's protection of government confidential commercial information further reinforce the exemption's application here. As the Supreme Court explained in *Merrill*, the exemption is meant to ensure that the disclosure of "sensitive information" does not "place[]" the government "at a competitive disadvantage" or harm its commercial interests. 443 U.S. at 360, 363. Other courts have echoed this principle, with one explaining that "Exemption 5 protects the government when it enters the marketplace as an ordinary commercial buyer or seller. . . . FOIA

should not be used to allow the government's customers to pick the taxpayers' pockets." *Gov't Land Bank*, 671 F.2d at 665; *see also, e.g.*, *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 406–07, 410–11 (S.D.N.Y. 2014) (similar); *Taylor Woodrow Int'l v. United States*, No. 88-429, 1989 WL 1095561, at *3 (W.D. Wash. Apr. 5, 1989) (concluding that disclosure of agency's cost estimates for construction projects would permit bidders to take "unfair commercial advantage" of agency).  Here, disclosure of the in-force dates would do just that.

FEMA also properly invoked Exemption 5 to withhold portions of a draft agency document, developed by FEMA for NFIP rate setting, under the deliberative-process privilege.  *See* Ondrich ¶¶ 44–46.  The deliberative-process privilege applies to "decisionmaking of executive officials generally," and it protects documents containing deliberations that are part of the process by which government decisions are formulated.  *In re Sealed Case*, 121 F.3d 729, 737, 745 (D.C. Cir. 1997).  For a document to be covered, it must be both "predecisional," *i.e.*, generated prior to the adoption of an agency policy, and "deliberative," *i.e.*, reflecting the give-and-take of the consultative process.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  The draft record that FEMA withheld—a prior iteration of the final "Target Rate Level" exhibit documents, including premium and model data, that FEMA produced to Plaintiffs with the withholdings described above (at pp. 28 –33, 35), *see* Ondrich Decl. ¶¶ 16, 18–19, 29, 45, 54—satisfies both requirements.

As the Ondrich declaration explains, the draft Target Rate Level exhibit was never officially implemented; instead, it was a preliminary draft generated in the midst of FEMA's development of Risk Rating 2.0 rates and superseded by the final exhibit.  *Id.* ¶ 45.  The final exhibit is what FEMA developed and used to set target NFIP premiums (at the state and occupancy levels).  *Id.* ¶¶ 15–19, 29, 45.  Protecting the draft exhibit from disclosure thus safeguards the agency's core deliberative-process privilege interest in frank and open discussions on risk modeling analysis; disclosure foreseeably harms that interest by potentially chilling future preliminary risk modeling analysis and

rate calculation.  *See, e.g.*, *Kidd v. Dep't of Just.*, 362 F. Supp. 2d 291, 296 (D.D.C. 2005) (protecting documents on basis that disclosure would "inhibit drafters from freely exchanging ideas, language choice, and comments in drafting documents").  What is more, the draft document contains incorrect data.  *See* Ondrich Decl. ¶ 46.  Disclosure could thus foreseeably cause public confusion on the agency's risk modeling analysis to generate Risk Rating 2.0 premiums, further demonstrating that the deliberative-process privilege applies here.  *See, e.g.*, *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (withholding draft manuscript because release could lead to "confusion of the public"); *Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 1164 v. HHS*, 63 F. Supp. 2d 104, 108 (D. Mass. 1999) (holding that release of predecisional documents "could cause harm by providing the public with erroneous information"); *Juul Labs, Inc. v. FDA*, --- F. Supp. 3d ----, 2024 WL 1733043, at * 17 (D.D.C. April 23, 2024) (similar).[23]

## CONCLUSION

For the foregoing reasons, the Court should grant FEMA's motion for summary judgment on the adequacy of the agency's search and on its withholdings under Exemptions 4 and 5.

Dated: June 14, 2024                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        MARCIA BERMAN
                                        Assistant Branch Director
                                        Civil Division, Federal Programs Branch

                                        */s/ Yoseph T. Desta*
                                        YOSEPH T. DESTA (CA Bar No. 332179)
                                        Trial Attorney

---

[23] As reflected in FEMA's *Vaughn* index and declarations, the agency disclosed nearly all the records in full and made only specific redactions to withhold discrete pieces of information protected under Exemption 4 and 5.  *See, e.g.*, Hines Decl. ¶¶ 54–55, 71, 82, 89, 93.  Accordingly, the agency has satisfied its burden to reasonably segregate non-exempt information.  *See, e.g.*, *Porup*, 997 F.3d at 1239.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Phone: 202-305-3080
Email:  Yoseph.T.Desta@usdoj.gov

*Counsel for Defendant*