## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ST. CHARLES PARISH, A POLITICAL SUBDIVISION OF THE STATE OF LOUISIANA, AND MATTHEW JEWELL, IN HIS OFFICIAL CAPACITY AS ST. CHARLES PARISH PRESIDENT,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY,<br><br>*Defendant*. | Civil Action No. 2:23-cv-01369<br><br>Section P<br><br>Judge Papillion<br><br>Magistrate Judge North |

<u>**DECLARATION OF NAOMI ONDRICH**</u>

I, Naomi Ondrich, do hereby declare and state as follows:

1.      I am the Branch Chief of the Actuarial and Catastrophic Modeling Branch of the Federal Emergency Management Agency ("FEMA"), a component of the United States Department of Homeland Security ("DHS"). The Actuarial and Catastrophic Modeling Branch sits within the Flood Insurance Directorate ("FID"), the organization within FEMA that manages the National Flood Insurance Program ("NFIP"). In my capacity as the Branch Chief of the Actuarial and Catastrophic Modeling Branch, I oversee all aspects of the actuarial and catastrophic modeling team, including overseeing actuarial analysis, rate development and implementation, and program reporting. In addition, where needed, I provide technical direction and support coordination of the team's work initiatives. I have held this position since September, 2023. I have over 30 years of experience as an actuary, 6 of which are with the Federal Government. I am an Associate of the

Casualty Actuary Society ("ACAS"), and a Member of the American Academy of Actuaries ("MAAA").

2.      The Actuarial and Catastrophic Modeling Branch is responsible for developing the NFIP's insurance rating program, establishing insurance premium rates, and providing actuarial support to the NFIP. Because of its responsibilities and subject matter expertise, the Actuarial and Catastrophe Modeling Branch works with FEMA's Disclosure Branch, which handles all Freedom of Information Act ("FOIA") requests for the agency, on FOIA searching and processing for FOIA requests that pertain to the NFIP and in particular to NFIP premiums and risk modeling.

3.      Due to my official duties as the Branch Chief of the Actuarial and Catastrophic Modeling Branch, I am familiar with this case, catastrophe modeling, and how FEMA rates policies as part of the NFIP.

4.      I am familiar with the Complaint filed by Plaintiffs St. Charles Parish and parish president Matthew Jewell, seeking disclosure of records sought through FOIA.

5.      The statements contained in this declaration are based upon my personal knowledge; upon information provided to me in my official capacity, including information provided by members of the Disclosure Branch, the Actuarial and Catastrophic Modeling Branch, and other FEMA employees involved in searching for and processing records in this case, and by third-party vendors that submitted information subject to the FOIA request at issue; and upon conclusions I reached based on that knowledge or information.

**FEMA's Search for Responsive Records**

6.      I understand that Plaintiffs submitted a FOIA request to FEMA requesting "all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana, in Risk Rating 2.0." I also understand that Plaintiffs clarified their

request, stating: "[t]he NFIP uses risk modeling to determine how much premium to charge participants who participate in the flood insurance program. I am requesting the risk model used to assign premiums to St. Charles Parish residents. I believe Milliman was the company that did the modeling for FEMA[.]"

7.     The NFIP is a federal flood insurance program, administered by FEMA, that services nearly five million policies across the United States.

8.     Risk Rating 2.0 is FEMA's actuarial update to the NFIP's pricing approach. FEMA formally announced Risk Rating 2.0 on its website in April 2021 and began applying it to NFIP policies on October 1, 2021.

9.     FEMA contracted with three vendors to license their flood catastrophe models—CoreLogic, Inc. (an information services company focused on the property industry), Verisk Analytics, Inc. (a data, analytics, and technology provider that works with the insurance industry and government organizations, and that helped pioneer the field of probabilistic catastrophe modeling used by insurers), and KatRisk LLC (a catastrophe modeling company). CoreLogic was also contracted by FEMA to acquire replacement cost values to complete catastrophe modeling work. FEMA also contracted with Milliman, Inc., an industry-leading actuarial firm, to take the catastrophe modeling output from the other vendors and use that output to assist FEMA in developing Risk Rating 2.0.

10.     The use of catastrophe models has been standard insurance industry practice for over 20 years. The National Association of Insurance Commissioners ("NAIC") describes a catastrophe model as "a computerized process that simulates potential catastrophic events based on historical events. The simulated events generate scenarios of frequency, severity, and location.

Catastrophe models incorporate data, technology, scientific research, engineering methods, and statistical analysis to model complex scenarios and events."[1]

11.     The CoreLogic, KatRisk, and Verisk catastrophe models were run by FEMA and the output was provided to Milliman to create the rating plan; as a result, all of the relevant Risk Rating 2.0 modeling data was under Milliman's possession. The output of the catastrophe models contains estimated losses by each model vendor, reflecting their underlying assumptions and proprietary data. NFIP policyholder insurance data, containing geospatial location information about a structure and the selected coverage of insurance applied to that structure, is imported into each vendor's catastrophe model. Those vendor models determine the flood hazards exposed to a given property based on its location as well as the vulnerability of the location based on its structural characteristics. Each model's view of hazard and vulnerability is unique to that model's assumptions and the data sourced by that model and vendor to inform the riskiness of the properties being analyzed. Together those components allow a model to estimate losses in a given year that the structure could experience. These loss estimates are derived directly from each catastrophe model vendor and thus reflect each vendor's proprietary data underlying those loss estimates.

12.     The declaration of Tammi Hines (Senior Director of the Information Management Division, Office of the Chief Administrative Officer at FEMA, and acting Chief of the Disclosure

---

[1] NAIC Center for Insurance Policy and Research, *Catastrophe Models (Property)* (last updated Mar. 20, 2024), https://content.naic.org/cipr-topics/catastrophe-models-property. The Actuarial Standards Board ("ASB") sets standards for appropriate actuarial practice in the United States through the development and promulgation of Actuarial Standards of Practice ("ASOPs"). ASOP 38 provides recommendations to actuaries when selecting or using catastrophe models for assessing risk. ASB, *ASOP No. 38, Catastrophe Modeling (for All Practice Areas* (July 2021), https://www.actuarialstandardsboard.org/asops/actuarial-standard-of-practice-no-38-revised-edition/. Both FEMA and Milliman actuaries adhered to ASOP 38 in the development process of Risk Rating 2.0 premiums.

Branch) describes in detail the full search process for locating the modeling data responsive to Plaintiffs' request.  Below, I reiterate just a few of the salient points.

13.     FID and the Disclosure Branch determined that records that FEMA had previously collected but had not yet released for a prior FOIA request (request number 2022-FEFO-00776) from a separate requester contained all the data potentially responsive to Plaintiffs' request.

14.     In November 2022, FID conducted a FOIA search for the 2022-FEFO-00776 request by locating a shared electronic database repository containing all actuarial communications, reports, spreadsheets, data files, and other records provided to FEMA by Milliman in connection with Milliman's work for Risk Rating 2.0. FID had used the repository to organize and store all final deliverables that Milliman had produced for FEMA as part of its contract and had provided to FEMA electronically. Under the supervision of FID's Branch Chiefs for the Actuarial and Catastrophic Modeling Branch and the Reinsurance Branch,[2] FID reviewed the repository to ensure that all final deliverables had been included and reviewed their emails from Milliman to ensure no files were missing. FID transferred all the data files to the Disclosure Branch via a shared electronic folder. At the time that FEMA was considering Plaintiffs' FOIA request and appeal, it had not processed or produced the repository materials for the 2022-FEFO-00776 request.

15.     Between March 24, 2023 and April 3, 2023, the Disclosure Branch and FID reviewed the 2022-FEFO-00776 request materials and the shared folder containing the Milliman data for this prior request, and they concluded from their review that the database had all the records potentially responsive to Plaintiffs' request. The Disclosure Branch and FID reached this

---

[2] Andy Neal and John Kulik respectively. Andy Neal is no longer at FEMA. Naomi Ondrich has assumed his role.

conclusion based on four considerations. First, FID had previously confirmed the shared folder contained all Milliman data. Second, Plaintiffs specifically identified Milliman data in their FOIA request. Third, in response to FEMA's attempt to clarify their request, Plaintiffs further specified they were requesting the Risk Rating 2.0 "risk model used to assign premiums," which they identified "Milliman" as the source for. And fourth, the data sought—the "risk model used to assign premiums to St. Charles Parish"—does not exist at the parish level. The risk data outputs of the catastrophe models are produced at the location level and aggregated to the state and line-of-business level in the "Target Rate Level" exhibit produced to Plaintiffs, discussed below. Target rate levels, *i.e.*, target NFIP premiums, are set at the state and occupancy level, rather than at the parish level. FEMA does not aggregate to parish or county levels when developing its rating algorithm.

16.     Nonetheless, the records in the repository of Milliman documents (all of which FEMA has produced), accompanied by publicly-available exhibits on FEMA's website, provide all that is necessary to calculate a Risk Rating 2.0 premium for a specific building in St. Charles Parish or any other location. The set of documents comprising the "Target Rate Level" exhibit[3] summarizes the final target premiums without fees assigned to each of FEMA's lines of business.[4] "Appendix F.1 NT" contained therein summarizes final target premiums by line of business. These final target premiums are used to create the base rates for the respective lines of business, which are the foundational rates for policyholders' flood insurance premiums. Those base rates are found

---

[3] Those documents are noted in the *Vaughn* index documenting withholdings FEMA made in its sixth and final production of records to Plaintiff.

[4] "Lines of business" is defined as segments of FEMA's policyholders, separated by occupancy (single-family home vs. non-single family home), levee status (leveed vs. non-leveed structures), peril (for example, inland flood, storm surge, and other sub-perils), and type of coverage (coverage A for building coverage, coverage C for contents coverage).

online via the "Appendix D – Rating Factors" document that FEMA has published online for several years.[5] The base rates are then adjusted based on the geographic, building, and coverage characteristics (*i.e.*, policyholder input variables), which are also contained online on Appendix D. The set of documents comprising the "Concentration Factor" exhibit[6] supports the creation of the concentration risk factor, which is also included in Appendix D online and reflects FEMA's efforts to account for differences in risk due to differences in policy concentration (*i.e.*, the greater flood risk in areas with a higher concentration of policies). Together, these documents provide the necessary data to understand how flood insurance premiums are calculated under Risk Rating 2.0, including in St. Charles Parish. FEMA's methodology in calculating rates is fully explained in its January 2022 online report titled *Risk Rating 2.0 Methodology and Data Sources*.

17. As the report makes clear, catastrophe modeling is foundational to Risk Rating 2.0 premium development. The NFIP runs catastrophe models, licensed by third-party vendors, over various market baskets (which are representative samples of policies in a given area) to establish average annualized losses (*i.e.*, the total expected losses for all policyholder) at a state and location level. This data is then used as inputs for determining rating factors, *i.e.*, the individualized geographic and property characteristics to adjust base rates. Catastrophe models are also run on NFIP-policyholder data to determine the necessary target rate levels described above. The resulting base rates and rating factors make up the rating plan. The NFIP rating engine was developed based on this rating plan; geospatial layers (distance to coast, elevation, etc.) were created in order to assign geographic and structural characteristics to a policyholder's property upon obtaining a quote

---

[5] https://www.fema.gov/sites/default/files/documents/fema_appendix-d-rating-factor-tables_02242023.xlsx.

[6] Those documents are noted in the *Vaughn* index documenting withholdings FEMA made in its sixth and final production of records to Plaintiff.

for a policy. Those characteristics are then assigned their respective rating factors to determine applicable premium.

18.    The FOIA search tasker form documenting FEMA's search here also provided the following explanation regarding the records located, to include in FEMA's response to the FOIA request:

> The Target Rate Level Exhibit shows the catastrophe model results, the derivation of the selected Average Annualized Losses (AALs) by state from the modeled results, how those AALs were rescaled by Occupancy type and Location, and the allocation of AALs by Coverage type (A/C) and Peril. Exhibits 10 and 11[7] show the derivation of each territory factor by Peril.

> Also, we would like to provide additional information that will be useful in gaining a better understanding of Risk Rating 2.0. FEMA has released full-risk rates data at the National, State, County, and Zip Code Levels for the public. The attached exhibits show the risk-based cost of flood insurance or the full actuarial rate for single-family homes under Risk Rating 2.0, using data from single-family policies renewed before Sept. 30, 2022. These exhibits will be updated and revised once data is available for all policyholders who have renewed their policies under Risk Rating 2.0.

> We will advise that the requester visit the Online resources for more information concerning full-risk rates under Risk Rating 2.0. The full-risk rates data can be found at: https://www.fema.gov/flood-insurance/work-with-nfip/riskrating/single-family-home.

19.    FEMA's explanation noted that the "Target Rate Level Exhibit" and Exhibits 10 and 11 together show the catastrophe model results," the derivation of AALs by state from model results, how AALs were rescaled, the allocation of AALs by coverage type and peril, and the derivation of territory factors by peril in order to specifically direct Plaintiffs to the local level information they are seeking. As described above, target rate levels are determined at the state and occupancy level, rather than the parish or county level. The respective target premiums for St.

---

[7] Exhibits 10 and 11 are documents that FEMA produced to Plaintiffs in its second and third monthly productions to Plaintiffs.

Charles Parish stakeholders can be found within the Louisiana state target premiums in "Appendix F.1 NT" of the "Target Rate Level" exhibit based on which occupancy they fall into (single-family home or non-single family home), and which peril and coverage they are seeking. That target premium informs the St. Charles Parish base rates that would fall under the Louisiana base rates for the respective line of business. There are no individual base rates at the parish or county-level. The base rates are found online in the Appendix D document discussed above. St. Charles Parish stakeholders seeking their respective territory factors referenced in the tasker explanation above would reference the Appendix D territory factor exhibits based on their respective Hydrologic Unit Code ("HUC," here HUC12)[8] and levee ID if applicable. These factors are applied to individuals within these boundaries. These factors can be found in Appendix D, and a description of these factors (and other technical terms used here and elsewhere) can be found in the *Risk Rating 2.0 Methodology and Data Sources* report on FEMA's website.[9] Any other factors relating to the derivation of flood insurance premiums are applied at the structure level (for example, First Floor Height, Ground Elevation, or Distance to Coast).

### Justifications For Application of FOIA Exemptions to Withhold Information

20.    FEMA withheld records under Exemptions 4 and 5 to withhold certain information in the records that it produced to Plaintiffs.

21.    Attached to the declaration of Tammi Hines is FEMA's *Vaughn* index, describing each specific FOIA withholding and the basis for that withholding.

---

[8] HUC's are a positioning system utilized to establish various regions; the number afterwards identifies how zoomed in the map is, as each additional digit moves the map in even more. For example, HUC08 is the lower Mississippi region encompassing parts of multiple states; when one moves down to the HUC12 level the map becomes much more localized.

[9] https://www.fema.gov/sites/default/files/documents/FEMA_Risk-Rating-2.0_Methodology-and-Data-Appendix__01-22.pdf.

A.      **Exemption 4**

22.      Exemption 4 protects "trade secrets and commercial or financial information obtained from a person which is privileged or confidential." 5 U.S.C. § 552(b)(4).

23.      Under Exemption 4, a trade secret "is a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983).

24.      FEMA initially invoked Exemption 4 to protect from disclosure trade-secret geospatial data underlying the risk rating engine for Risk Rating 2.0.

25.      After Plaintiffs' appeal caused FEMA to reevaluate their FOIA request and determine that Plaintiffs did not seek trade-secret rating-engine data and instead sought non-publicly-available modeling data undergirding Risk Rating 2.0, FEMA applied Exemption 4 to protect from disclosure portions of the data that are not trade secrets.

26.      To apply Exemption 4 when withheld records do not contain trade secrets, an agency must establish that the records are (1) commercial or financial; (2) obtained from a person; and (3) privileged or confidential. *See* 5 U.S.C. § 552(a)(8)(A)(i).

27.      As reflected in FEMA's *Vaughn* index, the agency invoked Exemption 4 to protect confidential commercial "contract" information and "modeling" information. The "modeling" information withholdings refer to catastrophe model outputs. As explained below and in further detail in the modeling vendors' declarations, these outputs are plainly considered by the vendors, and the catastrophe modeling industry at large, to be proprietary and private product information that must be and is closely guarded. The model outputs are commercially valuable information produced directly from, and are directly reflective of, the vendors' proprietary and closely guarded

10

catastrophe models, which they have developed at great expense, license in commercial offerings, and depend on to generate revenue.

### 1. *Catastrophe Modeling Data*

28.    The Exemption 4 withholdings described as "confidential commercial modeling factor(s)" in the *Vaughn* index all refer to various redacted elements of the "Target Rate Level" exhibit documents and "Concentration Factor" exhibit documents—produced as part of FEMA's sixth and final production of records—in which catastrophe modeling output is contained.

29.    Catastrophe modeling output in this case is modeled Average Annual Losses ("AALs") and scale factors applied to those AALs at the state and line-of-business level. An AAL is defined as an estimated loss that could occur in a given year from the modeled flooding peril sources (such as storm surge, inland flood, etc.). FEMA obtained estimated AALs from CoreLogic, KatRisk, and Verisk from the catastrophe models that it licensed from these vendors, and it then applied scale factors to the AALs generated by the vendors from their models. A scale factor is simply an adjustment to the modeled AALs when FEMA compared those vendor-generated loss estimates to historical NFIP experience; if a model had an upward or downward bias in its modeled loss estimates relative to what the NFIP has reasonably experienced in historical events, then the modeled losses for each vendor were adjusted to bring the modeled losses (without overfitting the modeled data to the historical experience). The resulting output are scaled AALs, which is simply the modeled AALs straight out of each of the model vendors' proprietary models, multiplied by the applicable scale factors. The scaled AALs then become the basis for deriving the target level premium in the "Target Rate Level" exhibit. Scaled AALs were not withheld, so as to provide Plaintiffs with a sense of the variation between the catastrophe modeled loss estimates. FEMA

only withheld the modeled AALs generated by CoreLogic, KatRisk, and Verisk through use of their catastrophe models.

30.     In other words, the withheld information relating to "confidential commercial modeling factor(s)" was provided to FEMA by third-party vendors; their third-party catastrophe model software generated estimated modeled losses that FEMA redacted.

31.     The withheld AALs are considered confidential commercial information by each third-party catastrophe model vendor because these model outputs provide valuable insight into the core model assumptions each vendor uses to calculate estimated flood losses. The vendors license their catastrophe modeling software and data to clients such as FEMA as proprietary products; their catastrophe models are developed at great expense and represent their main method of generating revenue. Thus, the vendors naturally treat the core assumptions undergirding their proprietary models as proprietary as well. Were these assumptions to become public, it would cause large financial damage to the vendors, which is why they closely safeguard their catastrophe modeling information.[10] As part of FEMA's ordinary process for handling FOIA requests that implicate Exemption 4, the vendors have each explained to FEMA these considerations and has made clear the vital importance of protecting their catastrophe modeling information.

32.     In accordance with DHS FOIA regulatory guidance, 6 C.F.R. § 5.7(c), FEMA reached out to each vendor to (a) provide them written notice that their Risk Rating 2.0 modeling and algorithm data was the subject of a FOIA request and may contain confidential commercial

---

[10] As part of its withholdings, FEMA also withheld the scale factors used to go from modeled AALs to scaled AALs. As discussed, FEMA did not withhold the scaled AALs themselves. (Those are available in Appendix G.5 of the "Target Rate Level" exhibit.) Because the scaled AALs are simply a multiplication of the modeled AALs by the scale factors, knowing the scale factors would allow Plaintiffs and others to divide the scaled AALs by the scale factor to back into the modeled AALs for each third-party vendor. Again, the release of modeled AALs would also cause financial damage to the catastrophe modelers.

information protected from disclosure under Exemption 4, and (b) solicit their perspective on the necessity to protect this information and on whether they customarily kept the data at issue private and provided it to FEMA with assurance of confidentiality. These written notices are known as "submitter's notices." The correspondences are summarized in the Hines declaration and the vendors' own declarations.

33.     All release recommendations from KatRisk, CoreLogic, and Verisk regarding modeling data were applied accordingly.

34.     The following is information that I have determined based on review of FEMA's correspondences with the modeling vendors and subsequent consultation with them. Each vendor has confirmed the necessity of the specific Exemption 4 withholdings of vendor modeling information reflected in FEMA's *Vaughn* index.

35.     The withheld modeling information in the sixth and final FOIA production to Plaintiffs is the vendors' commercial information because it reflects and reveals proprietary assumptions at the heart of the proprietary catastrophe models that they develop at great expense and license for profit, in a highly technical and competitive industry, to various clients seeking to price insurance products. The catastrophe models are the vendors' commercial products, and as such their model outputs, reflecting sensitive intellectual property undergirding their products, are highly commercially valuable. The model outputs are a fundamental aspect of the vendors' catastrophe modeling commercial offerings; their clients, including FEMA, specifically license the vendors' catastrophe models in order to have those models generate the vendors' loss estimates.

36.     As explained above, the redacted outputs of the catastrophe models contain estimated losses by each model vendor, reflecting their underlying assumptions and proprietary data. Although NFIP policyholder insurance data (containing geospatial location information

about a structure and the selected coverage of insurance applied to that structure) is imported into each vendor's model, the models determine the flood hazards exposed to a given policyholder's property based on its location as well as the vulnerability of the location based on its structural characteristics. Each model's view of hazard and vulnerability is unique to that model's assumptions and the data sourced by that model and vendor to inform the riskiness of the properties being analyzed. Together those components allow a model to estimate losses in a given year that the structure could experience. These loss estimates are derived directly from each catastrophe model vendor and thus reflect each vendor's proprietary data underlying those loss estimates.

37.     The withheld modeling information is confidential because the vendors customarily keep their catastrophe modeling product information private and do not publicly release such information or permit public release of such information. That includes modeling outputs generated by their catastrophe models, which their clients can generate only through limited software licenses. The vendors generally protect their catastrophe models and modeling factors and outputs from disclosure across their contracts and business activities by, among other things, using specific contract language restricting or limiting access to the data internally and externally; marking modeling information as confidential; implementing policies to guide employees and external parties in reporting modeling data breaches; establishing password protections governing access to their software platforms; housing the model data in secure network databases and requiring others to do so as well; and prohibiting data release by third parties unless approved in the license for specific data for specific purposes or with prior written consent.

38.     The vendors take these steps to closely guard their modeling information, including the modeling output information at issue here, so as to protect their commercial interests and protect themselves from competitive and financial harm. Investors and others involved in

insurance markets license various catastrophe models and use them to price their products and

purchases within the insurance market. If the vendors' modeling information were to be released,

others in the insurance market or new entrants then could reverse-engineer the vendors' existing

catastrophe models. That, in turn, would seriously impact the vendors' financial prospects, as their

catastrophe models and model outputs represent their entire business.

39.    As CoreLogic put in its September 8, 2023 submitter notice response letter,

disclosure "would cause significant competitive and financial harm to CoreLogic by enabling

CoreLogic's competitors to gain access to information, which could subsequently be used by that

competitor to predict CoreLogic's pricing and methodologies, and to potentially reverse engineer

its products / services / models." KatRisk echoed this sentiment in its August 17, 2023 submitter

notice response letter, explaining that the "data and software provided to FEMA are the result of

extensive internal development work over many years. Making our data, software and location

level results available to the public could have substantial financial impacts on our company and

cause us to lose the intellectual property associated with our products. If our data or software is

made publicly available at no cost, the ability for KatRisk to license our products and remain

financially viable would be greatly diminished." And as Verisk explained in its June 27, 2023,

letter, "[w]e develop, update and enhance our proprietary loss models at great expense. We derive

economic value (in fact nearly all our revenue) from them. We are careful to label them and the

user documentation prominently as confidential." Each of the vendors' own declarations further

reinforces and explains the commercial and confidential interests at stake in the withholdings at

issue.

40.    The vendors also each provided the withheld modeling information to FEMA on

the expectation that their modeling information would be kept private, and they each received

15

assurances from FEMA as part of their work on Risk Rating 2.0 that the information would be protected from disclosure. Each vendor provided FEMA with only a limited license for use of catastrophe modeling software, premised on the agreement that FEMA did not have ownership of the vendors' proprietary data and could not publicly release such data. As Verisk noted to FEMA in its June 27, 2023 letter, the parties' 2017 contract explicitly had confidentiality as a contract term (which stated that "Disclosure of output and the user manuals and guides outside of FEMA is prohibited"). The KatRisk and CoreLogic contracts implicitly contain such a confidentiality guarantee, as they both provide FEMA with only a limited license to run catastrophe modeling and do not give FEMA any right over the vendors' proprietary data in the models.

41.     The vendors have all indicated that if FEMA is not able to protect their catastrophe modeling information from public disclosure, they will likely be unwilling to license their catastrophe modeling products and services to the government in the future in a similar fashion, thus harming the ability of FEMA and other agencies to improve risk assessment through modern technology.

### 2.     *Contract Information*

42.     The declaration of Tammi Hines describes the Exemption 4 withholdings FEMA made to vendors' contract information.

### B.     Exemption 5

43.     Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption protects internal agency documents that are subject to the deliberative process privilege. *See, e.g.*, *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 512 (D.C. Cir. 2011). Exemption 5 also has been construed to exempt all documents that

are normally privileged in the civil discovery context. *See, e.g.*, *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799–800 (1984). As a result, the exemption protects "trade secret or other confidential … commercial information." Fed. R. Civ. P. 26(c)(7); *see, e.g.*, *Fed. Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 360 (1979). Additionally, for any Exemption 5 withholding, an agency must demonstrate foreseeable harm from disclosure. *See* 5 U.S.C. § 552(a)(8)(A)(i).

### 1.   *Deliberative Process Information*

44.     An agency may withhold information subject to the deliberative process privilege under Exemption 5 if it demonstrates that the information is pre-decisional and deliberative.

45.     As reflected in the *Vaughn* index, FEMA invoked Exemption 5 to protect portions of one draft FEMA document containing pre-decisional and deliberative information that was neither approved nor used in the final development of Risk Rating 2.0 to generate premiums (or for any purpose). This draft document refers to a prior iteration of the "Target Rate Level" exhibit that was included in the responsive documents but is superseded by the final "Target Rate Level" exhibit, also provided to Plaintiffs. The draft exhibit is therefore pre-decisional and not final.

46.     Release of this pre-decisional and deliberative risk rating data would cause confusion to the public because this information is not incorporated in the final risk rating calculations, and because part of the information is incorrect. As explained above, much of the information involved in rate setting is made publicly available, as FEMA attempts to be as transparent as possible. However, releasing pre-decisional and inaccurate target rate levels could lead to members of the public looking to those target rate levels in determining how their flood insurance is priced. This would create an inaccurate conclusion, as the target rate level would be incorrect. FEMA's openness and transparency would then be undercut by the release of this inaccurate information, as it would prevent the public from engaging with, and understanding, rate

making by confusing some of them with inaccurate information. These types of foreseeable harms fall within the ambit of Exemption 5's core concerns. *See, e.g.*, *Reps. Comm. for Freedom of the Press v. United States Customs & Border Prot.*, 567 F. Supp. 3d 97, 122 (D.D.C. 2021).

### 2.    *FEMA Confidential Commercial Information*

47.    An agency may withhold inter-agency or intra-agency information as confidential commercial information under Exemption 5 if it demonstrates that the information is government-generated information that is commercial in nature (e.g., because it relates to the buying and selling of goods and is implicated in business transactions) and is sensitive and otherwise unavailable because, if disclosed, it would put the government at a competitive disadvantage in contracting or other business transactions or otherwise harm its commercial interests. *See, e.g.*, *Merrill*, 443 U.S. at 360–63 ; *Gov't Land Bank v. Gen. Servs. Admin.*, 671 F.2d 663, 665–66 (1st Cir. 1982); *Hoover v. U.S. Dep't of the Interior*, 611 F.2d 1132, 1140–42 (5th Cir. 1980); *Morrison-Knudsen Co. v. Dep't of the Army of U.S.*, 595 F. Supp. 352, 355 (D.D.C. 1984), *aff'd sub nom. Morrison-Knudsen Co. v. Dep't of Army*, 762 F.2d 138 (D.C. Cir. 1985).

48.    FEMA manages flood risks in the NFIP and the program's future exposure in part by "secur[ing] reinsurance coverage . . . from private reinsurance and capital markets." 42 U.S.C. § 4081(e). FEMA contracts with private insurers to transfer some NFIP flood risks to them; FEMA pays them premiums, and in return these reinsurers agree to provide annual coverage for losses above an agreed-upon amount (as with an ordinary insurance arrangement). Each year sine 2017, FEMA has negotiated with and contracted with several private reinsurance companies to secure, in some years, more than $1 billion in coverage for certain NFIP losses. And FEMA also secures reinsurance coverage through the issuance of bonds to the capital markets; as part of this coverage, FEMA also pays premiums in exchange for reinsurance coverage for a set term.

49.     In obtaining reinsurance coverage, FEMA, as any insurance purchaser, attempts to target certain rates and coverage amounts based on its understanding of the probability that it will incur financial losses.

50.     In negotiations with reinsurers, reinsurance buyers recognize and accept that reinsurers require certain data to assess the risks that reinsurers would assume if they entered into reinsurance agreements with buyers. Thus, in negotiations with reinsurers, FEMA provides reinsurers with detailed but summarized catastrophe model input data and key statistics with a summary of key adjustments made to the model input data, as well as the summarized output data directly from each vendor model using the same input data provided.

51.     Reinsurance buyers including FEMA typically withhold from reinsurers any adjustments they make to the model output data based on their internal analysis of that model and its output; and reinsurers similarly withhold the same type of information from buyers based on the reinsurers' own internal analysis. Since the buyer's objective is to minimize the price paid for reinsurance coverage and maximize the amount of coverage offered, the buyer withholds components of the model output where the buyer may have increased the loss output to a level higher than the reinsurer estimated, as this could lead reinsurers to use the buyer's estimate for components with a higher buyer estimate and their own estimate for components with a lower buyer estimate, thus increasing their quoted rate and/or reducing their offered amount of reinsurance coverage for the proposed transaction. Since the reinsurer's objective is to maximize the price received for the coverage, the reinsurer withholds the same type of information from the buyer, as the buyer strategy applied in reverse could lead to a lower offered price for the proposed transaction.

52.     As reflected in the *Vaughn* index, the agency invoked Exemption 5 to protect confidential commercial FEMA information: contract in-force dates.

53.     The contracts in-force date is, simply put, the date for which all NFIP insurance policies in effect on that date are included in the data used for input into the catastrophe models for the analysis in question. Since the overwhelming majority of NFIP policies provide coverage for one year, the data used for model input generally includes NFIP policies that previously became effective after the date one year prior to the contracts in-force date and remain effective on the contracts in-force date. Thus, the model input data excludes NFIP policies that have expired on or before the contracts in-force date, and it excludes NFIP policies for which coverage may have been bound on or before the contracts in-force date but became effective after the contracts in-force date.

54.     The withheld contract in-force date information is commercial because it is contract information that is fundamental to the contracts and would provide access to internal proprietary model output with the precise valuation date. If disclosed, it would reveal to reinsurers that FEMA negotiates with the exact or approximate adjustment factors applied internally by FEMA for model vendor output that has already been provided to reinsurers with a contracts in-force date exactly on or relatively close to that date. The adjustment factors for applicable output components could be calculated or approximated by the reinsurers by simply comparing the adjusted model vendor output in the Target Rate Level exhibit with the direct unadjusted model vendor output (where it differs) that FEMA provides to reinsurers for the applicable reinsurance transaction. As explained above, that would result in higher quoted rates and/or lowered offered coverage amounts in negotiations with reinsurers. Paying higher prices would reduce FEMA's funding to pay for losses to NFIP policyholders and expenses to operate the NFIP. FEMA having to pay higher reinsurance

rates would also likely be reflected in higher NFIP rates to policyholders. And less reinsurance coverage would reduce NFIP reinsurance recoveries if a triggering event were to occur. These consequences logically explain why FEMA would treat the in-force date as private if it identified the underlying data already provided to reinsurers that would reveal the exact or approximate adjustment factors applied for internal FEMA use (as it would do here).

55.     The contract in-force date is confidential because it contains sensitive information that is not otherwise available, as its disclosure would compromise price negotiations with NFIP reinsurers. At its core, a reinsurance transaction represents one party transferring some of their insurance risk to another party for a negotiated price. The NFIP does this through the issuance of bonds to the capital markets, and through contracts with major reinsurers which operate somewhat like an insurance plan for an insurance plan. Should the contract in-force information in these records be released and reinsurers accessed it, the release would provide them with a substantial advantage in negotiations for reinsurance rates. Here, disclosure of the in-force dates would identify the underlying data already provided to reinsurers that would reveal the exact or approximate adjustment factors applied for internal FEMA use, thus compromising reinsurance negotiations. To safeguard its bargaining position in these negotiations, FEMA never publicly discloses the approximate adjustment factors it applies for internal FEMA use; nor does it publicly disclose any information that could readily reveal such adjustment factors.

⁂

56.     FEMA conducted a line-by-line review of all the withheld information to ensure that it contained no segregable, nonexempt information. With respect to each piece of information withheld, no further information could be reasonably segregated from the exempt information and released, for the reasons stated above.

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 13th day of June 2024.

NAOMI S ONDRICH

Digitally signed by NAOMI S ONDRICH
Date: 2024.06.13 17:56:01 -04'00'

Naomi Ondrich ACAS, MAAA
Branch Chief, Actuarial and Catastrophic Modeling