# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ST. CHARLES PARISH, LOUISIANA AND MATTHEW JEWELL, IN HIS OFFICIAL CAPACITY AS PARISH PRESIDENT**<br>        *Plaintiffs*,<br><br>**v.**<br><br>**FEDERAL EMERGENCY MANAGEMENT AGENCY**<br>        *Defendant*. | **CIVIL ACTION: 23-cv-1369**<br><br><br>**JUDGE DARREL JAMES PAPILLION**<br><br><br>**MAGISTRATE JUDGE MICHAEL B. NORTH** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND INCORPORATED OPPOSITION TO FEMA'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, St. Charles Parish and Parish President Matthew Jewell (collectively, the "Parish") submit this Memorandum in Support of their Cross-Motion for Summary Judgment and Incorporated Memorandum in Opposition to Defendant, Federal Emergency Management Agency's ("FEMA") Motion for Summary Judgment.  The Parish urges this Honorable Court to deny FEMA's motion for summary judgment, grant the Parish's cross-motion for summary judgment finding that FEMA's search was unreasonable, and remand this matter to FEMA ordering FEMA to conduct an adequate search for the critical data sought on behalf of the citizens of St. Charles Parish. The Parish also prays that the Court grants its request for statutory attorneys' fees and costs.

### I.    SUMMARY OF THE PARISH'S ARGUMENT

FEMA's 42-page memorandum largely overcomplicates the simple issue before the Court. The Parish, a public entity itself, made a public records request to FEMA to obtain critical

data that forms the basis of FEMA's "Risk Rating 2.0" methodology for setting flood insurance premiums in St. Charles Parish.  Over 600 days have elapsed since the Parish made its records request and FEMA has failed to provide the information as required under the Freedom of Information Act ("FOIA").  FEMA's first defense is that it originally misunderstood the Parish's November 2022 records request and that is why it responded with a blanket, canned response summarily taking the position that the entirety of the request was exempt as a proprietary trade secret of one or more of its contractors.  Then, FEMA argues that after the Parish appealed the Final Response, FEMA realized it, in fact, was in possession of responsive public documents to the Parish's request.  The documents it attests were responsive, however, were limited to a file compiled in response to an entirely separate requestor and limited to certain documents provided by one third-party consultant to FEMA.  Yet, FEMA's own production provides clear evidence that FEMA is sitting on critically important data and information, and it has failed to conduct a reasonable search to make a proper records production to the Parish.

For unexplainable reasons, FEMA has taken up a strategy of arguing that the Parish's request was limited to proprietary and trade secret information of its contractors and has grossly complicated a straightforward request.  To be clear, the Parish did not and does not seek protected third-party proprietary information.  FEMA's efforts to stonewall the Parish equate to a textbook example of acting in bad faith and entitling the Parish to statutory attorneys' fees and costs.  Unfortunately, while two public entities fight over accessing critical data within the public domain, each passing day is a missed opportunity for the Parish and its citizens to make policy and investment decisions to protect themselves and their property from the perils of a flood disaster.

## II.   FACTUAL BACKGROUND

### A.  The National Flood Insurance Program ("NFIP")

The NFIP was established by Congress in 1968 with the passage of the National Flood Insurance Act.[1]  The congressional intent for the NFIP was to reduce federal disaster outlays by sharing flood losses with property owners through a coordinated national government flood insurance program.[2]  Since the creation of the NFIP, Congress has passed four reform measures to stabilize the program, increase the program's borrowing authority, address significant events, such as Hurricane Katrina, and to address flood insurance premium rate challenges.[3]

The two most recent NFIP reform acts significantly changed the historical methodology for setting flood insurance premiums under the program.  First, Biggert-Waters Flood Insurance Reform Act of 2012 phased out NFIP policy discounts, reformed flood risk mapping, established a fee-based reserve fund, and allowed private flood insurance to satisfy mandatory flood insurance requirements.[4]  Upon FEMA's implementation of the Biggert-Waters Act, Congress became increasingly concerned about the drastic increase in flood insurance premiums and sought additional reforms to the NFIP in the Homeowner Flood Insurance Affordability Act in 2014 ("HFIAA").[5]  The HFIAA set annual premium increase caps and limitations and directed FEMA to "strive to minimize the number of policies with annual premiums that exceed one percent of the total coverage provided by the policy."[6]

---

[1] *See* 42 U.S.C. 4001, *et seq.*
[2] **Exhibit A**, The Coalition for Sustainable Flood Insurance, *An Evaluation of Risk Rating 2.0 Impacts on National Flood Insurance Program Affordability*, September 2022 (hereinafter "**CFSI Report**"), at 4.
[3] *Id.*
[4] *Id*. at 5.
[5] *Id*.
[6] *Id*.

### B.  FEMA's Risk Rating 2.0

Through its administrative rule making authority – not by Congressional action – FEMA created a new flood risk rating methodology referred to as Risk Rating 2.0.[7]  FEMA, on its own accord, implemented Risk Rating 2.0 on October 1, 2021 for all new policies and April 1, 2022 for policy renewals.[8]  Risk Rating 2.0 is a paradigm shift in how the NFIP sets premiums for a property's risk of flood loss.[9]  Specifically, FEMA has stated that Risk Rating 2.0 uses catastrophic loss modeling that incorporates risks associated with riverine flooding, pluvial flooding, coastal storm surge, Great Lakes region flooding, tsunami, and levee protection.[10]  Risk Rating 2.0, for the first time, also incorporates individual structure data, including geographic location, individual property characteristics (i.e. first floor elevation), rating territory (i.e., levee protection or barrier island), structure type, insurance to value ratios, and prior flood loss history.[11]

To establish this new rating initiative, FEMA contracted with a private third-party company, Milliman, Inc.[12]  FEMA and Milliman produced a public report, *National Flood Insurance Program, Risk Rating 2.0 Methodology and Data Sources* (hereinafter, the "Methodology Report"), on January 18, 2022 "to provide a consolidated description of the methodology and data sources used to develop the Risk Rating 2.0 plan and information about how [the] work complied with relevant actuarial standards of practice."[13] The Methodology Report broadly describes the types of data used by FEMA and Milliman, which includes: GIS

---

[7] CSFI Report, at 6.
[8] *Id*. at 3.
[9] *Id*. at 6.
[10] *Id*.
[11] *Id*.; *see also* **Exhibit B**, *National Flood Insurance Program, Risk Rating 2.0 Methodology and Data Source Report* ("**Methodology Report**"), January 18, 2022.
[12] Methodology Report, at 1.
[13] *Id*.

Data, Milliman's Market Baskets, FEMA's historical and inforce exposures, and catastrophe

modeling developed using FEMA's own data. Critically, the Methodology Report states:

> In performing the services, we relied on data and other information **provided to us by FEMA** and other sources. We did not audit, verify or review the data or other information for reasonableness and consistency. Such a review is beyond the scope of our assignment. If the underlying data or information is inaccurate or incomplete, the results of our analysis may likewise be inaccurate or incomplete. In that event, the results of our analysis may not be suitable for the intended purpose.[14]

The Methodology Report discusses "how Milliman calculated the target rate level, the net

cost of reinsurance and retained risk, the rating factors, the concentration of risk loads, and how

Milliman used ***FEMA's*** historical loss data," but the report does not actually provide the

underlying data itself.[15] FEMA confirms it used the NFIP's historical losses and exposures from

January 1, 1992 to June 30, 2018 and the Building Replacement Cost Value ***from FEMA's own***

***database***.[16]  In addition, the catastrophe models developed for Risk Rating 2.0 used FEMA flood

maps and other data sources developed by FEMA contractors.[17]  FEMA "consulted with the

United States Army Corps of Engineers to develop assumptions regarding the definition of

leveed areas, the probability of overtopping, and the probability of failure prior to overtopping

that could inform the catastrophe modeling."[18]  Further, according to an independent federal

agency, the U.S. Government Accountability Office, FEMA's Risk Rating 2.0 ratemaking

process "incorporates the damage or loss estimates of multiple catastrophe models, which

---

[14] Methodology Report, at 32 (emphasis added).
[15] *Id*. at 1 (emphasis added).
[16] *Id*. at 4.
[17] *Id*. (emphasis added).
[18] *Id*. at 7.

include commercial models as well as **FEMA models** that use data from other government agencies, including the U.S. Army Corps of Engineers."[19]

To anyone who has reviewed the Methodology Report and related FEMA public documents, it is clear that Risk Rating 2.0 relies upon input data either created by FEMA or selected to be used by FEMA – and there is no reason why that data should not be made available to St. Charles Parish.

### C. The Impact of Risk Rating 2.0 on The Citizens of St. Charles Parish

Since the implementation of FEMA's Risk Rating 2.0, a St. Charles Parish property owner has experienced on average over a 230% premium increase for flood insurance in the NFIP.[20]  In some instances, NFIP premiums have even exceeded a 700% increase for a St. Charles Parish homeowner.[21] The Parish has felt this impact directly, as insurance premiums on many Parish-owned properties have sharply increased causing budgetary constraints on the Parish.[22]  In addition, since flood insurance is a mandatory requirement by lenders for most, if not all, single family property owners who have a mortgage, this issue presents an immediate and urgent concern to the Parish leadership and their constituents.[23]

St. Charles Parish maintains a population of approximately 51,000 citizens with a median household income of $72,088.[24]  The average NFIP premium per household in St. Charles Parish increased from $815 per year to $2,766.[25]  For the average family in St. Charles Parish, Risk

---

[19] **Exhibit C**, United States Government Accountability Office, *Report to Congressional Addressees, FLOOD INSURANCE, FEMA's New Rate-Setting Methodology Improves Actuarial Soundness but Highlights Need for Broader Program Reform*, GAO-23-105977 (hereinafter "**GAO Report**"), at 14 (emphasis added).
[20] **Exhibit D**, Declaration of Matthew Jewell ("**Jewell Decl.**") ¶ 9.
[21] Jewell Decl. ¶ 10.
[22] *Id*. ¶ 8.
[23] *Id*. ¶ 11.
[24] *Id*. ¶ 12; *see also* U.S. Consensus Bureau (December 2022), https://www.stcharlesparish.gov/residents/economic-development-and-tourism/information-for-businesses/demographics
[25] Jewell Decl. ¶ 13; *see also* Insurance Journal, https://www.insurancejournal.com/news/southcentral/2023/05/02/718600.htm

Rating 2.0 has absorbed almost 3% of their median household income for them to cover the increased flood insurance expense to stay in their homes.

For this reason, the Parish is seeking all available data and information from FEMA to understand how the Parish can make informed policy decisions for coastal protection, flood mitigation, stormwater management and planning, and mitigation grant programing, among other public policy decisions. Once armed with this data and information, the Parish can make smart public infrastructure investments and help educate its constituents on how they can make individualized decisions relative to where their property is located, how it is built, and what is being covered.[26] The irony is that if FEMA would view the Parish as a partner and collaborate, sharing this information would serve to benefit the NFIP, St. Charles Parish, and every other NFIP policy holder across the country.

### III.   UNDISPUTED MATERIAL FACTS IN SUPPORT OF THE PARISH'S CROSS-MOTION FOR SUMMARY JUDGMENT

#### A.  The Parish's FOIA Request

After digesting the new Risk Rating 2.0 and consulting with various field experts and publicly available documents, the Parish desired to obtain data from FEMA to assist in making policy decisions and informing its citizens of ways to positively impact the negative effects of the flood insurance premium crisis.[27] As such, on November 3, 2022, the Parish submitted a straightforward FOIA request to FEMA:

> "Please provide all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana, in Risk Rating 2.0."[28]

---

[26] *See* **Exhibit E**, FEMA's Rate Explanation Guide, March 2022.
[27] Jewell Decl. ¶¶ 19-20.
[28] *Id.* ¶ 21.

FOIA allows FEMA 20 days, excluding Saturdays, Sundays, and legal public holidays, after

receipt of the request to determine whether to comply and notify the Parish of its determination.

5 U.S.C. § 522(a)(6)(A)(i).  On November 23, 2022, FEMA sought clarity in connection with the

request to "help the search tasker in finding records."[29]  That same day, the Parish responded and

provided the requested clarity.  The Parish explained:

> The NFIP uses risk modeling to determine how much premium to
> charge participants who participate in the flood insurance program.
> I am requesting the risk model used to assign premiums to St.
> Charles Parish residents. I believe Milliman was the company that
> did the modeling for FEMA.  Does this help narrow the request?[30]

FEMA informed the Parish that it would request additional information if needed.[31]  According

to FEMA, it conducted its first search for documents on November 25, 2022, and ended its

search on January 6, 2023.[32]

On January 27, 2023, two months after the Parish submitted its request (far beyond the

period for compliance under FOIA) and over two weeks after FEMA supposedly concluded its

search, FEMA issued a "standardized" Final Response informing the Parish that it would not

release the requested records because the information was confidential and considered trade

secrets pursuant to Exemption 4 under 5 U.S.C. § 552.[33] Incredibly, FEMA explains in its brief

that because it had received other FOIA requests from other individuals for trade secret data

related to NFIP, it interpreted the Parish's request in the same manner and used that same

standardized response.[34] Stated differently, the Parish didn't even get a tailored or unique

response from FEMA for its request.  The Final Response did not provide any information

---

[29] Jewell Decl. ¶ 22 and Ex. 1, at 2-3.
[30] Jewell Decl. ¶ 23 and Ex. 1, at 2.
[31] Jewell Decl. ¶ 24 and Ex. 1, at 2.
[32] R. Doc. 31-2 ¶ 16.
[33] Jewell Decl. ¶ 25 and Ex. 2; R. Doc. 31-2 ¶ 21.
[34] R. Doc. 31-1, at 9; R. Doc. 31-2 ¶ 21.

regarding whether FEMA had conducted a search, whether responsive documents had been located, and what documents, if any, were withheld pursuant to Exemption 4.[35] FEMA just flat-out denied the Parish access to any data or information it requested – even data that was generated and/or selected by FEMA for Risk Rating 2.0.

### B. The Parish's Administrative Appeal

In accordance with FOIA and the Department of Homeland Security regulations, the Parish submitted a timely administrative appeal of FEMA's Final Response on February 27, 2023.[36] In its appeal letter, the Parish made clear that its FOIA request was not seeking third party proprietary data or any type of algorithm FEMA used to calculate the premiums in Risk Rating 2.0, but rather that it sought data "crucial to the residents of St. Charles Parish."[37] The Parish further noted that due to the vagueness of the Final Response, it was impossible to understand FEMA's position on the exempted documents because the Final Response did not describe the documents reviewed or located or how it determined the documents were trade secrets.[38] FEMA again had 20 days, exclusive of Saturdays, Sundays and legal holidays, to respond. 5 U.S.C. § 522(a)(6)(A)(ii).

According to FEMA, "prompted by Plaintiffs' administrative appeal," FEMA began a second search for records on March 8, 2023.[39] On March 16, 2023, FEMA again requested clarity with regard to the request, asking for examples of the data that the Parish was requesting.[40] Essentially, FEMA requested the Parish to give it examples of documents and data that it was withholding from disclosing or providing to the Parish. It is simply an unexplainable

---

[35] Jewell Decl. ¶ 26 and Ex. 2.
[36] Jewell Decl. ¶ 27 and Ex. 3.
[37] Jewell Ex. 3, at 2.
[38] *Id.* at 3.
[39] R. Doc. 31-2 ¶ 16.
[40] Jewell Decl. ¶ 28 and Ex. 4.

game of "hide-the-ball."  The Parish, in an effort to cooperate and communicate with FEMA, responded on March 23, 2023, noting that its request for clarity was almost identical to its prior correspondence and also noting that the Parish could not identify for FEMA what data FEMA itself possessed, hence the reason for the request.[41]  FEMA states that it concluded its second search on April 3, 2023.[42]  On April 14, 2023, well beyond the time allowed for issuing a decision on the appeal, a representative of FEMA informed the Parish that a second search had been conducted, the Disclosure Branch was awaiting transfer of the records, and it anticipated receiving the records "soon."[43]  Again, in an effort to cooperate with a fellow public agency, the Parish waited another ten days and again received no further details or communications from FEMA.

### C.  The Parish's FOIA Lawsuit

Having constructively exhausted its administrative remedies and left with no other recourse, the Parish initiated this lawsuit on April 25, 2023.[44]  Soon after filing this lawsuit and when the Parish sought discovery, counsel for the Parish communicated with FEMA's counsel about producing the information sought by the Parish, but FEMA simply refused to cooperate in any meaningful or productive manner.  In fact, FEMA refused to even identify what documents it claimed to be exempt or to work with the Parish in developing an agreed upon search protocol to obtain the requested documents.

As such, on August 11, 2023, the Parish served written discovery requests to FEMA related to the scope of FEMA's search and its application of Exemption 4.[45]  FEMA again went

---

[41] Jewell Decl. ¶ 29 and Ex. 5.
[42] R. Doc. 31-2 ¶ 16.
[43] Jewell Decl. ¶ 30 and Ex. 6.
[44] R. Doc. 1.
[45] **Exhibit F**, Plaintiffs' Interrogatories and Requests for Production to FEMA, August 11, 2023.

to work to hide-the-ball by lodging a blanket objection to the discovery request and, on August 22, 2023, filed a motion for protective order to resist the inquiries of any discovery for any purpose at all.[46]  FEMA's memorandum in support of the motion for protective order actually brought to light an important admission.  FEMA admitted that it "ha[d] not yet completed its processing of records."[47]  How could that be?  FEMA had informed the Parish on January 27, 2023 that it had made a determination that **all** responsive records were exempt from disclosure. But eight months later, FEMA informed this Court and the Parish for the first time that it hadn't fully processed the Parish's request.[48]  Something was clearly amiss with FEMA's differing positions.

Judge North denied FEMA's motion in part and ordered FEMA to respond to the Parish's discovery requests that would explain how FEMA conducted its search.[49]  Judge North noted that "[t]hese facts – most notably FEMA's blanket invocation of confidentiality over documents that appear, at least to some extent, to be publicly available (rec. doc. 16-7) – *call into question the adequacy of FEMA's search for documents and whether it has responded in good faith.*"[50]  In reality, it wasn't until after Judge North's sharp ruling that FEMA became interested in producing public records to the Parish.  FEMA answered the discovery responses on September 20, 2023, wherein it noted that after its "second" search, FEMA discovered 12,904 pages of potentially responsive documents,[51] which it began producing to the Parish on September 23, 2023 and concluded its production on March 12, 2024.[52]

---

[46] R. Doc. 12.
[47] R. Doc. 12-1, at 7.
[48] *Id.*
[49] R. Doc. 21.
[50] R. Doc. 21, at 2 (emphasis added).
[51] **Exhibit G**, FEMA's September 20, 2023 Responses to Plaintiffs' Interrogatories and Requests for Production of Documents.
[52] *See* R. Doc. 31-2 ¶ 40.

### D.  FEMA's Search Procedures

FEMA attached to its motion for summary judgment the declaration of Tammi Hines, the Senior Director of the Information Management Division, Office of the Chief Administrative Officer at FEMA.[53]  Ms. Hines's declaration reveals the steps that FEMA took to search for documents responsive to the Parish's FOIA request, and what was going on behind the scenes while the Parish awaited months for any responsive records.

First, Ms. Hines affirms that FEMA did not even conduct a search for records responsive to the Parish's request on November 25, 2023.[54]  FEMA's justification for not conducting a search at all is because it "interpreted Plaintiffs' request for 'all data . . . used to calculate' NFIP premiums in St. Charles Parish as an indirect way of seeking the trade-secret geospatial information that feeds into the rating engine for Risk Rating 2.0 . . . ."[55]  Again, on January 27, 2023, FEMA provided a Final Response representing to the Parish that "a search was conducted," which "resulted in no records being released."[56]  Instead of conducting a meaningful search and producing relevant public records, FEMA merely referred the Parish to OpenFEMA, a general online database of information not specific to Risk Rating 2.0 or insurance premiums but that contains information from FEMA's various programs.[57]

Second, the Parish affirmed in its appeal of FEMA's Final Response on February 27, 2023 that it did not seek proprietary data but rather any input and output data crucial to St. Charles Parish residents that will assist the Parish in understanding the risk rating to protect and advance the interest of its citizens.[58]  Upon receipt of the Parish's appeal, FEMA commenced

---

[53] R. Doc. 31-2 ¶ 1.
[54] R. Doc. 31-2 ¶ 20.
[55] *Id*.
[56] Jewell Decl. ¶ 25 and Ex. 2.
[57] *See* Jewell Ex. 2.
[58] Jewell Decl. ¶ 27 and Ex. 3.

what it calls its "second" search (despite admitting it did not search for documents in the first instance) on March 8, 2023.[59]  Despite the Parish's affirmation that it did not seek proprietary and trade secret information, FEMA now complains that the Parish's appeal was "vague as to the specific data" requested, so it unilaterally determined only the Milliman data used to create Risk Rating 2.0 methodology "to be the potential focus of Plaintiffs' request."[60]  In conducting the "second" search, FEMA decided that responsive records included non-publicly-available "Milliman data (and subsumed data from the other catastrophe modeling vendors) underlying Risk Rating 2.0."[61]  FEMA's determination, even after two clarifications from the Parish, that the request only pertained to protected "Milliman data" is beyond unreasonable, arbitrary and capricious.  In fact, it wreaks of bad faith.

Third, despite its self-serving limitations regarding the Parish's request, FEMA then decided that "all the Milliman data potentially responsive to Plaintiffs' request" was contained in records "previously collected but had not yet [been] released for a prior FOIA request from a separate requester," a request numbered 2022-FEFO-00776.[62]  FEMA searched these 2022-FEFO-00776 materials between March 24, 2023 and April 3, 2023 and determined this database had all of the records potentially responsive to Plaintiffs' request.[63]  This raises the question: If FEMA believed it had all the responsive documents on or before April 3, 2023, why did it take them until September 23, 2023 to begin producing them to the Parish?

Fourth, FEMA further determined that "the records in the repository of Milliman documents . . . accompanied by publicly-available exhibits on FEMA's website, provide all that

---

[59] R. Doc. 31-2 ¶ 25.
[60] *Id*. ¶ 26.
[61] *Id*. ¶ 29.
[62] *Id*. Notably, that request sought "[a]ll actuarial communications, reports, spreadsheets, data files, and other records provided to FEMA by Milliman, Inc. in connection with Milliman's work under Risk Rating 2.0." *Id*. at ¶ 30.
[63] *Id*. ¶ 32.

is necessary to calculate a Risk Rating 2.0 premium for a specific building in St. Charles Parish or any other location."[64]  Not surprisingly, FEMA points to and describes this "publicly available information" to the Parish for the first time in the Hines Declaration.[65]  Even if FEMA's position was correct, which it is not, FEMA's actions alone do not appear to be in good faith.  FEMA explains that it completed its work on the search for records on April 3, 2023, and "anticipated issuing a response to Plaintiffs and beginning to provide responsive material soon after April 19, *once it had publicly released the full risk-rate data on its website* and could also direct the requester to these public materials."[66]  The Parish was not told when the referenced "publicly-available" material in fact became publicly available or was published on FEMA's website.[67]  Notably, FEMA represented to the Court in its *Memorandum in Support of the Motion for Protective Order* that it still had not yet compiled all responsive records as of August 2023, which is inconsistent with the Hines Declaration.[68] Regardless, because none of this information was communicated to the Parish, the Parish's only remedy was to expend more public resources to file this suit on April 25, 2023 after exhausting its administrative remedies.[69]

### E.  FEMA's Production is Obviously Incomplete

FEMA brags that it ultimately produced 13,065 pages of records, the vast majority of which were not redacted or considered confidential.[70]  Recall, this is a production that was actually pulled together by FEMA's staff from another FOIA request from an unrelated requester.  As such, it shouldn't be much of a surprise that a significant portion of the produced records are not responsive to the Parish's FOIA request.

---

[64] R. Doc. 31-2 ¶ 33.
[65] *See* Jewell Decl. ¶ 31.
[66] R. Doc. 31-2 ¶ 38.
[67] Jewell Decl. ¶ 31.
[68] *See* R. Doc. 12-1, at 7.
[69] *See* Jewell Decl. ¶ 32.
[70] R. Doc. 31-2 ¶ 40.

To assist with the review of the document production, the Parish retained a renowned expert, Dr. Joseph Suhayda. Dr. Suhayda has over 30 years of experience in coastal physical process, coastal engineering, marine geotechnics, hurricane flooding, and oceanographic design criteria.[71] He was retained to assist the Parish in analyzing FEMA's production, provide advice on documents that should have been produced, and to assist in understanding how the Parish can make critical policy decisions and adequately inform its citizens based on the data and information FEMA ultimately provides to the Parish.[72] Dr. Suhayda provides a summary list of all the documents produced by FEMA as Exhibit "1" to his affidavit.[73] But the records produced primarily address insurance variables and property characteristics that are countrywide in scope and not specific to St. Charles Parish – as requested.[74] In fact, there is a very limited amount of data specific to even Louisiana, and there was no data in the production that provided specific information concerning calculating insurance premiums in St. Charles Parish.[75]

On behalf of the Parish, Dr. Suhayda has reviewed FEMA's production, numerous public FEMA documents and reports related to Risk Rating 2.0, and determined that FEMA has in its possession data and information that would be highly valuable to the elected officials in St. Charles Parish, as it was originally requested.[76] For example, the key Risk Rating 2.0 Methodology Report explains the data used by FEMA and Milliman in creating Risk Rating 2.0.[77] While part of the Methodology Report details the information that Milliman provided to FEMA, there are numerous places in that same report that expressly reveal the type of information that *FEMA provided to Milliman*. As outlined above, the Risk Rating 2.0

---

[71] **Exhibit H**, Declaration of Joseph Suhayda ("**Suhayda Decl.**") ¶ 3.
[72] *Id*. ¶ 4.
[73] *Id*. ¶ 5 and Ex. 1.
[74] *Id*. ¶ 7.
[75] *Id*. ¶ 8.
[76] *Id*. ¶¶ 5-6.
[77] *Id*. ¶ 6; *see* Methodology Report; *See* R. Doc. 31-2 ¶ 30 (citing same).

Methodology Report is replete with references to both inputs provided by FEMA (public records) and inputs selected by FEMA (public records) to establish the new flood insurance premium calculations.

Based on Dr. Suhayda's review of the documents FEMA has produced and/or that are publicly available for review, the following list is a non-exhaustive sampling of documents that are now known to exist and are responsive to the Parish's request and have not been produced or have been broadly identified as exempt:

1. Premium Calculation Worksheet Input Data for each individual property in St. Charles Parish;

2. Premium Calculation Worksheet Output Data for each individual property in St. Charles Parish;

3. Historic Flood Claims Data specific to the Parish;

4. The map of Risk Rating 2.0 Premium Estimates for the Parish, which was previously available on the FEMA READYYOURRISK.COM website;

5. Redacted copies of all technical reports and communications by any consultants who completed any modeling to either FEMA or Milliman that included FEMA inputs or was selected by FEMA as part of the Risk Rating 2.0 premium calculation, including, but not limited to:

   a. Atkins;

   b. Mapping Data Integration Model Documentation Version 2.0 (February 13, 2020);

   c. KatRisk Data and Technical Documentation (February 2018);

   d. AIR Inland Flood Model for the United States (June 2016);

16

e.  AIR Hurricane Model for the United States (June 2017);

f.  RQE v. 18.0 US Flood Model Principles and Methodology (July 2018); and

6.  Any documentation confirming the list of levees in the Parish considered as part of the Risk Rating 2.0 and reasons for exclusion of any levees.[78]

## IV.  LEGAL STANDARD

### A.  Standard on Motion for Summary Judgment

Summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim." *Kitchens v. Dyson*, No. 18-9218, 2020 WL 360515, at *2 (E.D. La. Jan. 21, 2020) (Barbier, J.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "In considering a motion for summary judgment, the 'evidence of the non-movant is to be believed, and all inferences are to be drawn in his favor.'" *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).

### B.  General FOIA Standard and Procedure

"The FOIA was enacted to 'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Batton v. Evers*, 598 F.3d 169, 175 (5th Cir. 2010) (quoting *Dep't of the Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)). "Consistently with this purpose, as well as the plain language of the Act, **the strong presumption in favor of disclosure** places the burden on the agency to justify the withholding

---

[78] Suhayda Decl. ¶ 9.

of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S. Ct. 541, 547, 116 L. Ed. 2d 526 (1991). "FOIA requires federal agencies to disclose documents within their control upon request unless the documents fall within one of nine enumerated exceptions." *Berk v. Exec. Off. of United States Att'ys*, No. 21-10693, 2022 WL 17337821, *1 (5th Cir. Nov. 30, 2022) (citing 5 U.S.C. § 552(b)(1)-(9)). The exemptions to disclosure are explicitly limited by statute and should be construed narrowly. *Rose*, 425 U.S. at 361. Agencies are permitted 20 days (excluding Saturdays, Sundays, and legal public holidays) to respond to FOIA requests. 5 U.S.C. § 522(a)(6)(A)(i). They are permitted the same amount of time to respond to an administrative appeal. 5 U.S.C. § 522(a)(6)(A)(ii). If the agency fails to make a timely determination, the requester constructively exhausts its administrative remedies and may seek judicial review. 5 U.S.C. § 552(a)(6)(C).

"In a FOIA case, the district court reviews the agency's decisions *de novo* and 'the burden is on the agency to sustain its action.'" *Sea Shepherd Conservation Soc'y v. Internal Revenue Serv.*, 89 F. Supp. 3d 81, 89 (D.D.C. 2015) (quoting 5 U.S.C. § 552(a)(4)(B); *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981)). "FOIA cases are typically and appropriately decided on motions for summary judgment." *Id.*

### C.   FEMA must prove the search was reasonable and adequate.

"A defendant in a FOIA action is entitled to summary judgment if the defendant proves that it has fully discharged its obligations under the Act." *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007) (citing *Weisberg v. Dep't of Justice,* 705 F.2d 1344, 1350 (D.C. Cir. 1983)). "Specifically, the agency must demonstrate that (1) it conducted an adequate and good faith search for the requested documents; (2) any documents that it withheld fall within one of the FOIA exemptions; and (3) it disclosed all 'reasonably

segregable,' nonexempt material." *Id.* (citations omitted). "This burden does not shift even when the requester files a cross-motion for summary judgment because the Government ultimately has the onus of proving that the documents are exempt from disclosure, while the burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur." *Jurdi v. United States*, 485 F. Supp. 3d 83, 91 (D.D.C. 2020) (internal quotation marks and citation omitted).  "In determining whether the defendant agency has met its burden, 'the underlying facts and the inferences to be drawn from them are construed in the *light most favorable to the FOIA requester.*'" *Id.* (citations omitted) (emphasis added).

An agency from which information has been requested must undertake a search that is "reasonably calculated to uncover all relevant documents." *Media Rsch. Ctr. v. U.S. Dep't of Just.*, 818 F. Supp. 2d 131, 137 (D.D.C. 2011).  "[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Media Rsch. Ctr. v. U.S. Dep't of Just.*, 818 F. Supp. 2d 131, 137 (D.D.C. 2011). "The agency must demonstrate that it 'made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" *Id.* (citing cases). "When a requester challenges an agency's response based on the adequacy of the search performed, '[t]o prevail on summary judgment ... the defending "agency must show *beyond material doubt* ... that it has conducted a search reasonably calculated to uncover all relevant documents."'" *Mobley v. C.I.A.*, 924 F. Supp. 2d 24, 35 (D.D.C. 2013) (emphasis added) (citations omitted).

"Where the agency's responses raise serious doubts as to the completeness of the search or are for some other reason unsatisfactory, summary judgment in the government's favor would

usually be inappropriate." *Perry v. Block,* 684 F.2d 121, 127 (D.C. Cir. 1982). "A search is inadequate where 'the record itself reveals "positive indications of overlooked materials."'" *Am. C.L. Union v. Fed. Bureau of Investigation*, No. C 12-03728 SI, 2013 WL 3346845, at *3 (N.D. Cal. July 1, 2013) (emphasis added) (quoting *Valencia–Lucena v. U.S. Coast Guard,* 180 F.3d 321, 327 (D.C. Cir. 1999)).

## V.   LEGAL ANALYSIS

### A.  FEMA's search was not reasonable because it improperly narrowed the Parish's requests, failing to construe the requests liberally.

First, FEMA failed to construe the Parish's requests liberally, but rather at every stage unilaterally narrowed the requests to avoid searching for and producing responsive documents. In connection with the first search for documents that allegedly took place from November 25, 2022 – January 6, 2023, FEMA did not conduct a search at all or review even a single record in consideration of the Parish's initial request.  FEMA attempts to explain this away by asserting that it "construed" the Parish's request as "an indirect way of seeking trade-secret geospatial information in the rating engine for Risk Rating 2.0."[79] But hardly any of those words are contained in the Parish's request, and the Parish was in fact very direct in requesting "data" that related to the setting of premiums in St. Charles Parish. FEMA overcomplicated the request and chose to construe it as one "indirectly" seeking trade secrets, which then allowed FEMA to summarily and instantaneously avoid conducting any search.  As a result, FEMA provided a very short, standardized response to the Parish that claimed that all possibly responsive records would be exempt under Exemption 4.[80]

---

[79] R. Doc. 31-1 at 11 (citing R. Doc. 31-2 ¶ 20).
[80] Notably, FEMA's January 27, 2023 Final Response that did not provide any information about the documents searched, the documents retained, and the specific basis for their retention, was improper. "When an agency withholds documents or parts of documents, it must explain what it is withholding **and** specify the statutory exemptions that apply." *James Madison Project v. Dep't of the Treasury*, 478 F. Supp. 3d 8, 13 (D.D.C. 2020)

Not only was FEMA's initial search unreasonable, but it was done in bad faith. How could FEMA know that all the possible responsive records were exempt or confidential without searching or reviewing them first? FEMA's failure to make any attempt to locate even a single responsive document is by definition bad faith, and certainly unreasonable.

FEMA tries to recover from its first failure by arguing that it better understood the Parish's request after its appeal – an appeal that provided the exact same request and explanation as the original request. According to FEMA, it initiated a "second search" on March 8, 2023, and then referred it to the FID and Disclosure Branch for review between March 23 and April 3, 2023.[81] Yet, even given a second chance, FEMA states that it re-interpreted the Parish's request to be limited to only one category of documents—materials from Milliman—and then only searched a file that it had already compiled of Milliman-only materials. Make no mistake, FEMA did not conduct any further search or review. Whether it was done out of convenience, being overworked, indolence, or with the intent to hide information from the public, the result is the same: FEMA's narrow interpretation of the Parish's request was unreasonable and violated FOIA.

FEMA's stated reasons for interpreting the request as it did do not support its claim that it performed a reasonable search but instead make clear that FEMA improperly narrowed the Parish's request. FEMA first states that the Disclosure Branch and FID reached this conclusion because "FID had previously confirmed the shared folder contained all Milliman data."[82] Second, FEMA states that "Plaintiffs specifically identified Milliman data in their FOIA

---

(emphasis added). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* As the Parish expressed in its appeal to FEMA, the Parish was not able to assess the application of Exemption 4 without this necessary information, required by law, and thus it could not determine if the application of the Exemption at that time was logical or plausible. Clearly, it was neither logical nor plausible because FEMA eventually produced over 13,000 documents, most of which are not redacted.

[81] R. Doc. 31-2 ¶ 32.

[82] *Id.*

request."[83]  Third, FEMA reasons that in response to FEMA's request for clarity, "Plaintiffs further specified they were requesting the Risk Rating 2.0 'risk model used to assign premiums,' which they identified 'Milliman' as the source for."[84]  Finally, FEMA reasons that "the data sought—the 'risk model used to assign premiums to St. Charles Parish'—does not exist at the parish level."[85]

The first reason is hardly explanatory and does nothing to support FEMA's conclusion. The second and third reasons reveal that FEMA chose to focus only on a subset of data and ignored the request for Parish-related information or anything other than Milliman-created data. Its fourth reason is equally unavailing because the Parish did not only request the risk model used to assign premiums, and none of this information was communicated to the Parish as the search was being conducted.  Rather, FEMA simply asked the Parish open-ended questions that it could not succinctly answer, and then used the responses to improperly narrow the request and its search.

FEMA has "a duty to construe a FOIA request liberally, and [is] bound to read it as drafted[,] not as agency officials . . . might wish it was drafted." *Mobley*, 924 F. Supp. 2d at 39 (internal quotation marks and citations omitted).  "In this regard, it is clear that, for example, when a FOIA requester 'seek[s] all of a certain set of documents' while also 'evincing a heightened interest in a specific subset thereof,' such a request 'is reasonably susceptible to the broader reading' of seeking the entire set of documents despite the fact that a specific subset of documents is named." *Id.* (citations omitted).  Accordingly, FEMA's construction of the request as an "indirect" request for trade secret information, or its interpretation as a request for all

---

[83] R. Doc. 31-2 ¶ 32
[84] *Id.*
[85] *Id.*

Milliman data, was improper.  To the extent FEMA asserts it was proper to narrowly construe the Parish's FOIA request as a request for Milliman documents based on the Parish's response to FEMA's request for "clarity," it would still be improper to search for only that subset of documents.  FEMA cannot ignore the Parish's full request, which was for data supporting the setting of flood premiums in St. Charles Parish.

### B. FEMA's search was unreasonable because it only yielded "Milliman Data."

The fact that FEMA's search only yielded a limited field of Milliman-created documents establishes that FEMA has failed to meet its burden of proof that it conducted a reasonable search in response to the Parish's request.  Sure, FEMA eventually produced over 13,000 documents, but these documents were nothing more than the documents searched and gathered to respond to a completely separate FOIA request (not from the Parish) – one limited to documents provided to FEMA by Milliman.  The fact of the matter is that FEMA failed to conduct any additional searches specific to the Parish's request, or if it has, it has failed to describe how it conducted any additional searches in its discovery responses and pleadings.

Likely realizing its own deficiencies in its search protocol here, FEMA tries to reshape its legal burden by asserting that it has produced all of the materials necessary for the Parish to understand the data underlying the setting of premiums for Risk Rating 2.0.  Even if that were true, and it is not, that is not the legal standard.  FEMA cannot meet its burden by showing that it searched for records and produced what *should* answer the Parish's questions.  Rather, it is FEMA's burden to provide "a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that **all files likely to contain responsive materials . . . were searched**." *Porup v. Cent. Intel. Agency*, 997 F.3d 1224, 1237 (D.C. Cir. 2021) (emphasis added) (internal quotation marks and citations omitted).  FEMA has failed to meet this burden.

For example, in *Sea Shepherd Conservation Soc'y v. Internal Revenue Serv.*, a trial court found the agency failed to meet its burden of showing its search was adequate. 89 F. Supp. 3d 81 (D.D.C. 2015).  Specifically, the court reviewed the affidavits and found that they failed to explain why only limited locations were searched without stating that "no other record system was likely to produce responsive documents," failed to describe any other details of the search, such as the relevant file systems or search terms that may have been employed, and failed to indicate that a search was conducted for the broader category of records requested by the plaintiff rather than one subset of records requested. *Id.* at 93-94 (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  Accordingly, the court remanded the matter to the agency so it could conduct additional searches and provide more detailed descriptions of its searches. *Id.* at 94.

After not one, but two attempts to properly construe the Parish's request, FEMA eventually decided to merely re-produce the same document production it marshalled for FEMA Request No. 2022-FEFO-00776.  FEMA tries to justify its very limited search by stating "FID noted that Plaintiffs referenced the Milliman data that was used to create the Risk Rating 2.0 rating methodology and determined that data to be the potential focus of Plaintiffs' request."[86]  It further defends its limited search by rationalizing that the "FID and the Disclosure Branch determined that records that FEMA had previously collected but had not yet released for a prior FOIA request from a separate requester contained all the Milliman data potentially responsive to Plaintiffs' request."[87]  That prior request (2022-FEFO-00776) from a separate requester specifically sought "[a]ll actuarial communications, reports, spreadsheets, data files, and other records provided to FEMA by Milliman, Inc. in connection with Milliman's work under Risk

---

[86] R. Doc. 31-2 ¶ 26.
[87] *Id.* ¶ 29.

Rating 2.0."[88] This, of course, is a very different request from the Parish's request. Nevertheless, FID conducted a search of the 2022-FEFO-00776 materials, "and they concluded from their review that the database had all the records potentially responsive to Plaintiffs' request."[89]

FEMA flat out admits that once it identified the "Milliman data" file (2022-FEFO-00776), it concluded that no further search was necessary and deemed the Parish's request satisfied. FEMA's search of only a single repository of documents related only to "Milliman data" was not reasonable, and it has failed to show by affidavits or otherwise that it searched any other documents or data sets to respond to the Parish's request, such as claims information related to St. Charles Parish, historical loss data related to St. Charles Parish, or levee data related to St. Charles Parish, among multiple other responsive topics. Nor has FEMA averred that all files likely to contain responsive materials were searched. Accordingly, the Parish's request should be remanded to FEMA to search all files likely to contain responsive materials. *See Sea Shepherd*, 89 F. Supp. 3d at 94.

Accordingly, on the face of FEMA's motion for summary judgment and supporting affidavits it has failed to meet its burden that it searched all files likely to contain responsive materials. However, other materials, relied upon by FEMA, show that FEMA clearly possesses additional information that it did not produce or search.

### C.  FEMA's search was unreasonable because there are known documents not produced or even identified by FEMA.

FEMA's own documents, namely the Methodology Report, and other publicly available information reveal that numerous data sets and documents are available and responsive to the Parish's request, but that FEMA did not search for or produce. For example, the Methodology

---

[88] R. Doc. 31-2 ¶ 30.
[89] *Id*. ¶ 32.

Report specifically states that Milliman performed its services by reviewing data provided to it by FEMA, which includes FEMA's historical loss data.[90]   The Methodology Report also indicates that the catastrophe models developed in Risk Rating 2.0 used FEMA flood maps,[91] and  FEMA "consulted with the United States Army Corps of Engineers to develop assumptions regarding the definition of leveed areas, the probability of overtopping, and the probability of failure prior to overtopping that could inform the catastrophe modeling."[92]   But none of this data was included in FEMA's production and FEMA has not indicated it even searched for any such data.   It would certainly be a surprise to hear that FEMA has no historical loss data, historical claims data, flood maps, or levee data connected to St. Charles Parish, but FEMA has not indicated one way or another, at least in response to the Parish, whether it possesses such documents.

It bears repeating that the Methodology Report specifically states that Milliman relied upon data provided by FEMA to perform its services, which data it did not independently verify.[93]   The report and the Risk Rating 2.0 methodology is only as good as that data, and it is critical that the Parish understands what data is being examined in setting these crucial premiums.

In addition, Dr. Suhayda attests, based on his review of the production as well as publicly available documents, and his experience in the industry, that FEMA possesses or should possess various data sets responsive to the Parish's request, including premium calculation worksheet input and output data for each individual property in St. Charles Parish; historic flood claims data specific to the Parish; the map of Risk Rating 2.0 premium estimates for the Parish, which was previously available on the FEMA READYYOURRISK.COM website; redacted copies of all technical reports and communications by any consultants who completed any modeling that

---

[90] Methodology Report, at 4.
[91] *Id*. at 4 (emphasis added).
[92] *Id*. at 7.
[93] *Id.* at 32

included FEMA inputs or was selected by FEMA as part of the Risk Rating 2.0 premium

calculation, and any documentation confirming the list of levees in the Parish considered as part

of the Risk Rating 2.0 and reasons for exclusion of any levees.[94]

To the extent that FEMA considers any of the information the Parish believes should

have been disclosed as confidential or trade secret information, (1) it is not absolved of the duty

to search for the responsive records, and (2) it should have been listed on the *Vaughn* index. A

*Vaughn* index is a "routine device through which the defendant agency describes the responsive

documents withheld or redacted and indicates why the exemptions claimed apply to the withheld

material." *Batton*, 598 F.3d at 174 (quoting *Jones v. FBI*, 41 F.3d 238, 241 (6th Cir. 1994)). "An

adequate *Vaughn* index must provide a 'detailed justification' for each of the agency's claimed

exemptions to disclosure." *Gahagan v. United States Citizenship and Immigration Services,* 147

F. Supp. 3d 613, 627 (E.D. La. 2015) (quoting *Stephenson v. I.R.S.*, 629 F.2d 1140, 1145 (5th

Cir. 1980)).

FEMA's *Vaughn* index identifies the numerous documents that it redacted in its sixth

interim response to the Parish, which are not responsive to the Parish's request, and the

exemption pertaining to each redaction.[95]  The *Vaughn* index does not, however, include any

documents that were *withheld* by FEMA pursuant to any applicable exemption.  Recall that in its

January 27, 2023 Final Response, FEMA asserted that it could not provide any documents to the

Parish because any responsive documents would be confidential trade-secret information

protected by Exemption 4.  FEMA has not listed any of those potentially responsive documents

on its *Vaughn* index. As a further example, the Methodology Report states that "Milliman's work

under Risk Rating 2.0 has been fully documented in over 40 separate actuarial communications

---

[94] Suhayda Declaration ¶ 9.
[95] *See* R. Doc. 31-3.

to FEMA provided over the course of the engagement, including both actuarial reports and other formats such as spreadsheets and electronic data files."[96]  But FEMA has not alleged that it searched for any such communications, that it considers such communications confidential or exempted from disclosure, and if it does, they are not included on the *Vaughn* index.

### VI.    THE PARISH IS ENTITLED TO ATTORNEYS' FEES AND COSTS

"The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C.A. § 552(a)(4)(E)(i). "When deciding whether to award attorneys fees under FOIA, the district court must conduct a two-step inquiry, asking first 'whether a plaintiff has substantially prevailed' according to the statutory definition of the term ("eligibility"). If the plaintiff has thus prevailed, the court then 'determine[s] whether the plaintiff *should* receive fees' ("entitlement")." *DaSilva v. U.S. Citizenship & Immigr. Servs.*, 599 F. App'x 535, 541 (5th Cir. 2014).

As to the first inquiry, a complainant has "substantially prevailed" if it "has obtained relief through either (1) a judicial order, or an enforceable written agreement or consent decree; or (2) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C.A. § 552(a)(4)(E)(ii).  The Parish can succeed under either theory to be eligible for attorneys fees.  The Parish moves this Honorable Court for an order finding that FEMA's search was unreasonable and to remand its request to FEMA with a judicial order to properly complete its search and produce the responsive records and/or a detailed list of documents it claims should be exempt, and the basis for exemption.  Thus, if the Court issues an

---

[96] Methodology Report, at 1.

order granting the Parish's requested relief, it will satisfy the first theory of causation and become eligible for attorneys' fees and costs under FOIA.

The Parish can also show that it substantially prevailed, and is thus eligible for attorneys fees, under the second causative theory. "This second theory of causation requires the plaintiff to show that 'prosecution of the action could reasonably be regarded as necessary to obtain the information and that the action had a substantive causative effect on the delivery of the information.'" *DaSilva*, 599 F. App'x at 541. This theory is known as the "catalyst theory." *See Batton v. I.R.S.*, 718 F.3d 522, 525-26 (5th Cir. 2013). The Parish has shown that it substantially prevailed in the case because it took the filing of this lawsuit to get FEMA to produce any documents.  FEMA states in its motion and supporting affidavits that it conducted a second search for documents prompted by the Parish's appeal, and that while it had completed its search and planned to make a production "soon after" April 19, 2023, it did not make any production until months after the Parish initiated this lawsuit.  In fact, it informed the Court in August of 2023 that it still had not even compiled all the responsive records, of which Judge North considered problematic to FEMA's explanation of its search protocol.  And still, FEMA has not produced the requested and responsive records related to data underlying the premiums in St. Charles Parish. The facts show that the lawsuit was necessary to obtain the information from FEMA.

Because the Parish is eligible for attorneys fees, the Court looks to the second inquiry—entitlement.  To determine entitlement to attorney's fees, courts consider four factors: "(1) the public benefit derived from the case, (2) the commercial benefit to the requester, (3) the nature of the requester's interest in the information, and (4) the reasonableness of the agency's conduct." *Morley v. C.I.A.*, 719 F.3d 689, 690 (D.C. Cir. 2013).

The Parish – a public entity itself – satisfies the public benefit factor.  When considering the first factor, public benefit, "a court should take into account the degree of dissemination and likely public impact that might be expected from a particular disclosure." *Gahagan v. United States Citizenship & Immigr. Servs.*, No. CV 14-2233, 2016 WL 1110229, at *10 (E.D. La. Mar. 22, 2016) (quoting *Blue v. Bureau of Prisons*, 570 F. 2d 529, 533 (5th Cir. 1978)).  As enumerated above, the impact of Risk Rating 2.0 has been devasting to the Parish.  This information will allow for the Parish to make investment of public dollars into infrastructure and programs to align with the goals and objectives of NFIP.  Simply put, the Parish is seeking this information to make informed policy decisions and to educate its own citizens to best address the flood insurance premium crisis.  FEMA, as a federal public agency, should be eager to share this information with a fellow public agency, but it has elected not to cooperate.

The Parish also asserts that the commercial benefit is significant.  Considering that approximately 3% of the average family's median income in St. Charles Parish has to be allocated to flood insurance premiums in order to stay in their homes underscores the huge economic and commercial impact at stake.  The documents sought will benefit the (private) tax paying citizens of the Parish by arming them with information and data to allow them to make personal decisions in terms of investing wisely to better protect and insure their property from the perils of a flood.

Similar to the first factor of entitlement, the Parish's interest in the requested information is to address the existential threat caused by the nearly 230% (some cases 700%) increase in the average homeowner's flood insurance premiums.  The Parish is seeking this information so it can spend its tax-payers' money in a wise, educated and efficient manner.  The Parish is asking

FEMA for this data in order to best protect its own citizens and align itself with the federal government's strategy to address flood risk and prevention for its constituents.

As to the final factor of entitlement – reasonableness of FEMA's conduct – "it requires a court to answer not whether the plaintiff has affirmatively shown that the agency was unreasonable, 'but rather whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until after [the plaintiff] filed suit.'" *Gahagan*, 2016 WL 1110229, at *13 (quoting 550 F.3d 1155, 1162–63 (D.C. Cir. 2008)). "[T]he Supreme Court has found that FOIA establishes a 'strong presumption in favor of disclosure,' and accordingly 'places the burden on the [government] agency [to which a request has been made] to justify the redaction of identifying information in a particular document as well as when it seeks to withhold an entire document.'" *Id.* (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).

FEMA's actions are beyond unreasonable and appear to be in bad faith.  As illustrated throughout this brief, FEMA has not acted with reason or logic.  In violation of the FOIA standards, FEMA conveniently misconstrued and inexplicably narrowed the Parish's FOIA request on two occasions whereby it avoided producing any relevant information to the Parish. FEMA's own affidavits reveal that it did not conduct any search for documents when the Parish first submitted its request, despite taking over two months to issue its Final Response, and its second search for records was limited to a single repository of Milliman data that had been previously gathered to respond to a completely separate FOIA request.  Even then, FEMA admits that it had all of the documents from its search related to 2022-FEFO-00776 as of April 14, 2023, yet it did not make its full production for nearly another 11 months.  In fact, it wasn't until after

Judge North questioned FEMA's bad faith efforts relative to the Parish's request that FEMA even acknowledged that it intended to provide any documents to the Parish.

The Parish asserts that it satisfies both the eligibility and entitlement criteria for attorneys' fees and costs under FOIA.  As such, the Parish prays that this Honorable Court determine the Parish is entitled to attorneys' fees and costs subject to a *Motion for Attorneys' Fees and Tax Costs* upon adjudication of the parties respective cross-motions for summary judgment.[97]  *See Gahagan*, 2016 WL 1110229, at *14 (finding the plaintiff met three of the four entitlement factors and awarding attorneys fees).

## VII.   CONCLUSION

For the foregoing reasons, the Parish is entitled to summary judgment in its favor and a finding that FEMA has acted unreasonably in searching for documents responsive to the Parish's FOIA request.  The Parish submitted its first request in November 2022 to obtain information critical to its tax paying citizens.  The request was necessary, unfortunately, due to the lack of information supporting the disparity in the flood insurance premiums assessed to citizens of St. Charles Parish and Louisiana compared to the rest of the country.  For the Parish to survive and develop meaningful policy, it must understand the Risk Rating process and data.  As demonstrated, FEMA has failed to abide by the liberal standards under FOIA favoring disclosure but has instead thwarted another governmental entity's attempt to obtain public information.

Accordingly, the Parish prays that the Court denies FEMA's motion for summary judgment, grants this cross-motion for summary judgment, remands the matter to FEMA with an order to conduct a reasonable and adequate search, and find that the Parish is entitled to statutory attorneys fees and costs.

---

[97] If the court determines a fee award is appropriate, the court will use the lodestar method to determine the amount of attorney's fees. *DeSilva*, 599 F. App'x at 541.

Respectfully submitted,

**ADAMS AND REESE LLP**


*/s/ Erica P. Sensenbrenner*
CHRISTOPHER J. KANE (#29282)
ERICA P. SENSENBRENNER (#38400)
701 Poydras Street, Suite 4500
New Orleans, LA 70l39
Telephone: (504) 58l-3234
Facsimile:  (504) 566-0210
Christopher.Kane@arlaw.com
Erica.Sensenbrenner@arlaw.com


**AND**

COREY M. OUBRE (#28709)
Director of Legal Services
St. Charles Parish
723 Paul Maillard Road
Luling, LA 70070
Telephone: (985) 783-5013
Facsimile:  (985) 307-0861
cmoubre@stcharlesgov.net

**AND**

ROBERT L. RAYMOND (#11408)
Assistant Director of Legal Services
St. Charles Parish
14108 River Road
Destrahan, LA 70047
Telephone: (985) 783-5013
Facsimile:  (985) 307-0861
rraymond@stcharlesgov.net

***Attorneys for Plaintiffs***