UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ST. CHARLES PARISH, A POLITICAL SUBDIVISION OF THE STATE OF LOUISIANA, AND MATTHEW JEWELL, IN HIS OFFICIAL CAPACITY AS ST. CHARLES PARISH PRESIDENT,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY,<br><br>*Defendant*. | Civil Action No. 2:23-cv-01369<br><br>Section P<br><br>Judge Papillion<br><br>Magistrate Judge North |

## **SUPPLEMENTAL DECLARATION OF NAOMI ONDRICH**

I, Naomi Ondrich, do hereby declare and state as follows:

1. I am the Branch Chief of the Actuarial and Catastrophic Modeling Branch of the Federal Emergency Management Agency ("FEMA"), a component of the United States Department of Homeland Security. The Actuarial and Catastrophic Modeling Branch sits within the Flood Insurance Directorate, the organization within FEMA that manages the National Flood Insurance Program ("NFIP"). In my capacity as the Branch Chief of the Actuarial and Catastrophic Modeling Branch, I oversee all aspects of the actuarial and catastrophic modeling team, including overseeing actuarial analysis, rate development and implementation, and program reporting. In addition, where needed, I provide technical direction and support coordination of the team's work initiatives. I have held this position since September 2023. I have over 30 years of experience as an actuary, 6 of which are with the Federal Government. I am an Associate of the Casualty Actuary Society ("CAS"), and a Member of the American Academy of Actuaries ("MAAA").

2. The Actuarial and Catastrophic Modeling Branch is responsible for developing the NFIP's insurance rating program, establishing insurance premium rates, and providing actuarial support to the NFIP. Because of its responsibilities and subject matter expertise, the Actuarial and Catastrophe Modeling Branch works with FEMA's Disclosure Branch, which handles all Freedom of Information Act ("FOIA") requests for the agency, on FOIA searching and processing for FOIA requests that pertain to the NFIP and in particular to NFIP premiums and risk modeling.

3. Due to my official duties as the Branch Chief of the Actuarial and Catastrophic Modeling Branch, I am familiar with this case, catastrophe modeling, and how FEMA rates policies as part of the NFIP.

4. I am familiar with the Complaint filed by Plaintiffs St. Charles Parish and parish president Matthew Jewell, seeking disclosure of records sought through FOIA. I am also familiar with Plaintiffs' summary judgment filing in this case (ECF No. 35), including the declaration of Dr. Joseph Suhayda that Plaintiffs included as part of their submission.

5. I have prepared this declaration to supplement my June 13, 2024, declaration, that FEMA submitted to support its summary judgment motion. *See* ECF No. 31-5. The statements contained in this declaration are based upon my personal knowledge; upon information provided to me in my official capacity, including information provided by members of the Actuarial and Catastrophic Modeling Branch, Disclosure Branch, and other FEMA employees involved in searching for and processing records in this case; and upon conclusions I reached based on that knowledge or information.

6. As I and Tammi Hines, Senior Director of the Information Management Division and acting Chief of the Disclosure Branch at FEMA, previously explained in our prior declarations, FEMA's actuarial and FOIA staffs interpreted Plaintiffs' FOIA request for "modeling data used to

calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana in Risk Rating 2.0," and in particular "the risk modeling" that was performed by Milliman and "used to assign premiums to St. Charles Parish residents," as seeking Milliman catastrophe modeling output. Accordingly, FEMA's actuarial and FOIA staffs located a central repository of such data and confirmed it had all final Millman data.

7. We did not interpret Plaintiffs' request as seeking any local-level "input" data into premium calculations claims—which Plaintiffs identify as claims information, historical loss data, or levee data related to St. Charles Parish—because that is not Milliman catastrophe modeling data, or, for that matter, catastrophe modeling data.

8. As I previously explained: Catastrophe modeling is a type of risk modeling where a computerized process simulates potential catastrophic events based on historical events. The simulated events generate scenarios of frequency and severity at selected locations. Catastrophe models incorporate data, technology, scientific research, engineering methods, and statistical analysis to model complex scenarios and events.[1] For Risk Rating 2.0, FEMA ran catastrophe models from three vendors (CoreLogic, KatRisk, and Verisk) and provided the model output to Milliman for the company to create the Risk Rating 2.0 rating plan and calculate premiums in St. Charles Parish and elsewhere.

9. Therefore, the catastrophe model output that Milliman relied on to create the rating plan represents the records responsive to Plaintiffs' request for Milliman risk modeling data used to generate Risk Rating 2.0 premiums in St. Charles Parish and other locations across the country.

---

[1] NAIC Center for Insurance Policy and Research, *Catastrophe Models (Property)* (last updated Mar. 20, 2024), https://content.naic.org/cipr-topics/catastrophe-models-property.

That model output is the catastrophe model data "used to assign premiums to St. Charles Parish residents."

10. Claims information, historical loss information, and levee data do not represent catastrophe modeling data used to generate premiums. Claims, historical loss, and levee data are standalone pieces of data, which, as their names indicate, represent particular aspects of flood risk. Such pieces of information are *inputs* into the catastrophe modeling analysis. Input data is just that: inputs, i.e., raw ingredients—not the modeling analysis itself that is ultimately used to generate rates. Catastrophe modeling output data is what results from the resulting application of software and algorithms to various inputs to generate outputs that insurance industry professionals utilize for ratemaking and other related insurance purposes.[2] For these reasons, we did not and still do not understand Plaintiffs' FOIA request for Milliman risk modeling data to cover individual policy information, historical loss information, or other inputs.

11. It is my understanding that Plaintiffs believe that FEMA's *Risk Rating 2.0 Methodology and Data Report* indicates that the agency failed to produce records responsive to their request, but the report contradicts that belief. The report clearly delineates between input data such as policy information and historical and inforce exposure data (see pages 2–3 for these

---

[2] *Id.* ("Catastrophe models produce outputs that can be used by insurance industry professionals in various ways. An exceedance probability (EP) curve calculates the loss for each event in the portfolio, produces either by the sum of all losses (aggregate loss) or the largest event each year (occurrence loss) and ranks each event by the probability of the event exceeding the aggregate or occurrence-based loss amount. An average annual loss (AAL) can be calculated on an occurrence (largest event within a year) or aggregate (all events within a year) basis and represents the loss amount averaged across all years in the event set. . . . The output derived from catastrophe models is widely used for ratemaking, premium mitigation credit quantification, reinsurance purchase, capital, and solvency assessment."); *see also, e.g.*, American Academy of Actuaries, *Use of Catastrophe Model Output* (July 2018), at 11–23 https://www.actuary.org/sites/default/files/files/publications/Catastrophe_Modeling_Monograph_07.25.2018.pdf (explaining how catastrophe model outputs are used for rate calculation and other purposes).

demarcated sections), which, for the reasons just discussed, is not responsive, and catastrophe modeling (see pages 4–7 for the clearly demarcated catastrophe modeling section).[3] Plaintiffs combine the two categories of data together, but they are distinct.

12.     I understand that Plaintiffs and Dr. Suhayda have identified six specific categories of records that they believe were missed in FEMA's search. *See* ECF No. 35-1 at 16–17. But the FEMA actuarial and FOIA staffs have determined that none of the six categories of records are responsive for the reasons just discussed: none represent Milliman data or risk modeling data as it is commonly understood. In fact, many of the categories of records do not even exist.

13.     The first category of record that Plaintiffs and Dr. Suhayda identify is the "Premium Calculation Worksheet Input Data for each individual property in St. Charles Parish." However, Premium Calculation Worksheets for individual properties do not exist. FEMA has publicly posted on its website a *Risk Rating 2.0 Methodology and Data Sources – Premium Calculation Worksheet Examples*[4] Excel document, which provides four sample worksheets explaining how various geographical, property, and policy inputs (e.g., distance to river, foundation height, etc.) ultimately flowed through the risk modeling analysis and led to premium rates in Risk Rating 2.0. The worksheet examples were created to illustrate how an individual property would be rated through the rating engine upon renewal, and to show how rates are assigned at a state level for base rates

---

[3] FEMA, *National Flood Insurance Program: Risk Rating 2.0 Methodology and Data Sources* 2–7 (Jan. 18, 2022), https://www.fema.gov/sites/default/files/documents/FEMA_Risk-Rating-2.0_Methodology-and-Data-Appendix__01-22.pdf (*RR 2.0 Methodology and Data Sources Report*).

[4] https://www.fema.gov/sites/default/files/documents/fema_risk-rating_PCW_Rating_Examples.xlsx.

and HUC12-level for territories, not at the locality level like St. Charles Parish.[5] No premium calculation "worksheet" or similar record exists at the locality level or for each individual policyholder. FEMA does not document or generate individual policyholder premiums in a worksheet format.[6]

14. The second category of record that Plaintiffs and Dr. Suhayda identify is the "Premium Calculation Worksheet Output Data for each individual property in St. Charles Parish." But this does not exist, for the reasons just discussed.

15. The third category of record that Plaintiffs and Dr. Suhayda identify is the "Historic Flood Claims Data specific to the Parish." This data is not risk modeling data, for the reasons discussed above. To reiterate, catastrophe modeling data is what results from the resulting application of software and algorithms to various inputs to generate outputs. Moreover, FEMA has put certain redacted claims information on its OpenFEMA website (https://www.fema.gov/about/openfema/data-sets). Unredacted claims information at the location level, revealing individual policyholder information, would be exempt under FOIA Exemption 6.

16. The fourth category of record that Plaintiffs and Dr. Suhayda identify is "[t]he map of Risk Rating 2.0 Premium Estimates for the Parish, which was previously available on the FEMA READYOURRISK.COM website." This does not exist; FEMA never made a map for the Parish.

---

[5] *Id.*; *see also RR 2.0 Methodology and Data Sources Report* at 21 (explaining that the four examples of premium calculations in the worksheet are for "South Carolina non-Leveed Area [Single Family Home (SFH)] risk (Pages 1-2)," "Michigan non-Leveed Area SFH risk (Pages 3-4)," "California Leveed Area SFH risk (Pages 5-6)," and "South Carolina non-Leveed Area Residential Unit risk"); *see also id.* at 21–23 (explaining the worksheets in greater detail).

[6] What FEMA does have is a quotes database with all the data that would go into premium calculations for individual policies, with the information of millions of NFIP policyholders. That database, and the individualized information, contains significant personally identifiable information subject to FOIA Exemption 6

The website identified is not a FEMA website.

17. The fifth category of record that Plaintiffs and Dr. Suhayda identify is "[r]edacted copies of all technical reports and communications by any consultants who completed any modeling to either FEMA or Milliman that included FEMA inputs or was selected by FEMA as part of the Risk Rating 2.0 premium calculation, including, but not limited to: a. Atkins; b. Mapping Data Integration Model Documentation Version 2.0 (February 13, 2020); c. KatRisk Data and Technical Documentation (February 2018); d. AIR Inland Flood Model for the United States (June 2016); e. AIR Hurricane Model for the United States (June 2017); and f. RQE v. 18.0 US Flood Model Principles and Methodology (July 2018)." Technical reports and communications related to modeling do not constitute catastrophe modeling data for premium calculations. This information is instead background and user documentation on the models.

- Moreover, the documentation in categories a, c–f is all proprietary information of the third-party modelers. The modelers have each explained, including in their declarations submitted in this case (ECF Nos. 31-6–31-10), that they safeguard proprietary information regarding their models, including model documentation, from disclosure. The vendors do so to prevent competitors from exploiting their intellectual property and protect against other related financial harms. The critical commercial and confidential interests that each vendor has in their proprietary information, including the model documentation that details the assumptions and algorithms of each model, are fully covered in the declarations previously submitted in this case. Plaintiffs have informed FEMA multiple times that they do not seek proprietary information.

- Category b., Mapping Data Integration Model Documentation Version 2.0 (February 13, 2020), is documentation for a FEMA model. The documentation is unfinished, so, were

7

Plaintiffs to specifically request it in a properly submitted FOIA request, this documentation would likely need to be withheld under Exemption 5.

18. The sixth category of record that Plaintiffs and Dr. Suhayda identify is "Any documentation confirming the list of levees in the Parish considered as part of the Risk Rating 2.0 and reasons for exclusion of any levees." Levee data is not catastrophe modeling data, for the reasons discussed above.[7] Moreover, FEMA does not have the documentation that Plaintiffs request. FEMA does not itself decide to include or not include certain levees as part of Risk Rating 2.0. As FEMA explains at pages 6–9 in its public *Levees in Risk Rating 2.0* document, FEMA instead relied on the National Levee Database,[8] which is developed and maintained by the U.S. Army Corps of Engineers, to include all known and available levee data at the time that the data is extracted to use for modeling. Specifically, the document states at page 8 that, "[f]or Risk Rating 2.0, levee risk reduction benefits were considered for every feature identified as a levee system in the NLD in early March 2020." In other words, FEMA did not exclude (or have reason to exclude) any levees from Risk Rating 2.0; it simply relied on and included in Risk Rating 2.0 all levees in the Army Corps' data extract from the National Levee Database. Additionally, the list of all levees included in Risk Rating 2.0 is available online via the *Risk Rating 2.0 Methodology and Data Sources – Appendix D Rating Factors*.[9]

---

[7] FEMA's public explanation of levee data in Risk Rating 2.0, titled *Levees in Risk Rating 2.0* (available here https://www.fema.gov/sites/default/files/documents/FEMA_Levees-in-Risk-Rating-2.0_2_22.pdf) makes this clear at page 2 by distinguishing between levee data and catastrophe modeling in Risk Rating 2.0.

[8] The U.S. Army Corps of Engineers National Levee Database can be found here: https://levees.sec.usace.army.mil/.

[9] FEMA's list of levees used in Risk Rating 2.0 can be found on the tab "Levee Quality-IF" available here: fema_appendix-d-rating-factor-tables_02242023.xlsx (live.com).

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 5th day of August 2024.

NAOMI S ONDRICH
Digitally signed by NAOMI S ONDRICH
Date: 2024.08.05 06:50:22 -04'00'

Naomi Ondrich ACAS, MAAA
Branch Chief, Actuarial and Catastrophic Modeling